IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 2 1 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

EQUITY IN ATHLETICS, INC.,          )
                                    )
        Plaintiff,                  )          Civil Action No. 5:07CV00028
                                    )
v.                                  )          **MEMORANDUM OPINION**
                                    )
DEPARTMENT OF EDUCATION, et al.,    )          By: Hon. Glen E. Conrad
                                    )          United States District Judge
        Defendants.                 )

Equity in Athletics, Inc. ("Equity") is a not-for-profit Virginia nonstock corporation,

whose members include coaches, student-athletes, fans, booster clubs, parents, save-our-sport

groups, and/or alumni, affiliated with certain Virginia colleges and universities, including James

Madison University ("JMU"). In this action for declaratory and injunctive relief, Equity

challenges interpretive guidelines implementing Title IX of the Education Amendments of 1972,

20 U.S.C. §§ 1681-1688 ("Title IX"), on the grounds that they violate the Constitution, Title IX,

and the Administrative Procedure Act ("APA"). Equity alleges that these interpretive guidelines,

namely the 1979 Policy Interpretation ("Three-Part Test") and its 1996, 2003, and 2005 Policy

Clarifications, authorize or mandate the very discrimination that Title IX prohibits, by permitting

institutions to engage in the gender-conscious capping or cutting of male athletic programs.

Equity seeks declaratory and injunctive relief to vacate the allegedly unlawful guidelines and to

require the United States Department of Education ("DOE") to issue new rules consistent with

Title IX and the Constitution.

        Subsequent to the filing of this action, Equity amended its complaint to include JMU and

certain JMU officials as defendants and to directly challenge JMU's decision to eliminate ten

athletic programs. Equity alleges that the decision to eliminate the men's swimming and diving, track and field, cross country, and wrestling programs impermissibly discriminates against men, in violation of Title IX, the Equal Protection Clause of the Fourteenth Amendment, the Constitution of Virginia, and the Virginia Human Rights Act. Equity further alleges that the decision to eliminate the men's and women's archery and gymnastics programs, and the women's fencing program, constitutes arbitrary discrimination in violation of the substantive due process protections of the Constitution of the United States and the Constitution of Virginia. In addition to filing an amended complaint, Equity filed a motion for preliminary injunction, directed solely at JMU, seeking to prevent the university from taking additional steps to eliminate the aforementioned athletic programs.

The case is presently before the court on Equity's motion for preliminary injunction. The court held a hearing on the motion on July 19, 2007. For the following reasons, the motion will be denied.

## Factual and Procedural Background

During the 2006-2007 academic year, JMU fielded men's and women's archery, men's baseball, men's and women's basketball, men's and women's cross country, women's fencing, women's field hockey, men's football, men's and women's golf, men's and women's gymnastics, women's lacrosse, men's and women's soccer, women's softball, men's and women's swimming and diving, men's and women's tennis, men's and women's track and field, women's volleyball, and men's wrestling. On September 29, 2006, JMU's Board of Visitors voted to downsize the university's athletic department to attain proportionality between the

2

gender makeup of its athletic programs and that of its undergraduate enrollment. As reported in

the approved minutes, the Board of Visitors took the following action:

> On motion of Mr. Rivers, seconded by Mr. Foster[,] approved the elimination of the following men's sports: archery, cross country, gymnastics, indoor track, outdoor track, swimming and wrestling; and the following women's sports: archery, fencing, and gymnastics to be in compliance with the proportionality test of Title IX.

(Equity Hearing Ex. M.)

That same day, JMU issued a press release, which read as follows:

> James Madison University's Board of Visitors voted today to approve a plan to bring the JMU Athletics program into compliance with Title IX.
>
> The plan will take effect July 1, 2007, when the following varsity teams will be eliminated:
>
> **Men's**
> Archery
> Cross Country
> Gymnastics
> Indoor Track
> Outdoor Track
> Swimming
> Wrestling
>
> **Women's**
> Archery
> Fencing
> Gymnastics
>
> With 28 varsity teams, the JMU Athletics program ties for the rank of seventh in terms of the number of teams among all 327 Division I schools nationally.
>
> "The JMU Athletics program is unusually large for a public university of our size," said Joseph Damico, rector of the JMU Board of Visitors. "With so many teams, we faced an

3

insurmountable challenge coming into compliance with Title IX. Fundamentally, that is why the Board voted today for this plan."

The proportionality requirements of Title IX mandate that collegiate athletics programs mirror each school's undergraduate population in terms of gender. As of the fall semester 2006, JMU's proportions place it fundamentally out of compliance with federal law:

**Overall Enrollment**
Female 61%
Male 39%

**Athletics Participation**
Female 50.7%
Male 49.3%

Jeff Bourne, JMU athletics director, said, "We explored every avenue in search of an alternative to this action. Lamar Daniel, a well-known consultant on Title IX compliance, has worked closely with us and he believes that this plan is our most viable alternative for reaching compliance with Title IX. "

Once this plan is fully implemented, total participation in athletics will move to 61 percent female and 39 percent male, in alignment with current student enrollment. The university will then have 18 intercollegiate sports:

**Men's**
Baseball
Basketball
Football
Golf
Soccer
Tennis

**Women's**
Basketball
Cross Country
Field Hockey
Golf
Lacrosse
Soccer

4

Softball
Swimming
Tennis
Track, Indoor
Track, Outdoor
Volleyball

This decision affects 144 student-athletes currently participating in these sports, as well as three full-time and eight part-time coaches. "Now that the Board has voted to enact this plan, our main concern is with our affected student-athletes and coaches," said Bourne. "We are taking great care to preserve the financial guarantees already made to our student-athletes. If you are a student-athlete on an affected team and you are receiving a scholarship, you will continue to receive that scholarship until you graduate."

Currently, eight students on the rosters of the 10 affected teams receive a total of $13,500 in scholarships. Access to sports-medicine and academic-advising programs also will be available to them. Any affected student-athletes who decide to transfer to another program will be provided with full assistance regarding the transfer process. Affected coaches will receive severance packages appropriate to the university's policies and procedures.

All of the financial resources recovered from the implementation of this plan will be redirected to provide the full complement of NCAA scholarships for women's golf, tennis and swimming. Partial scholarship funding will return to men's golf and tennis, with a plan to enhance to full funding by 2011.

(Amend. Compl. Ex. 3.)

On February 8, 2007, JMU issued a "Title IX Statement." That statement explained as

follows:

The decision to eliminate ten sports at the university was difficult for the board of visitors and the administration. Alternatives were proposed, considered, and analyzed to deal with the need to come into compliance with Title IX. Unfortunately, 144 students and 11 coaches are adversely affected by this decision. The primary reason for the decision was to bring JMU into compliance with the law. Any solution that would require the addition of sports beyond the

5

current 28 teams was deemed unacceptable. Although we regret the elimination of these 10 teams, as of July, 2007, the university will continue to manage and support a comprehensive intercollegiate athletic program of 18 sports.

Institutions may demonstrate compliance with Title IX by satisfying one of three "prongs" delineated by the Office of Civil Rights. The first test requires the university to demonstrate that its ratio of male to female students is mirrored in its ratio of male to female athletes. The second test requires the university to "demonstrate a history and continued practice of program expansion for the underrepresented sex." The third test requires the university to "fully and effectively accommodate the interests and abilities of the underrepresented sex."

It was the judgment of the administration and the board of visitors that the institution could not/would not satisfactorily meet the second or third test. The university could not demonstrate a history or continued pattern of program expansion to accommodate the needs of the under-represented gender, having added only one women's sport since 1990. And, while a survey is one tool to determine interest, we are already aware of student interest in varsity status, which the Office of Civil Rights has indicated is a sufficient indicator of un-met interest. Given its commitment to not add sports and its desire to be in compliance with Title IX, the university was left with the need to comply with the proportionality prong.

Three of the sports that will be eliminated as varsity sports were women's teams. In addition to achieving compliance with Title IX, sustainability of the existing teams was an issue that had to be addressed by the university. None of the eliminated women's teams are conference sports. JMU is one of only 2 Division I schools in the country that has a varsity archery team. In addition, the NCAA does not sponsor a national championship in archery. The fencing team has faced difficulty maintaining enough participants to qualify for NCAA competition, and has had 4 coaches in the past 5 years. Only one other state institution in the Commonwealth has a varsity gymnastics team, so the majority of competitions are outside the conference and the state. These issues made continuation of archery, fencing and gymnastics as varsity sports unrealistic.

6

It has been suggested that the implications of the board's decision would be that only 6 scholarships are available for men's tennis, soccer, baseball and golf. This is not accurate. Proportionality of scholarship dollars is calculated relative to roster size and headcount, not relative to opportunities for participation. Teams must meet roster numbers to compete, and they cannot exceed scholarship numbers set by the NCAA.

The $550,000 previously allocated to the eliminated sports will be used to fully fund the remaining women's sports and to partially fund the men's golf and tennis teams. This means that men's tennis and golf scholarships will actually increase, and men's soccer and baseball will remain unchanged.

While some student-athletes may choose to transfer to another institution, those students who are interested will have the opportunity to continue their athletic endeavors at the club level. In some cases, clubs already exist that are associated with a particular sport. In other cases, we encourage the creation of such a club. The Athletic Department has recommended that the university provide funding to the associated clubs over the next three years to facilitate the transition to club status.

Again, while the board and the administration regret that this difficult decision had to be made, the information available to us indicated that this was the most viable alternative for the continuation of the Athletics program at JMU.

(Amend. Compl. Ex. 4.)

Equity filed its original complaint on March 19, 2007. By letter dated March 23, 2007, Equity advised JMU of the legal issues raised in the original complaint, and requested that JMU defer implementing the planned cuts pending the resolution of the instant action. On April 4, 2007, JMU declined Equity's request to postpone the elimination of the selected athletic programs. Equity subsequently filed an amended complaint, naming JMU as a defendant, on

7

June 1, 2007. On June 15, 2007, Equity filed its motion for preliminary injunction, which is presently before the court.

The court held a hearing on Equity's motion on July 19, 2007. On August 1, 2007, Equity filed a motion for leave to file a post-hearing brief. The court granted the motion, and the post-hearing brief was filed on that same date. The JMU defendants filed a response to Equity's post-hearing brief on August 6, 2007, and the DOE defendants filed a response on August 8, 2007. Equity's motion for preliminary injunction is now ripe for review.

## Statutory and Regulatory Background

### A. Title IX

"Enacted in response to evidence of 'massive, persistent patterns of discrimination against women in the academic world,'" National Wrestling Coaches Ass'n v. Dept. of Educ., 366 F.3d 930, 934 (D.C. Cir. 2004) (quoting 118 Cong. Rec. 5,804 (1972) (statement of Sen. Bayh)),[1] Title IX prohibits educational institutions that receive federal financial support from engaging in sex-based discrimination. See Education Amendments of 1972, Pub. L. No. 92-318, Title IX, §§ 901-907, 86 Stat. 235, 373-375 (codified at 20 U.S.C. § 1681, et seq.). Section 901(a) provides that "no person in the United States shall, on the basis of sex, be excluded from

---

[1] See also Neal v. Bd. of Tr. of the Cal. State. Univ., 198 F.3d 763, 766 (9th Cir. 1999) ("Title IX was Congress's response to significant concerns about discrimination against women in education."); Cohen v. Brown Univ., 991 F.2d 888, 901 (1st Cir. 1993) ("Congress [held] 'extensive hearings on higher education' when Title IX was pending, in the course of which 'much testimony was heard with respect to discrimination against women in our institutions of higher education.'") (quoting H.R. Rep. No. 554, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 2462, 2511).

8

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Section 901(b), in turn, provides as follows:

> Nothing contained in [section 901(a)] shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any supported program or activity, in comparison with the total number or percentage or that sex in any community, State, section or other area: Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this title of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b).

Section 902 of the statute "authorize[s] and direct[s]" each agency empowered to extend financial assistance to any educational program or activity "to effectuate the provisions of section 901 with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 20 U.S.C. § 1682. The statute further provides that "[n]o such rule, regulation, or order shall become effective unless and until approved by the President." Id.

"After Title IX was passed, there were efforts to limit the effect of the statute on athletics programs." McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 287 (2d Cir. 2004). In 1974, Senator John Tower proposed an amendment that would have exempted revenue-producing intercollegiate sports from Title IX's coverage. Id. (citing 120 Cong. Rec. 15,322-15,323 (1974)). However, this proposed amendment was not enacted. Id. Instead, "[l]ater that

9

year, Congress enacted a provision known as the Javits Amendment, which instructed the Secretary of Health, Education, and Welfare ('HEW') to 'prepare and publish . . . proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition on sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.'" Id. (quoting Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974)).

**B.      HEW's 1975 Implementing Regulations**

On June 20, 1974, HEW, the DOE's predecessor, published proposed regulations implementing Title IX in the Federal Register, which contained provisions addressing Title IX's application to athletic programs and provided an opportunity for public comment. 39 Fed. Reg. 22,227, 22,236 (June 20, 1974). After considering over 9,700 comments, suggestions, and objections, HEW published final regulations implementing Title IX on June 4, 1975. 40 Fed. Reg. 24,128 (June 4, 1975). The regulations were approved by President Gerald Ford. 40 Fed. Reg. at 24,137. Once the regulations were published by HEW, Congress had forty-five days to disapprove them. McCormick, 370 F.3d at 287 (citing 40 Fed. Reg. at 24,128). "During this time, Congress held hearings on the regulations over the course of six days." Id. (citing Sex Discrimination Regulations: Hearings before the Subcomm. on Postsecondary Educ. of the House Comm. on Educ. and Labor, 94th Cong. 1975)). The regulations went into effect on July 21, 1975, "after Congress declined to disapprove them." Id. (citing 40 Fed. Reg. at 24,137).

The regulations prohibit sex-based discrimination in any interscholastic, intercollegiate, club, or intramural athletic program offered by a recipient of federal funds. 45 C.F.R. § 86.41(a)

10

(subsequently codified at 34 C.F.R. § 106.41(a)) ("1975 Regulations"). While the regulations explicitly authorize recipients to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 45 C.F.R. § 86.41(b); 34 C.F.R. § 106.41(b), the regulations require recipients to "provide equal athletic opportunity for members of both sexes." 45 C.F.R. § 86.41(c); 34 C.F.R. § 106.41(c). The regulations specify ten factors, among others, that must be considered in determining whether equal opportunities are available. Id. The first of those ten factors, which lies at the heart of this action, is "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." Id.

### C.  The 1979 Policy Interpretation

On December 11, 1978, HEW published a Proposed Policy Interpretation for public comment. 43 Fed. Reg. 58,070, 58,071 (Dec. 11, 1978). At that time, HEW had received nearly 100 complaints against more than 50 colleges. Id. Consequently, HEW designed the Policy Interpretation to "provide a framework within which those complaints [could] be resolved, and to provide institutions of higher education with additional guidance on the requirements of the law relating to intercollegiate athletic programs." Id.

Following the publication of the Proposed Policy Interpretation, HEW received over 700 comments and visited eight universities "to see how the proposed policy and other suggested alternatives would apply in actual practice at individual campuses." 44 Fed. Reg. 71,413, 71,413 (Dec. 11, 1979). On December 11, 1979, HEW published a Final Policy Interpretation, the general purposes of which included "clarif[ying] the meaning of 'equal opportunity' in intercollegiate athletics . . . [and] provid[ing] guidance to assist institutions in determining

11

whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory." Id. at 71,414. Of particular importance here, the Policy Interpretation contains the following guidance with respect to the regulatory requirement that educational institutions "effectively accommodate the interests and abilities of members of both sexes":

> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.
>
> a. Compliance will be assessed in any one of the following ways:
>
> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest[s] and abilities of the members of that sex; or
>
> (3) Where members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

Id. at 71,418. These three methods of assessing compliance subsequently became known as the "Three-Part Test."

### D. The Department of Education Organization Act

In 1979, Congress divided HEW into the Department of Health and Human Services ("HHS") and the Department of Education ("DOE"). See Department of Education Organization

12

Act, Pub. L. No. 96-88, 93 Stat. 669 (1979) (codified at 20 U.S.C. §§ 3401-3510). "HEW's functions under Title IX were transferred . . . to the Department of Education," N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 517 n.4 (1982) (citing 20 U.S.C. § 3441(a)(3)), and the regulations implementing Title IX were subsequently recodified without substantive change at 34 C.F.R. Part 106.[2] The regulations governing athletics have remained in effect without substantive change since that time. The DOE is the "princip[al] locus of ongoing enforcement activity," Cohen v. Brown University, 991 F.2d 888, 895 (1st Cir. 1988), and courts "treat [the DOE] as the administrative agency charged with administering Title IX," McCormick, 370 F.3d at 287 (citing Id.).

E.    **The Civil Restoration Act of 1987**

In 1984, the United States Supreme Court held that Title IX was "program-specific," in that the receipt of grants by some students at Grove City College did not trigger institution-wide coverage under Title IX, and that only the financial aid program could be regulated under Title IX. Grove City College v. Bell, 465 U.S. 555, 573-574 (1984). In response, Congress passed the Civil Restoration Act of 1987, Pub L. No. 100-259, 102 Stat. 28 (1988) (codified as amended at

_____

[2] The Department of Education Organization Act expressly provides that:

> All orders, determinations, rules, [and] regulations . . . which have been issued, made, granted, or allowed to become effective by the President, [or] any Federal department or agency or official thereof, . . . in the performance of functions which are transferred under this Act to the Secretary or the Department, and . . . which are in effect at the time this Act takes effect, shall continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with the law by the President, the Secretary, or other authorized official . . . .

20 U.S.C. § 3505(a) (emphasis added).

13

20 U.S.C. § 1687), which reestablished institution-wide coverage of Title IX.  Specifically, the

Act provides that an educational institution as a whole must comply with Title IX's requirements,

if any part of the institution receives federal funds.  Id.  Thus, the Act "mak[es] it crystal clear

that Title IX applies to athletic programs operated by any school receiving federal funding for

any of its educational programs and activities, and not just to those athletic programs which

directly received federal funds."  National Wrestling Coaches Ass'n v. United States Dep't. of

Educ., 263 F. Supp. 2d 82, 94 (D. D.C. 2003).

### F.      The 1996 Clarification

On September 20, 1995, in response to questions about the regulations implementing

Title IX and the 1979 Policy Interpretation, the DOE released a letter from Norma V. Cantu, the

DOE's Assistant Secretary for Civil Rights.  The "Dear Colleague" letter enclosed a Draft

Clarification of portions of HEW's 1979 Policy Interpretation and asked for comments as to

whether the clarification "provides the appropriate clarity in areas that have generated questions."

(DOE Initial Brief, Ex. 1.)  The letter was circulated to over 4,500 interested parties.  In addition,

the DOE published a Notice in the Federal Register announcing the availability of the Draft

Clarification.  60 Fed. Reg. 51,460 (Oct. 2, 1995).  After reviewing over 200 public comments,

the DOE released a final version of the Clarification on January 16, 1996.  (Equity Initial Brief,

Ex. S.)

The letters transmitting both the draft and final versions of the Clarification emphasized

that the DOE was providing additional clarification on, not revisiting, the Three-Part Test.  The

Clarification provides specific factors that guide an analysis of each part of the Three-Part Test,

as well as examples to demonstrate how these factors will be considered.  The Clarification

confirms that institutions need to comply only with any one part of the Three-Part Test to provide

non-discriminatory participation opportunities for individuals of both sexes, and the letters

accompanying both the draft and final versions of the Clarification emphasized that institutions

are not required to cap or eliminate participation opportunities for men.

### G.    The 2003 Further Clarification

The DOE issued a Further Clarification of Intercollegiate Athletics Policy Guidance

Regarding Title IX Compliance on July 11, 2003.  (Equity Initial Brief Ex. U.)  In the Further

Clarification, the DOE emphasizes the flexibility of the Three-Part Test, and clarifies that

nothing in Title IX or the Three-Part Test requires the cutting or reduction of men's teams or the

use of quotas.  The DOE encourages schools to take advantage of the Three-Part Test's flexibility

and to determine which part best suits their individual situations.  The DOE also emphasizes that

the reduction of men's teams is a disfavored practice.

### H.    The 2005 Additional Clarification

On March 17, 2005, the DOE issued an Additional Clarification to explain some of the

factors it considers when investigating a recipient's program in order to make a determination

under the third prong of the Three-Part Test.  (DOE Initial Brief, Subst. Ex. 4.)  In the Additional

Clarification, the DOE reiterates that each part of the three-part test is an equally sufficient and

separate method of complying with Title IX.

### Equity's Claims

Equity's amended complaint includes the following claims: (1) the Three-Part Test

unlawfully establishes a disparate impact standard and unlawfully authorizes intentional

discrimination in violation of the equal protection component of the Due Process Clause of the

15

Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment, Title IX, and the Title IX regulations; (2) the Three-Part Test and its subsequent Clarifications unlawfully amended the Title IX regulations without the required notice and comment rulemaking; (3) the Three-Part Test, its subsequent Clarifications, and the DOE's Title IX regulations are not in effect, because they were not approved by the President; and (4) the JMU athletic cuts are substantively and procedurally unlawful. Specifically, with respect to its fourth claim, Equity alleges that the JMU defendants eliminated ten athletic teams for the express purpose of attaining enrollment proportionality, in violation of Title IX's statutory and regulatory requirements, the Virginia Human Rights Act, and the substantive due process and equal protection provisions of both the Constitution of the United States and the Constitution of Virginia.

### Equity's Motion for Preliminary Injunction

As previously stated, Equity seeks a preliminary injunction preventing JMU from taking additional steps to eliminate the selected athletic programs. The court held a hearing on Equity's motion on July 26, 2007. During the hearing, the court received affidavits and exhibits into evidence; heard testimony from Jennifer Chapman, a JMU student-athlete who graduated in May of 2007, and Coach Bill Walton, the director of JMU's track and field program; and heard arguments from Equity, the JMU defendants, and the DOE defendants.

### A.     Legal Standard

A preliminary injunction is considered "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir.

16

1989)). In deciding whether to grant a preliminary injunction, courts in the Fourth Circuit use the test set forth in <u>Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.</u>, 550 F.2d 189 (4th Cir. 1977). <u>See</u> <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 271 (4th Cir. 2002). This test requires courts to consider four factors: (1) the likelihood of irreparable harm to the plaintiff if preliminary injunctive relief is denied; (2) the likelihood of harm to the defendants if the requested relief is granted; (3) the plaintiff's likelihood of succeeding on the merits of the action; and (4) the public interest. <u>Direx Israel, Ltd.</u>, 952 F.2d at 812; <u>see also</u> <u>Blackwelder</u>, 550 F.2d at 193-95.

The plaintiff bears the burden of establishing that these factors support granting a preliminary injunction. <u>Direx Israel, Ltd.</u>, 952 F.2d at 812. The first two factors are the most important. <u>Id.</u> at 817. "If the hardship balance tilts sharply and clearly in the movant's favor, the required proof of likelihood of success is substantially reduced." <u>Id.</u> On the other hand, "if the balance of hardships is substantially equal as between the plaintiff and defendant[s], then 'the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success.'" <u>Scotts Co.</u>, 315 F.3d at 271 (quoting <u>Direx</u>, 952 F.2d at 808).

**B.**     **Application**

      **1.**     **Balance of the Harms**

The first factor in the <u>Blackwelder</u> test controls the court's initial inquiry: "the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the

injunction is denied."[3] Id. at 271. Such "irreparable harm" must be both actual and imminent and can be neither remote nor speculative. Direx, 952 F.2d at 812.

In addressing this issue, Equity presented evidence of the harm that would be inflicted upon student-athletes whose teams were chosen for elimination, as well as the harm that would be inflicted upon athletes on the continuing women's swimming and diving ("swimming") and track and field ("track") teams.

For those students whose teams were chosen for elimination, the harm that will be suffered if the preliminary injunction is not granted is that they will be unable to complete their intercollegiate athletic careers at JMU, the school of their choice. Those athletes who are on athletic scholarships will not lose them and, like some athletes have chosen to do, they are free to transfer to other colleges or universities who offer their particular intercollegiate athletic programs. This is not to downplay the anger and heartbreak that was obviously felt by athletes whose teams were chosen for elimination or to suggest that transferring provides a simple or ideal solution. Indeed, the athletes' desire to complete their undergraduate education and intercollegiate athletic careers at JMU is completely understandable. However, "Title IX does not establish a right to participate in any particular sport in one's college and there is no

_____

[3] The court notes that in response to Equity's motion for preliminary injunction, the JMU defendants suggest that Equity's delay in seeking preliminary injunctive relief, alone, provides a sufficient basis for denying the motion. The court disagrees with this proposition. The Fourth Circuit has indicated that "any delay attributable to plaintiffs in initiating a preliminary injunction request, coupled with prejudicial impact from the delay, should be considered when the question of irreparable harm to plaintiffs is balanced against harm to defendants." Candle Factory, Inc. v. Trade Assocs. Group, 23 Fed. Appx. 134, 138 (4th Cir. 2001) (explaining Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989). However, the Fourth Circuit has emphasized that courts are "not require[d] . . . to find, as a matter of law, that the plaintiff suffered no irreparable injury because it delayed in initiating its request for a preliminary injunction." Id. Thus, while the court will consider the effects of any delay attributable to Equity in balancing the harms to the parties, the court will not deny Equity's motion solely on the basis of such delay.

18

constitutional right to participate in intercollegiate . . . athletics." Gonyo v. Drake Univ., 837 F.

Supp. 989, 994 (S.D. Iowa 1993); see also Miami Univ. Wrestling Club v. Miami Univ., 302

F.3d 608, 615 (6th Cir. 2002).

Although the court believes that the evidence of harm to athletes on the eliminated

teams is very compelling, the court also heard moving testimony from Jennifer Chapman, a

recent JMU graduate and former captain of the women's cross country team. Chapman

described, in detail, the harm that would be inflicted upon athletes on the continuing women's

swimming and track teams. Chapman emphasized that the men's and women's swimming and

track teams compete and travel together, and that each program is essentially "one big family."

Chapman also emphasized that the track program's throws coach and pole vault coach had been

eliminated as a result of the cuts, and that the remaining women would lose the benefit of

training with male athletes. Additionally, Chapman testified that the elimination of the men's

swimming and track teams would impact the school's ability to recruit female swimmers and

track athletes.

On the other side of the scale, while the court disagrees with the JMU defendants'

proposition that Equity's delay, alone, provides a sufficient basis for denying the instant motion,

see footnote 3, supra, the court cannot simply ignore the period of delay between the Board of

Visitors' decision and the filing of this action. See Quince Orchard Valley Citizens Ass'n, Inc. v.

Hodel, 872 F.2d 75, 80 (4th Cir. 1989) (explaining that while "a particular period of delay may

not rise to the level of laches and thereby bar a permanent injunction," any delay attributable to

the plaintiff in initiating a preliminary injunction may be considered when balancing the harm to

the plaintiff against the harm to the defendants). More than five months elapsed between the date

19

of the Board of Visitors' decision and the date on which this action was filed, and nearly three months elapsed between the filing of the original complaint and the filing of the motion for preliminary injunction. During this period of delay, the university took a number of actions that it normally would not have taken, and did not take a number of actions that it normally would have taken, based on the fact that certain athletic programs would no longer exist on July 1, 2007. Several coaches have been terminated, competitions have been cancelled, and funds totaling nearly $350,000 from the eliminated programs have been reallocated to other programs for coaching salaries and scholarships.[4] Additionally, no further competitions have been scheduled for the eliminated athletic programs, no athlete recruitment has taken place for the eliminated programs, and no efforts have been made to establish the eligibility of the eliminated programs or their athletes. While Coach Walton heavily downplayed the significance of some of the administrative hurdles that JMU would face if the university was ordered to reinstate the eliminated programs, and opined that the eliminated programs could be reinstated without any insurmountable problems, granting the preliminary injunction would nonetheless override the university's own judgment as to how to apportion its resources and what its athletic offerings will be. While "[a]cademic freedom, of course, does not immunize defendants from civil liability, including injunctive relief, for any violations of the law, . . . courts should be very cautious about overriding, even temporarily, a school's decisions [as to its athletic offerings], especially absent a showing that plaintiffs are likely to ultimately prevail." Gonyo, 837 F. Supp. at 994.

In applying the Blackwelder test, the "[w]eighing of harms is no simple task." Direx, 952 F.2d at 812. This is especially true in this case, given the particular nature of the harms at issue.

_____

[4] The court notes that additional funds from the eliminated programs are available for club team sponsorships.

While the harms identified by Equity may indeed be more emotionally compelling, the court is unable to conclude that the balance of hardships "tilt[s] decidedly" in favor of Equity. Id. at 818. Consequently, "a strong showing of likelihood of success" on the merits is required. Id.

### 2. Likelihood of Success

In addressing Equity's likelihood of success on the merits, the court must first recognize that a number of Circuits have addressed many of the same issues raised by Equity, namely whether the Three-Part Test set forth in the 1979 Policy Interpretation violates Title IX or the applicable regulations; whether the Three-Part Test is entitled to deference; and whether the proportionality prong of the Three-Part Test offends constitutional principles of equal protection.

"Every court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender (men in this case)." Neal v. Bd. of Tr. of the Cal. State Univ., 198 F.3d 763, 769-770 (9th Cir. 1999); see also Cohen v. Brown Univ., 991 F.2d 888, 898 n.15 (1st Cir. 1993) ("Cohen I") ("Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent)."); Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 830 (10th Cir. 1993) ("We recognize that in times of economic hardship, few schools will be able to satisfy Title IX's effective accommodation requirement by continuing to expand their women's athletics programs . . . . Financially strapped

21

institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population."); Kelley v. Board of Trustees, 35 F.3d 265, 272 (7th Cir. 1994) ("And despite plaintiffs' assertions to the contrary, neither the regulation nor the policy interpretation run afoul of the dictates of Title IX."); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002) (holding that the decision to eliminate men's athletic programs did not violate Title IX, since "[t]he statute focuses on opportunities for the underrepresented gender, and does not bestow rights on the historically overrepresented gender, and it is well-established that classification by gender is not a per se violation of Title IX"); Chalenor v. Univ. of North Dakota, 291 F.3d 1042 (8th Cir. 2002) ("[A]lthough Title IX does not require proportionality, the statute does not forbid it either. And the gender make-up of athletic participation is certainly relevant to a determination of whether a school is in compliance with Title IX.").

Additionally, every Circuit, in reviewing the Three-Part Test set forth in the 1979 Policy Interpretation, has concluded that it is entitled to substantial deference, since it is an agency's considered interpretation of its own regulations. See Cohen I, 991 F.2d at 896-897; Roberts, 998 F.2d at 828; Kelley, 35 F.3d at 271; Cohen v. Brown University, 101 F.3d 155, 173 (1st Cir. 1996) ("Cohen II"); Neal, 198 F.3d at 770; Miami Univ. Wrestling Club, 302 F.3d at 615.

Likewise, every Circuit, which has considered the constitutionality of the proportionality prong of the Three-Part Test, has held that it does not offend constitutional principles of equal protection. In Cohen I, 991 F.2d 888, the "watershed" case involving Title IX and university athletics, Brown University appealed from the district court's issuance of a preliminary

22

injunction ordering Brown to reinstate its women's gymnastics and volleyball programs, pending

the resolution of the plaintiffs' claim that the proposed cutbacks violated Title IX. Cohen I, 991

F.2d at 891. Brown challenged the validity of the 1979 Policy Interpretation, arguing that the

Three-Part Test violates the Fifth Amendment's Equal Protection Clause. Id. at 901. The First

Circuit ultimately rejected this argument, explaining as follows:

> What is more, even if we were to assume, for argument's sake, that the regulation creates a gender classification slanted somewhat in favor of women, we would find no constitutional infirmity. It is clear that Congress has broad powers under the Fifth Amendment to remedy past discrimination. See, e.g., Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 110 S. Ct. 2997, 3009, 111 L. Ed. 2d 445 (1990) (noting that Congress need not make specific findings of discrimination to grant race-conscious relief); Califano v. Webster, 430 U.S. 313, 317, 51 L. Ed. 2d 360, 97 S. Ct. 1192 (1977) (upholding social security wage law that benefitted women in part because its purpose was "the permissible one of redressing our society's longstanding disparate treatment of women"). Despite the little legislative history regarding discrimination in collegiate athletics that emerged during the consideration of Title IX, Congress did hold "extensive hearings on higher education" when Title IX was pending, in the course of which "much testimony was heard with respect to discrimination against women in higher education." H.R. Rep. No. 554, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 2462, 2511. Athletics featured even more prominently in Congress's decision to reverse the Grove City rule. See supra pp. 8-9. Under these circumstances, we find Brown's plaint unbecoming.

Id. at 901.

The First Circuit revisited the same issues in Cohen v. Brown University, 101 F.3d 155

(1st Cir. 1996) ("Cohen II"), after the district court determined, following a bench trial, that

Brown's intercollegiate athletics program violated Title IX and its supporting regulations, and

ordered Brown to maintain certain women's teams at the varsity level. In Cohen II, Brown again

challenged, on constitutional and statutory grounds, the test employed by the district court in

23

determining whether Brown's intercollegiate athletics program complied with Title IX. <u>Cohen</u>

<u>II</u>, 101 F.3d at 162. To the extent that Brown challenged the test itself, the Court held that the

challenge was foreclosed by the law of the case doctrine. <u>Id.</u> However, the Court determined

that it could review the constitutionality of the district court's remedial order, and ultimately held

that the order withstood intermediate scrutiny. <u>Id.</u> In reaching this decision, the Court went on to

emphasize as follows:

> As explained previously, Title IX as it applies to athletics is
> distinct from other anti-discrimination regimes in that it is
> impossible to determine compliance or to devise a remedy without
> counting and comparing opportunities with gender explicitly in
> mind. Even under the individual rights theory of equal protection,
> reaffirmed in <u>Adarand</u>, [515 U.S. at 227], 115 S. Ct. at 2112 (the
> equal protection guarantee "protects persons, not groups"), the only
> way to determine whether the rights of an individual athlete have
> been violated and what relief is necessary to remedy the violation
> is to engage in an explicitly gender-conscious comparison.
> Accordingly, even assuming that the three-part test creates a gender
> classification that favors women, allowing consideration of gender
> in determining the remedy for a Title IX violation serves the
> important objective of "ensuring that in instances where overall
> athletic opportunities decrease, the actual opportunities available to
> the underrepresented gender do not." <u>Kelley</u>, 35 F.3d at 272. In
> addition, a gender-conscious remedial scheme is constitutionally
> permissible if it directly protects the interests of the
> disproportionately burdened gender. <u>See</u> <u>Hogan</u>, 458 U.S. at 728
> ("In limited circumstances, a gender-based classification favoring
> one sex can be justified if it intentionally and directly assists
> members of the sex that is disproportionately burdened.").

<u>Id.</u> at 184-185.

In <u>Kelley v. Bd. of Tr., Univ. of Ill.</u>, 35 F.3d 265 (7th Cir. 1994), the plaintiffs, members

of the University of Illinois' men's swimming team, filed suit against the university's Board of

Trustees, alleging that the defendants violated Title IX and the Equal Protection Clause of the

Fourteenth Amendment, by voting to terminate the swimming team and three other varsity

24

athletic programs. To the extent that the plaintiffs challenged the constitutionality of Title IX,

the applicable regulations, and the 1979 Policy Interpretation, themselves, the Seventh Circuit

rejected the plaintiffs' argument, explaining as follows:

> While the effect of Title IX and the relevant regulation and policy
> interpretation is that institutions will sometimes consider gender
> when decreasing their athletic offerings, this limited consideration
> of sex does not violate the Constitution. Congress has broad
> powers under the Due Process Clause of the Fifth Amendment to
> remedy past discrimination. Metro Broadcasting, Inc. v. Federal
> Communications Comm'n, 497 U.S. 547, 565-566. Even absent a
> specific finding that discrimination has occurred, remedial
> measures mandated by Congress are "constitutionally permissible
> to the extent that they serve important governmental objectives . . .
> and are substantially related to achievement of those ends. Id. at
> 565; see also Mississippi University for Women v. Hogan, 458
> U.S. 718, 728. There is no doubt but that removing the legacy of
> sexual discrimination in the provision of extracurricular offerings
> such as athletics – from our nation's educational institutions is an
> important governmental interest. We do not understand plaintiffs
> to argue otherwise.
>
> Plaintiffs' complaint appears, instead, to be that the remedial
> measures required by Title IX and the applicable regulation and
> policy interpretation are not substantially related to their purported
> goal. Plaintiffs contend that the applicable rules allow "the
> University to . . . improve[] its statistics without adding any
> opportunities for women . . ." (Br. 23), an outcome they suggest is
> unconstitutional. But to survive constitutional scrutiny, Title IX
> need not require--as plaintiffs would have us believe--that the
> opportunities for the underrepresented group be continually
> expanded. Title IX's stated objective is not to ensure that the
> athletic opportunities available to women increase. Rather its
> avowed purpose is to prohibit educational institutions from
> discriminating on the basis of sex. And the remedial scheme
> established by Title IX and the applicable regulation and policy
> interpretation are clearly substantially related to this end. Allowing
> a school to consider gender when determining which athletic
> programs to terminate ensures that in instances where overall
> athletic opportunities decrease, the actual opportunities available to
> the underrepresented gender do not. And since the remedial
> scheme here at issue directly protects the interests of the

disproportionately burdened gender, it passes constitutional muster. <u>Mississippi University for Women</u>, 458 U.S. at 728 ("[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened."); <u>see also</u> <u>Cohen</u>, 991 F.2d at 900-901 (holding that Title IX and the applicable regulation and policy interpretation do not violate the Equal Protection Clause).

<u>Kelley</u>, 35 F.3d at 271-273.

     In <u>Neal v. Bd. of Tr. of the Cal. State Univ.</u>, 198 F.3d 763 (9th Cir. 1999), the Ninth Circuit, on appeal from the grant of a preliminary injunction, considered "whether Title IX prevents a university in which male students occupy a disproportionately high percentage of athletic roster spots from making gender-conscious decisions to reduce the proportion of roster spots assigned to men." <u>Id.</u> at 765. The Court held that Title IX "does not bar such remedial actions," <u>Id.</u>, and that the 1979 Policy Interpretation does not raise serious constitutional questions, <u>Id.</u> at 772. In reaching this decision, the Court emphasized that the First and Seventh Circuits had both considered the constitutionality of the first prong of the Three-Part Test, and that both Circuits had emphatically rejected the claim that the Policy Interpretation was unconstitutional under the Fourteenth Amendment. <u>Id.</u> at 772 (citing <u>Cohen I</u>, 991 F.2d at 899; <u>Cohen II</u>, 101 F.3d at 181-184; and <u>Kelley</u>, 35 F.3d at 272-273). The Court ultimately adopted the reasoning of <u>Cohen I</u>, <u>Cohen II</u>, and <u>Kelley</u>, and held that their constitutional analyses "disposed of any serious constitutional concerns that might be raised in relation to the OCR Policy Interpretation." <u>Id.</u>; <u>see also</u> <u>Boulahanis v. Board of Regents</u>, 198 F.3d 633, 639 (7th Cir. 1999) ("[W]e repeat our holding in <u>Kelley</u> that 'while the effect of Title IX and the relevant regulation and policy interpretation is that institutions will sometimes consider gender when

26

decreasing their athletic offerings, this limited consideration of sex does not violate the Constitution.'").

In light of the existing case law on the Three-Part Test, Equity goes to great lengths to persuade the court to reject the "prior extra-circuit decisions" (Equity Initial Brief at 17.) Equity also advances new arguments as to why the Three-Part Test is procedurally invalid. However, at this stage of the litigation, the court is unable to conclude that any of Equity's arguments have a strong likelihood of success.

<u>Constitutionality of the Three-Part Test</u>

In attempting to persuade the court to reject the First Circuit's decision in <u>Cohen I</u>, the Seventh Circuit's decision in <u>Kelley</u>, and ultimately, the Ninth Circuit's decision in <u>Neal</u>, Equity emphasizes that both <u>Cohen I</u> and <u>Kelley</u> relied on the United States Supreme Court's decision in <u>Metro Broadcasting, Inc. v. Federal Communications Comm'n</u>, 497 U.S. 547, 565-566 (1990), which was partially overruled by <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 228 (1995). However, as the First Circuit explained in <u>Cohen II</u>, the proposition for which <u>Cohen I</u> and <u>Kelley</u> cited <u>Metro Broadcasting</u> as authority – the general principle that Congress has broad powers to remedy past discrimination – was not "vitiated" or even reached by <u>Adarand</u>. <u>Cohen II</u>, 101 F.3d at 182. Instead, <u>Adarand</u> solely overruled <u>Metro Broadcasting</u> to the extent that <u>Metro Broadcasting</u> was inconsistent with the holding in <u>Adarand</u> that "all <u>racial</u> classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny." <u>Adarand</u>, 515 U.S. at 227 (emphasis added).[5] Consequently, in

_____

[5] On this issue, <u>Metro Broadcasting</u> had held that race-conscious classifications adopted by Congress to address racial and ethnic discrimination are subject to a different standard than such classifications prescribed by state and local governments. <u>Metro Broadcasting</u>, 497 U.S. at 565.

27

Cohen II, the First Circuit rejected Brown's reliance on Adarand as "contrary intervening controlling authority," emphasizing that "while Adarand does make new law, the law it makes is wholly irrelevant to the disposition of this appeal . . . ." Cohen II, 101 F.3d at 181. See also Neal, 198 F.3d at 773, n.8 ("The amicus brief filed by USA Wrestling and a number of other organizations repeatedly invokes the Adarand line of cases and Title VII precedents to suggest that the scope of remedial action to correct for disparities among groups is quite limited. Those precedents are not relevant in the context of collegiate athletics.").

Along similar lines, Equity argues that the Supreme Court's recent decision in Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, __ U.S. __, 127 S. Ct. 2738, 168 L. Ed. 2d 508 (June 28, 2007), is controlling intervening authority that compels the conclusion that gender balancing, such as that provided by the first prong of the Three-Part Test, violates the Constitution's guarantee of equal protection. In Parents Involved, the Supreme Court addressed the issue of whether the Seattle, Washington public school system, which had not operated legally segregated schools in the past, or the Jefferson County, Kentucky public school system, which had been found to be unitary, "may choose to classify students by race and rely upon that classification in making school assignments." Parents Involved, 127 S. Ct. at 2746. In a 5-4 decision, the Court held that the race-based assignment plans used by both school systems violated the Constitution's guarantee of equal protection, in that the plans were not narrowly tailored to further a compelling state interest. Id. at 2751-2754, 2759-2761. Chief Justice Roberts announced the judgment of the Court, and delivered the opinion of the Court with respect to Parts I, II, III-A, and III-C, and an opinion with respect to Parts III-B and IV, in which Justices Scalia, Thomas, and Alito joined.

28

In his majority opinion, Chief Justice Roberts emphasized that racial classifications are subject to strict scrutiny, and that, "[i]n order to satisfy this searching standard of review, the school districts must demonstrate that the use of individual racial classifications in the assignment plans . . . is 'narrowly tailored' to achieve a 'compelling' government interest." Id. at 2751-2752 (quoting Adarand, 515 U.S. at 227). Although Chief Justice Roberts recognized that remedying the effects of past intentional discrimination is a compelling interest, he determined that such interest could not be relied upon by either school system, since the Seattle public school system had not operated legally segregated schools, and the desegregation decree to which the Jefferson County schools were previously subject had been dissolved. Id. at 2752. Chief Justice Roberts also held that the school systems could not rely upon the compelling interest in diversity in higher education, upheld in Grutter v. Bollinger, 539 U.S. 328 (2003), since "[t]he diversity interest [in Grutter] was not focused on race alone but encompassed 'all factors that may contribute to student body diversity.'" Id. at 2753 (quoting Grutter, 539 U.S. at 337).

In his plurality opinion, Chief Justice Roberts ultimately determined that the assignment plans utilized by the schools were "directed only to racial balance, pure and simple," Id. at 2755, which fails to qualify as a compelling state interest. In reaching this decision, Chief Justice Roberts emphasized as follows:

> Accepting racial balancing as a compelling state interest would
> justify the imposition of racial proportionality throughout
> American society, contrary to our repeated recognition that "at the
> heart of the Constitution's guarantee of equal protection lies the
> simple command that the Government must treat citizens as
> individuals, not as simply components of a racial, religious, sexual
> or national class." Allowing racial balancing as a compelling end
> in itself would "effectively assure that race will always be relevant
> in American life, and that the 'ultimate goal' of 'eliminating

29

entirely from governmental decisionmaking such irrelevant factors as a human being's race' will never be achieved."

Id. at 2757-2758 (internal citations omitted). Having determined that the school systems' race-based assignment plans did not serve a compelling state interest, and that they were not narrowly tailored to "achieve their stated goals," Id. at 2760, Chief Justice Roberts ultimately held that the plans violated the Equal Protection Clause of the Fourteenth Amendment.

Relying on the foregoing passage from the plurality opinion, and Chief Justice Roberts' specific reference to citizens being treated as individuals, "not as simply components of a racial, religious, sexual or national class," Id. at 2757 (emphasis added), Equity argues that "gender balancing" is "clearly no longer appropriate." However, the court is unable to conclude that this single passage from the plurality opinion can be read to suggest such a sweeping application to circumstances beyond the racial classifications at issue in Parents Involved. Chief Justice Roberts' opinion simply does not discuss gender discrimination; its holding is limited specifically to racial classifications and the higher degree of scrutiny to which they are subject;[6] and the court finds no compelling basis on which to assume that Chief Justice Roberts intended to include gender-based classifications within the scope of his opinion. See Cohen II, 101 F.3d at 183 (explaining why Adarand, and its discussion of racial classifications, does not extend to gender-based classifications). The court also notes that Chief Justice Roberts specifically rejected Justice Breyer's argument that "the plurality's views would threaten a surge of race-

_____

[6] Whereas racial classifications are subject to a strict scrutiny analysis, gender classifications are subject to a less demanding intermediate scrutiny analysis. See Adkins v. Rumsfeld, 464 F.3d 456, 468 (4th Cir. 2006) ("A statute that explicitly classifies people based on sex is subject to intermediate scrutiny, which means 'it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'") (quoting Nguyen v. INS, 533 U.S. 53, 60 (2001)).

30

based litigation," since "[h]undreds of state and federal regulations use racial classifications for educational or other purposes." Id. at 2833. In response, Chief Justice Roberts emphasized that Justice Breyer's prediction was "unjustified," and that the examples of legislation cited by Justice Breyer "have nothing to do with the pertinent issues in these cases." Id. at 2766. Chief Justice Roberts' comments as to the limited scope of his opinion provide further support for the conclusion that it was not intended to provide immediate redress for cases outside the realm of race discrimination.

The court also notes that, as the DOE defendants emphasized during the hearing on the instant motion, gender classifications are simply different from racial classifications, especially in the realm of collegiate athletics. Unlike most educational settings, "athletic teams are gender segregated, and universities must decide beforehand how many athletic opportunities they will allocate to each sex." Neal, 198 F.3d at 773 n. 8. Consequently, "athletics require a gender conscious allocation of opportunities in the first instance," and "[t]he paradigm that has motivated the Supreme Court's more recent reverse-discrimination jurisprudence simply does not fit the case at bar." Id.

For these reasons, the court is unable to conclude that the Supreme Court's recent decision in Parents Involved fundamentally changes the equal protection analysis applicable to this case, or that it necessarily provides a basis upon which Equity may succeed on the merits of its equal protection arguments.

The Alleged Lack of Authority for the Three-Part Test

Equity next argues that the proportionality prong of the Three-Part Test establishes a

31

disparate-impact standard, and that, pursuant to <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001), the standard exceeds the scope of the DOE's authority under Title IX. However, as the DOE defendants explain in their response to Equity's motion, <u>Sandoval</u> provides no support for Equity's argument. In <u>Sandoval</u>, the Supreme Court solely addressed "the question [of] whether private individuals may sue to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964." <u>Sandoval</u>, 532 U.S. at 278. The Court specifically indicated that it was not inquiring as to whether the regulations were authorized by Title VI, <u>Id.</u> at 279, and ultimately assumed for purposes of the case that the regulations at issue were valid, <u>Id.</u> at 281-282. Consequently, the court is unable to conclude, on the basis of <u>Sandoval</u>, that Equity's argument regarding the alleged lack of authority for the Three-Part Test has a strong likelihood of success. <u>See</u> <u>National Wrestling Coaches Ass'n v. Dept. of Education</u>, 366 F.3d 930, 946 (D.C. Cir. 2004) (distinguishing the same argument advanced by Equity from the argument at issue in <u>Sandoval</u>).

Deference Owed to the Three-Part Test

Equity next contends that the Three-Part Test is not entitled to deference, emphasizing that "[a]ll of the extra-circuit decisions" that uphold the Three-Part Test apply <u>Chevron</u>[7] deference to the 1979 Policy Interpretation, and that <u>Chevron</u> deference is no longer appropriate in light of the Supreme Court's decision in <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001). However, the court is also unpersuaded by this argument. Even assuming that the Policy Interpretation is not entitled to deference under <u>Chevron</u>, it is still true that an agency's interpretation of its own regulation, as is the case here, "is entitled to deference and is

---

[7] <u>Chevron U.S.A., Inc. v. NRDC, Inc.</u>, 467 U.S. 837 (1984).

32

'controlling unless plainly erroneous or inconsistent with the regulation.'" IntraComm, Inc. v. Bajaj, 2007 U.S. App. LEXIS 15951, at *21 (4th Cir. July 5, 2007) (citing Auer v. Robbins, 519 U.S. 452 (1997)). Having reviewed the parties' arguments and the relevant case law, the court is unable to conclude, at this stage of the litigation, that the Three-Part Test is not entitled to deference.[8] See Chalenor, 291 F.3d at 1046 (holding that the Three-Part Test is entitled to controlling deference under Auer, even if Chevron deference is not due, since it constitutes a "reasonable and considered interpretation of the regulation"); McCormick, 370 F.3d at 290 ("Because the Policy Interpretation is both persuasive and not unreasonable, we need not, under United States v. Mead Corp. . . ., decide here which form of deference to apply - Skidmore or Chevron.").

Procedural Challenges to the Three-Part Test

The court is also unable to conclude, at this stage of the litigation, that Equity is likely to succeed on its procedural challenges to the Three-Part Test. Equity first argues that the Three-Part Test is procedurally invalid because neither the 1979 Policy Interpretation nor the DOE's subsequent Clarifications complied with the Administrative Procedure Act's ("APA") notice and comment procedures. See 5 U.S.C. § 553. However, as the United States Court of Appeals for the District of Columbia Circuit noted in National Wrestling, the challenged policies "are interpretive guidelines that the Department was not obligated to issue in the first place,"

---

[8] The court again notes, as it did during the hearing on Equity's motion, that the Three-Part Test, set forth in the 1979 Policy Interpretation, has been in existence for more than twenty-five years and has withstood a multitude of challenges. Courts have held that such longstanding and consistent administrative interpretations may be "entitled to considerable weight." Zenith Radio Corp. v. United States, 437 U.S. 443, 450 (1978); see also Brown v. Gardner, 513 U.S. 115, 121 (1994) (noting that there are cases in which "consistent application and age can enhance the force of administrative interpretation").

National Wrestling, 366 F.3d at 940, and interpretive guidelines are not subject to the APA's notice and comment procedures. See Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1340 (4th Cir. 1995) ("The notice and comment requirement of the APA does not apply to 'interpretive rules, general statements of policy, or rules of agency organization, procedure, practice.'") (quoting 5 U.S.C. § 553(b)). Although Equity argues that the 1979 Policy Interpretation and its subsequent clarifications essentially amended the regulations that they interpret, courts have held that an interpretive guideline does not "become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. Cir. 1993). "If that were so, no rule could pass as an interpretation of a legislative rule unless it were confined to parroting the rule or replacing the original vagueness with another." Id.

The court is also presently unpersuaded by Equity's argument that the Three-Part Test is not in effect, because the 1979 Policy Interpretation was not signed by the President in the Federal Register. While 20 U.S.C. § 1682 provides that any "rule, regulation, or order" issued by a federal agency to effectuate the anti-discrimination provisions of Title IX shall become effective only if approved by the President, the statute does not require Presidential approval each and every time an agency issues interpretive guidelines. Equity's argument to the contrary has been expressly rejected by other courts.[9] See Cohen v. Brown Univ., 879 F. Supp. 185, 199 (D.

---

[9] The court notes that, in its post-hearing brief, Equity argues that "there nearly was [Fourth Circuit authority]" to support its presidential approval argument, relying on Judge Widener's opinion concurring in part and dissenting in part in Mayor and City Council of Baltimore v. Mathews, 562 F.2d 914 (4th Cir. 1977), vacated, 571 F.2d 1273 (4th Cir. 1978). However, the statement from Judge Widener's opinion on which Equity relies provides no support for Equity's particular argument. That statement – "the more basic problem for me lies in the lack of formally adopted, nationally uniform, standards approved by the President" – refers to the Department of Health, Education, and Welfare's failure to adopt any Title VI regulations with respect to state systems of higher education. Id. at 927. Neither Judge Widener's opinion, nor any other portion of the vacated Mathews decision, addresses

Case 5:07-cv-00028-GEC   Document 39   Filed 08/21/07   Page 34 of 40   Pageid#: 1300

R.I. 1995), rev'd in part on other grounds, 101 F.3d 155 (1st Cir. 1996) (holding that the 1979

Policy Interpretation "need not be approved by the President in order to become effective, since

the Policy Interpretation "is not a rule, regulation, or order, but is a guideline designed to

interpret a rule, regulation, or order, namely the agency's own regulations . . . ."); Cmtys. for

Equity v. Mich. High School, Athletic Ass'n, 2001 U.S. Dist. LEXIS 5834, at *6 (W.D. Mich.

May 2, 2001) ("[T]he Court finds no reason why the Policy Interpretation must be signed by the

President as it is only a guideline to interpret Title IX, and not a rule, regulation, or order.").

Equal Protection Claim Against JMU

Equity next argues that JMU's gender-conscious decision to eliminate certain athletic

programs denied student-athletes equal protection in violation of the Fourteenth Amendment.

This same argument was rejected by the Seventh Circuit in Kelley:

> Plaintiffs' final argument is that the defendants' decision to
> eliminate the men's swimming program while retaining the
> women's program denied them equal protection of law as
> guaranteed by the Fourteenth Amendment.  We do not agree.  First
> the record makes clear that the University considered gender solely
> to ensure that its actions did not violate federal law.  And insofar as
> the University actions were taken in an attempt to comply with the
> requirements of Title IX, plaintiffs' attack on those actions is
> merely a collateral attack on the statute and regulations and is
> therefore impermissible.  Milwaukee County Paver Ass'n v.
> Fiedler, 922 F.2d 419, 424 (7th Cir. 1991), certiorari denied, 500
> U.S. 954, 114 L. Ed. 2d 714, 111 S. Ct. 2261.

Kelley, 35 F.3d 265, 272 (7th Cir. 1994).  Likewise, relying on Kelley, the Eighth Circuit

rejected the same argument in Miami Univ. Wrestling Club:

> In the case before us today, it is evident that Miami took the
> challenged actions in an attempt to comply with the requirements
> of Title IX, and as we explain below, Miami was successful in that

---

whether regulations' interpretive guidelines must be approved by the President under 20 U.S.C. § 1682.

> attempt. Only if Title IX, its regulations or the Policy
> Interpretation . . . could we hold that Miami's
> compliance with the law and the regulations is unconstitutional.

Miami Univ. Wrestling Club, 302 F.3d at 614.

In this case, it is undisputed that JMU chose to eliminate certain men's athletic programs in an attempt to comply with the requirements of Title IX. Based on the Seventh Circuit's reasoning in Kelley and the Eighth Circuit's reasoning in Miami Univ. Wrestling Club, the court is unable to conclude that Equity's equal protection challenge to JMU's decision has a strong likelihood of success.

New First Amendment Claim Against JMU

In its post-hearing brief, Equity argues that the planned cuts will injure its members' "associational rights" under the First Amendment, and that "the University Defendants must meet strict scrutiny before they restrict the Swimming, Track, and Cross Country teams' rights to associate . . . ." (Post-Hearing Br. at 2.) This is an entirely new claim, which is not asserted in Equity's amended complaint.[10] The court agrees with the DOE defendants that new legal

---

[10] The court notes that Equity does assert, in its amended complaint, that the JMU defendants violated the student-athletes' right to due process of law, as guaranteed by the Fourteenth Amendment. However, Equity does not address the merits of its due process claim in any of the briefs submitted in support of its motion for preliminary injunction. Based on the court's own review of relevant case law, the court is unpersuaded that such claim has a strong likelihood of success. See Mitchell v. La. High Sch. Athletic Ass'n, 430 F.2d 1155, 1157-1158 (5th Cir. 1970) (holding that "[t]he privilege of participating in interscholastic athletics must be deemed to fall . . . outside the protection of due process"); Hamilton v. Tenn. Secondary Sch. Athletic Ass'n, 552 F.2d 681, 682 (6th Cir. 1976) (rejecting the argument that the privilege of participating in interscholastic athletics is protected by the Fourteenth Amendment's guarantee of due process); Seamons v. Snow, 84 F.3d 1226, 1235 (10th Cir. 1996) (holding that a student had "no constitutionally protected property interest in participating in the school's athletic program"); Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 344 (3d Cir. 2004) (holding that the plaintiff's due process claim could be "summarily dismissed," since the plaintiffs conceded that they had "no property interest . . . in participating in extracurricular activities, including sports . . .") (internal quotations omitted); Brands v. Sheldon Comm. Sch., 671 F. Supp. 627, 631 (N.D. Iowa 1987) ("A clear majority of courts addressing this question in the context of interscholastic or intercollegiate athletics has found that athletes have no legitimate entitlement to participate."); Graham v. Tenn. Secondary Sch.

36

theories must be added by way of amended pleadings, not by arguments asserted in legal briefs. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); Anderson v. Aset Corp., 329 F. Supp. 2d 380, 383 (W.D. N.Y. 2004) ("a memorandum of law is not a proper vehicle for rewriting or amending the complaint"); Church v. Maryland, 180 F. Supp. 2d 708, 737 (D. Md. 2002) (disregarding an allegation that was raised for the first time in plaintiff's affidavit in opposition to defendants' motion for summary judgment).

Notwithstanding the court's view that Equity's claims must be clearly expressed in its complaint, the court is unable to conclude that this new claim is likely to succeed on the merits.[11] "[A] constitutionally protected right to associate depends upon the existence of an activity that is itself protected by the First Amendment," Willis v. Town of Marshall, 426 F.3d 251 (4th Cir. 2005), and courts "have generally been unwilling to extend First Amendment protection to sports or athletics," Maloney v. Cuomo, 470 F. Supp. 2d 205, 213 (E.D. N.Y.). See Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 374 (D. Ariz. 1983) ("[P]laintiff's argument that the players have been denied a constitutional right to expression through football is unfounded."); MacDonald v. Newsome, 437 F. Supp. 796, 798 (E.D. N.C. 1977) (holding that surfing is not protected by the First Amendment); Murdock v. City of Jacksonville, 361 F. Supp. 1083, 1095-1096 (M.D. Fla. 1973) (holding that wrestling is not protected by the First Amendment); see also

_____

Athletic Ass'n, 1995 U.S. Dist. LEXIS 3211, at *18 (E.D. Tenn. Feb. 20, 1995) ("Moreover, participation in interscholastic athletic competition is a mere privilege, not a property right, and it falls outside the protection of due process.").

[11] The court notes that Equity cites no case law to support its proposition that members of intercollegiate teams have a right of association protected by the First Amendment.

Graham v. Tenn. Secondary Sch. Athletic Ass'n, 1995 U.S. Dist LEXIS 3211, at *20 (E.D. Tenn. Feb. 20, 1995) (holding that "[p]articipation by students in school athletic activities is recreational in nature and qualifies neither as a form of 'intimate association' nor as a form of 'expressive association' entitled to constitutional protection").

Claims Under State Law

In addition to its claims under federal law, Equity alleges that the JMU defendants violated the Virginia Human Rights Act and the Constitution of Virginia. In response to the argument that such claims are barred by the Eleventh Amendment, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984), Equity argues that its motion for preliminary injunction seeks to enforce, not simply state law, but "federalized state law" under 42 U.S.C. § 1988(a).[12] However, contrary to Equity's assertion, § 1988(a) does not create any new causes of action; it merely provides the applicable law in actions that are already proper under civil rights statutes, such as 42 U.S.C. § 1983. See Moor v. County of Alameda, 411 U.S. 693, 701 (1973) ("Section

---

[12] Section 1988(a) provides as follows:

> (a) Applicability of statutory and common law. The jurisdiction in civil and criminal matters conferred on the district and circuit courts [district courts] by the provisions of this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

38

1988 does not authorize federal courts "to borrow entire causes of action from state law");

Johnson v. Ryder Truck Lines, Inc., 575 F.2d 471, 474 (4th Cir. 1978) ("Section 1988 in itself does not create any cause of action, but it 'instructs federal courts as to what law to apply in causes of action arising under federal civil rights acts'") (internal citations omitted). Consequently, the court is unpersuaded that Equity's "federalized state claims" have a strong likelihood of success.[13]

In sum, the court is unable to conclude, at this stage of the litigation, that any of the aforementioned claims are likely to succeed on the merits. Accordingly, this factor weighs heavily against Equity.

### 3. Public Interest

The court is not unsympathetic to the plight of the members of the athletic programs that were chosen for elimination by JMU's Board of Visitors. These students are innocent victims of Title IX's benevolent attempt to remedy the effects of past discrimination against women, and JMU's efforts to comply with Title IX. Nonetheless, the court finds that the final factor, the public interest, "weighs in favor of permitting colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that they are in violation of the law." Gonyo, 837 F. Supp. at 996.

---

[13] The court notes that Equity cites Antrican v. Odom, 290 F.3d 178 (4th Cir. 2002), to support the proposition that its state law claims are "federalized claims" under § 1988(a). However, the portion of the Antrican decision on which Equity relies does not discuss § 1988(a) or otherwise support Equity's argument. See Antrican, 290 F.3d at 187-88 (holding that North Carolina officials could not rely on the principles of sovereign immunity set forth in Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984), since the plaintiffs were seeking to enforce federal standards associated with the Medicaid Act, as opposed to a state's own laws).

39

## Conclusion

For the reasons stated, the court concludes that none of the factors set forth in the

Blackwelder test favor granting a preliminary injunction. Accordingly, Equity's motion for

preliminary injunction must be denied.

The Clerk is directed to send certified copies of this memorandum opinion and the

accompanying order to all counsel of record.

ENTER: This 21st day of August, 2007.

_United States District Judge_