# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| EQUITY IN ATHLETICS, INC., | ) | |
|     1711 Grandin Road SW, | ) | |
|     Roanoke, VA 24015, | ) | |
|        Plaintiff, | ) | |
| | ) | |
|        v. | ) | |
| | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
|     400 Maryland Avenue, SW | ) | |
|     Washington, DC 20202, | ) | |
| | ) | |
| ARNE DUNCAN, | ) | |
|     SECRETARY OF EDUCATION, | ) | |
|     400 Maryland Avenue, SW | ) | |
|     Washington, DC 20202, | ) | Civil Action No. 5:07-0028-GEC |
|     in his official and individual capacity, | ) | |
| | ) | |
| SANDRA BATTLE, | ) | |
|     ACTING ASSISTANT SECRETARY | ) | |
|     FOR CIVIL RIGHTS | ) | |
|     400 Maryland Avenue, SW | ) | |
|     Washington, DC 20202, | ) | |
|     in her official and individual capacity, | ) | |
| | ) | |
| LINWOOD H. ROSE, | ) | |
|     PRESIDENT, JAMES MADISON UNIV., | ) | |
|     800 South Main Street | ) | |
|     Harrisonburg, VA 22807, | ) | |
|     in his official and individual capacity, | ) | |
| | ) | |
| JEFFREY T. BOURNE, | ) | |
|     ATHLETICS DIRECTOR, JAMES | ) | |
|     MADISON UNIV., | ) | |
|     800 South Main Street | ) | |
|     Harrisonburg, VA 22807, | ) | |
|     in his official and individual capacity, | ) | |
| | ) | |
| MEREDITH STROHM GUNTER, | ) | |
|     RECTOR, JAMES MADISON UNIV., | ) | |
|     800 South Main Street | ) | |
|     Harrisonburg, VA 22807, | ) | |
|     in his official and individual capacity, | ) | |
| | ) | |
| | ) | |
| **(parties continued on next page)** | ) | |

JAMES E. HARTMAN                                          )
    VICE RECTOR, JAMES MADISON UNIV.,              )
    800 South Main Street                          )
    Harrisonburg, VA 22807,                        )
    in her official and individual capacity,       )

MARK T. BOWLES, JOSEPH F. DAMICO,                        )
RONALD C. DEVINE, VANESSA M. EVANS ,                     )
LOIS J. FORBES, CHARLES H. FOSTER JR.,                   )
JOSEPH K. FUNKHOUSER, II, STEPHEN R.                     )
LEEOLOU, ELIZABETH V. LODAL, WHARTON                     )
B. RIVERS JR., LARRY M. ROGERS, JUDITH                   )
STRICKLER, and FRED D. THOMPSON, JR,                     )
    VISITORS, JAMES MADISON UNIV.,                 )
    800 South Main Street                          )
    Harrisonburg, VA 22807,                        )
    in their official and individual capacities,   )

JAMES MADISON UNIVERSITY and THE                         )
VISITORS OF JAMES MADISON UNIVERSITY,                    )
    800 South Main Street                          )
    Harrisonburg, VA 22807,                        )
    Virginia corporate entities,                   )

JOHN DOES 1 to 200,                                      )
    in their official and/or individual capacity,  )

JOHN DOE ENTITIES 1-200,                                 )

        and                                     )

UNITED STATES OF AMERICA,                                )

        Defendants.                             )

## SECOND AMENDED COMPLAINT

Equity in Athletics, Inc. ("EIA"), seeks relief based on the following allegations.

## NATURE OF THE ACTION

1.      EIA brings this action to protect athletic opportunities and teams at Virginia

educational institutions that receive federal financial assistance (hereinafter, "schools") from

ongoing gender-based discrimination and *ultra vires* interference by the federal defendants under

the color of implementing Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-

1688 ("Title IX") and to preserve and/or to reinstate the ten athletic teams that James Madison University ("JMU") has scheduled for elimination in violation of statutory and constitutional equal-protection and due-process requirements of both federal and Virginia law.

2.      Through a series of actions, the defendants United States Department of Education ("DOE"), its Secretary, its Assistant Secretary of Education for Civil Rights, their inferior officers and agents, and their respective predecessors at DOE and the former United States Department of Health, Education and Welfare ("HEW") unlawfully revised the Title IX athletics regulation, which require schools to provide equal athletic *opportunity,* based on the genders' *relative interests* after *assessing both genders'* interests, into a three-part test, which purports to require schools to meet one of three tests, each tied to a comparison of athletic participation to enrollment (*i.e.,* equal participation, based on enrollment). EIA challenges that three-part test – together with any and all related administrative actions in which the federal defendants have held out that test directly or indirectly to mandate or authorize schools to take actions to comply with that test (collectively, hereinafter the "Three-Part Test") – as both substantively and procedurally unlawful, both facially and as applied. EIA seeks declaratory and injunctive relief to compel the federal defendants to comply with the civil-rights requirements of the U.S. Constitution, Title IX, and Title IX's implementing regulations and with the rulemaking and other procedural requirements of Title IX and the Administrative Procedure Act, 5 U.S.C. §§551-706 ("APA").

3.      Relying on the Three-Part Test for its actions, JMU through its Board of Visitors resolved on September 29, 2006, to eliminate ten athletic teams on July 1, 2007, in order to attain the federal defendants' unlawful enrollment-proportionality quota. As set forth in Count IV, the elimination of the ten teams and their demotion to club status violated the due-process

rights of the ten teams and of EIA's members on those teams, both substantively and procedurally. Because the JMU defendants persisted with these unlawful elimination and demotion after receiving information sufficient to establish their unlawfulness, the JMU defendants' actions constitute not only intentional, but willful, discrimination under both federal and Virginia statutory law and constitutional protections.

## PARTIES TO THE ACTION

4.    Plaintiff EIA is a not-for-profit Virginia nonstock corporation headquartered in Roanoke, Virginia. The individuals and organizations that are members of EIA and its member organizations (collectively, "EIA Members") include, without limitation, coaches, student-athletes, fans, booster clubs, parents, save-our-sport groups, and/or alumni affiliated with the schools listed in Paragraphs 9-14. EIA Members have educational, professional, economic, participatory, aesthetic, and spectator interests in intercollegiate and interscholastic athletics at Virginia schools, including without limitation the schools listed in Paragraphs 9-14. These interests have been harmed, continue to be harmed, and are threatened with further harm by the elimination of athletic opportunities and teams that result from schools' efforts to comply with the Three-Part Test.

5.    Defendant DOE is an executive department of the United States government. Defendant Duncan is the Secretary of Education. Defendant Battle is the acting Assistant Secretary for Civil Rights. Defendants Duncan and Battle are sued in their official capacities and also in their individual capacities for actions taken under color of legal authority and for continuing the unlawful actions taken by their predecessors under color of legal authority. Defendants Duncan and Battle are not sued in their individual capacities for monetary or punitive damages. Congress has empowered the foregoing federal defendants to extend federal

financial assistance to educational programs and activities, and none of the defendants extend federal funding directly to intercollegiate or interscholastic athletic programs. Defendant United States is the federal sovereign, sued for declaratory and injunctive relief. This pleading refers to the defendants identified in this Paragraph collectively as the "federal defendants."

6.     Defendants James Madison University and The Visitors of James Madison University (collectively, hereinafter "JMU") are corporate entities created by statute and "governmental instrumentalities" of the Commonwealth of Virginia. Va. Code §§23-14, 23-164.1. Defendant Rose is JMU's president. Defendant Bourne is JMU's Athletic Director. Defendants Strohm Gunter, Hartman, Bowles, Damico, Devine, Evans, Forbes, Foster, Funkhouser, Leeolou, Lodal, Rivers, Rogers, Strickler, and Thompson are members of JMU's Board of Visitors, with defendants Strohm Gunter and Hartman serving as the Rector and Vice Rector, respectively. All of the foregoing JMU officials listed in this paragraph are sued in their official capacities and also in their individual capacities for actions taken under color of legal authority. This pleading refers to the defendants identified in this Paragraph collectively as the "JMU defendants." JMU defendants Evans, Funkhouser, Lodal, and Thompson did not take part in the Visitors' decision to eliminate the ten teams and are named only to the extent that the Court requires jurisdiction over the Visitors for purposes of injunctive or declaratory relief.

7.     The John Doe defendants are natural persons whose unlawful, *ultra vires,* and other actions or inactions contribute directly or indirectly to the ongoing or threatened violation by Virginia schools of Title IX, the Title IX regulations, and Virginia law. The John Doe defendants are sued in their individual capacities. To the extent that they hold public office, the John Doe defendants are sued in their individual capacities under color of law and in their official capacities. The John Doe defendants include, without limitation, the boards of visitors or

other governing bodies of any Virginia school that follows the Three-Part Test and violates the Title IX regulations and corresponding Virginia and federal statutory and constitutional provisions.

8.      The John Doe Entity defendants are public or private entities, including without limitation, schools, corporations, and associations, whose unlawful, *ultra vires,* and other actions or inactions contribute directly or indirectly to the ongoing or threatened violation by Virginia schools of Title IX, the Title IX regulations, and Virginia law. The John Doe Entity defendants include, without limitation, any Virginia school that follows the Three-Part Test and violates the Title IX regulations and corresponding Virginia and federal statutory and constitutional provisions.

## SCHOOLS WITHIN THIS COURT'S JURISDICTION

9.      EIA Members are associated with their schools in one or more of the following capacities: participating in athletics as an athlete or coach, fostering athletic education as an alumni supporter or booster of the athletic program or parent of a current or prospective student athlete; following athletic teams for the aesthetic enjoyment as a spectator; and (in the case of high school juniors and seniors) desiring to apply to attend a postsecondary school in the future to participate as an athlete. In each of these capacities, EIA Members possess the skills, abilities, and interests to continue in the foregoing capacities and desire and plan to continue their association in these capacities in future academic years. In these capacities, EIA Members are associated with Virginia secondary and postsecondary schools, including without limitation the College of William and Mary in Virginia, at Williamsburg ("W&M"); George Mason University, at Fairfax ("GMU"); Longwood University, at Farmville ("Longwood"); James Madison University, at Harrisonburg ("JMU"); Old Dominion University, at Norfolk ("ODU");

6

the University of Virginia, at Charlottesville ("UVA"); the Virginia Commonwealth University, at Richmond ("VCU"); and Virginia Polytechnic Institute and State University, at Blacksburg ("Tech"). In particular, EIA Members include JMU student athletes from each of the ten teams that the JMU defendants demoted to club status on July 1, 2007. All of the foregoing schools receive federal funds within the meaning of Title IX, and that federal funding includes funding extended to provide real property or structures thereon, personal property, financial aide, and for other purposes. None of the foregoing schools receives federal funding for its athletic programs.

10.     Under §2.2-3901 of the Virginia Code, "[c]onduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of… sex… shall be an 'unlawful discriminatory practice' for the purposes of [the Virginia Human Rights Act]." As set forth in Counts I through III, the Three-Part Test is void *ab initio,* never took effect, and unlawfully purports to establish equal participation, based on enrollment, in place of the Title IX regulations' standard of equal opportunity, based on interest. As such, the Three-Part Test is not a "regulation governing discrimination on the basis of… sex" within the meaning of the Virginia Human Rights Act (*i.e.,* violating the Three-Part Test is not an unlawful discriminatory practice").

11.     Under their respective enabling legislation, each of the schools listed in Paragraph 9 lacks the authority to take action "inconsistent with the laws of the Commonwealth" or otherwise contrary to law. Virginia Code §23-44 (W&M), §23-91.29(a) (GMU), §23-188 (Longwood), §23-164.6 (JMU), §23-49.17(A) (ODU), §23-76 (UVA), §23-50.10 (VCU), §23-122 (Tech).

12.     The athletic participation and sports sponsorship rates for the schools listed in Paragraph 9 in particular (Ex. 1) and those rates for Virginia secondary schools in aggregate (Ex.

2) are incorporated herein by reference. Males at Virginia schools have statistically greater interest in athletics than females at Virginia schools. As detailed in Paragraphs 137-143, therefore, the Three-Part Test violates the Title IX regulations. As a Title IX regulatory violation, compliance with the Three-Part Test in place of the Title IX regulations is an unlawful discriminatory practice under Virginia Code §2.2-3901 and thus inconsistent with the laws of the Commonwealth and otherwise contrary to law under the enabling legislation of the schools listed in Paragraph 9.

13.     On September 29, 2006, JMU announced plans to eliminate ten intercollegiate varsity athletic teams to comply with the federal defendants' Three-Part Test. *See* Ex. 3 (JMU press release). As of March 19, 2007, JMU continued to believe that its planned actions complied with Title IX and that it has no other alternate course to comply with Title IX. *See* Ex. 4 (JMU press release). Under HEW's 1975 equal-opportunity regulations, however, JMU's current array of athletic teams essentially complies with Title IX (*i.e.,* no change is necessary, except potentially to add men's lacrosse) and JMU's elimination and demotion of men's track, cross country, swimming, and wrestling violate the equal-opportunity regulations, as well as corresponding Virginia and federal statutory and constitutional provisions.

14.     At all times relevant to JMU's deliberating on its plans to eliminate ten teams to comply with defendants' Three-Part Test, the federal defendants had actual knowledge that the Three-Part Test was procedurally invalid and not in effect under both the APA and Title IX. Notwithstanding that knowledge, the federal defendants continued to hold the Three-Part Test out as creating "obligations," publicly on DOE's internet site, in direct communications with JMU's administration, and in direct communication to JMU students. *See, e.g.,* Ex. 5 (DOE letter to JMU student). If defendants had acknowledged the procedural invalidity of the Three-Part

Test publicly, JMU would have known that both federal and Virginia law prohibited is planned actions, and JMU would not have eliminated the ten teams and demoted them to club status.

## JURISDICTION AND VENUE

15.     The claims against the federal defendants arise out of the federal defendants' violation of Sections 901 and 902 of Title IX, 20 U.S.C. §§1681, 1682, Section 4 of the APA, 5 U.S.C. §553, and the Equal Protection Component of the Due Process Clause of the Fifth Amendment, U.S. CONST. amend. V, cl. 4. EIA's claims against the federal defendants, therefore, raise federal questions and questions of civil rights under acts of Congress, over which this Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4), 1361 and pursuant to 42 U.S.C. §1988(a) and Va. Code §§8.01-194, 2.2-3901.

16.     The claims against the JMU defendants arise out of the JMU defendants' violation of Section 901 of Title IX, 20 U.S.C. §1681, the Equal Protection Clause of the Fourteenth Amendment, U.S. CONST. amend. XIV, §1, the Due Process Clause of the Virginia Constitution, VA. CONST. art. 1, §11, the Virginia Human Rights Act, Va. Code §2.2-3901, and JMU's enabling legislation, Va. Code §23-164.6. EIA's claims against the JMU defendants, therefore, raise federal questions and questions of civil rights under acts of Congress, over which this Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4) and pursuant to 42 U.S.C. §§1983, 1988(a) and Va. Code §8.01-194. Pursuant to  42 U.S.C. §1988(a), EIA can rely on Virginia law to support its claims under 28 U.S.C. §1343 and 42 U.S.C. §1983.

17.     The allegations raised herein constitute good cause to expedite this action under Fed. R. Civ. Proc. 57 and 28 U.S.C. §1657(a).

18.     Pursuant to 28 U.S.C. §1391(b), (e), venue is proper in the Western District of Virginia, in which EIA and JMU reside and where the substantial part of JMU's planning its cuts

and fielding its athletic teams occurred. Pursuant to this Court's standing order dated January 30, 1992, venue is proper in the Harrisonburg Division.

**Standing**

19.     EIA Members have suffered injuries and threatened injuries in the form of cut and capped teams, which cuts and caps are fairly traceable to the Three-Part Test and redressable by its repeal. Nationwide, schools make gender-based cuts of teams because of the Three-Part Test. *See, e.g., Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d 608, 610-11 (6th Cir. 2002) (in 1999, Miami University eliminated its men's wrestling, tennis, and soccer teams to comply with the federal defendants proportionality requirements); *Boulahanis v. Board of Regents,* 198 F.3d 633, 635-36 (7th Cir. 1999) (in or about 1996, Illinois State University eliminated its men's wrestling and soccer teams to comply with the federal defendants proportionality requirements). Nationwide, schools impose gender-based caps on men's teams because of the Three-Part Test. *See, e.g.,* "Want to Try Out for College Sports? Forget It," NEW YORK TIMES, A1 (Sept. 22, 2002) (Ex. 6).

20.     For professional, economic (in the case of coaches), participatory, aesthetic, educational, and associational reasons, EIA Members who are coaches and student-athletes currently on athletic teams desire to remain with those teams, rather than see them cut or capped, and to have the schools with which their teams compete retain or reinstate teams with which EIA Members desire to compete in future seasons. For participatory, economic (in the case of scholarship athletes), aesthetic, educational, and associational reasons, EIA Members who are student-athletes who have (or will have) athletic eligibility to participate in future seasons desire that teams continue to exist (and that capable club teams be elevated to intercollegiate status) in order to meet their athletic interests. For spectator, educational, and other aesthetic reasons (*e.g.,*

the pleasure of providing students with opportunities), EIA Members who are fans, parents, booster clubs, or alumni or that are save-our-sport groups have supported (and desire and intend to support in each future season) and have watched and followed (and desire and intend to watch and follow in each future season) athletic teams that either will be cut or have been cut because of the Three-Part Test.

21.     The Three-Part Test forces EIA Members who are coaches to engage in gender-based discrimination, and such EIA Members desire to cease such discrimination. As the direct and indirect result of the Three-Part Test, under the euphemism "roster management," EIA Members have been forced to serve (and continue to be forced to serve) as the involuntary participants who implement defendants' Three-Part Test by cutting teams or capping athletes solely to comply with the Three-Part Test and whose schools either would not or lawfully could not continue to require or allow such cutting or capping.

22.     Public schools (including the schools listed in Paragraph 9) do not have the option of refusing federal funds (and thus seeking to avoid Title IX's prospective reach) because the Equal Protection Clause of the Fourteenth Amendment and the corresponding provisions of the Virginia constitution prohibit such public schools from discriminating based on gender. Moreover, both public and private schools (including the schools listed in Paragraph 9) cannot afford to forego federal funds and so would conform their actions to the requirements of the Title IX regulations, as revised by this litigation. Even if such schools could afford to forego federal funds, §86.4(b) of the Title IX regulations imposes ongoing obligations on such schools to comply with the Title IX regulations, even after the schools cease to accept federal funds.

23.     As substantively and procedurally *ultra vires* the federal defendants' authority, the Three-Part Test unlawfully injures EIA Members by directly impairing their freedom to

interact with schools to convince the schools to retain the teams. By operation of law, invalidating the Three-Part Test would restore the 1975 regulatory standard, under which schools must provide opportunity (or ration scarcity) based on relative interest, which benefits those students whose rate of athletic interest exceeds the rate of other gender's athletic interest, relative to their respective enrollment rates at a school. Particularly at schools with disproportionately high enrollment rates by gender, the defendants' Three-Part Test poses an obstacle to the other gender. Restoring the 1975 standard would put athletes of both genders on an equal footing. Of special relevance to EIA Members associated with Virginia schools, restoring the interest-based 1975 standard would eliminate the Three-Part Test's favoring of female athletic interest generally and large-roster women's sports particularly. Removing proportionality's impetus to add new, large-roster women's sports (*e.g.,* crew, equestrian) would allow schools to maintain their existing programs, without cutting, capping, or otherwise impairing men's sports or small-roster women's sports. Similarly, removing proportionality's emphasis on large-roster women's sports would restore to EIA Members on men's teams and small-roster women's teams the 1975 regulations' improved bargaining position in negotiations with their with schools to retain or establish varsity teams.

24.     The schools associated with EIA Members have never been adjudged to have violated Title IX in their athletic departments. Except as specifically provided, the allegations in this Complaint refer to such schools, for which gender-conscious remedial measures such as cutting and capping are unlawful under Title IX, the Title IX regulations, and (for public schools) the Fourteenth Amendment. Because the Three-Part Test purports to authorize such otherwise-illegal conduct by schools that continue to receive federal funds, the Three-Part Test constitutes a *per se* injury to EIA Members.

25.     The Three-Part Test serves as an influential government document that causes schools to take gender-based actions (namely, cutting and capping) that they would not take but for the Three-Part Test and which they would cease taking upon the rescission of the Three-Part Test. Particularly in Virginia, where state law prohibits Title IX regulatory violations, eliminating the Three-Part Test and restoring the 1975 equal-opportunity regulatory standard would prohibit schools from disproportionately accommodating female athletic interest.

26.     By their ongoing violation of the procedural requirements of Title IX and the APA, the federal defendants have maintained ongoing unlawful and *ultra vires* practices and policies, in violation of EIA Members' constitutional right to have laws enacted pursuant to bicameralism and presentment and to have substantive regulations (and amendments thereto) adopted pursuant to notice-and-comment rulemaking.

27.     EIA Members have deferred filing administrative complaints against schools pursuant to the Title IX regulations because filing such complaints would be futile (*i.e.,* the federal defendants have closed their mind on the Three-Part Test's applicability to athletic opportunity and its legality as a means of accommodating athletic opportunity). If EIA prevails in this litigation and (contrary to the allegations in Paragraph 22) a school continued gender-based cutting and capping or failed to assess the interests of both genders in determining equal athletic opportunity, EIA and EIA Members would file such administrative complaints to achieve the school's voluntary compliance with Title IX's requirements. Because the administrative-complaint process provides a low-cost alternative to litigation, EIA and EIA Members prefer that process to litigation. Administrative complaints are a highly effective means to compel schools to comply with civil rights requirements. Approximately ninety percent of administrative complaints filed with DOE resolve within 180 days.

28.     Each federal defendant has actual knowledge of the Three-Part Test's causing and continuing to cause the foregoing injuries. Each federal defendant knowingly and purposefully continues to holds the Three-Part Test out as a Title IX obligation with the express purpose of advancing female athletes over male athletes.

**Judicial Review and the Inadequacy of Alternate Remedies**

29.     Defendant United States has waived its sovereign immunity for actions against the United States, its instrumentalities, and officers for non-monetary injunctive and equitable relief and for the entry of judgments and decrees against the United States in such actions. Defendant United States has waived sovereign immunity for this action and for the relief sought in Paragraph 177.

30.     With the federal officer defendants named and served in their official and individual capacities, sovereign immunity does not shield those officers' ongoing *ultra vires* actions. As a matter of historical fact, when the states ratified the U.S. Constitution, the equitable, judge-made doctrine that allows use of the sovereign's courts in the name of the sovereign to order the sovereign's officers to account for their conduct was as least as firmly established and as much a part of the legal system as the judge-made doctrine of federal sovereign immunity. No act of Congress limits this Court's jurisdiction to entertain an equity action against the federal officers' *ultra vires* acts. Once this Court assumes equitable jurisdiction over a challenge to the federal defendants' *ultra vires* actions, a legal remedy that subsequently materializes directly against a school does not displace this Court's equitable jurisdiction.

31.     This action is not barred by the APA's "adequate-remedy bar," 5 U.S.C. §704, because that provision does not apply to the Title IX claims (which are made reviewable by

statute and thus outside the adequate-remedy bar) and because the federal defendants are indispensable parties to an action directly against the schools. *See* Paragraphs 34-35. Further, EIA Members who are alumni, fans, parents, and booster clubs have no private right of action against schools under Title IX's statutory or regulatory provisions and thus have no alternate (much less adequate) remedy against schools.

32.     Because this Court has jurisdiction as a threshold matter, the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, provides this Court the power to "declare the rights and other legal relations of any interested party…, whether or not further relief is or could be sought." 28 U.S.C. §2201; *accord* FED. R. CIV. P. 57 advisory committee note ("the fact that another remedy would be equally effective affords no ground for declining declaratory relief").

33.     The federal defendants have consummated their decisionmaking process in concluding that, as serially amended by "clarification" in 1996, 2003, and 2005, the Three-Part Test constitutes an obligation under Title IX. If allowed to withstand substantive and procedural scrutiny by this Court, the Three-Part Test would establish schools' obligations and alter EIA Members' rights under Title IX. Particularly in Virginia, where federal regulations are state law, the federal defendants' purported amendment of the Title IX regulations alters the legal regime applicable to schools and EIA Members.

**Indispensable Parties**

34.     The EIA Members who face the most imminent and ongoing injuries are those affiliated with the ten teams that JMU demoted to club status on July 1, 2007. Although EIA provided JMU an opportunity to remain outside this litigation by staying those demotions (Ex. 7), JMU declined to do so (Ex. 8). Accordingly, JMU is an indispensable party.

35.     Notwithstanding the JMU defendants' presence in this litigation, the federal

defendants remain indispensable parties because (a) the federal defendants claim interests relating to the subject of this action (namely, determining what Title IX requirements apply to recipients of federal funds disbursed by the federal defendants and ensuring that recipients comply with those requirements), and (b) in the absence of joining the federal defendants, any schools joined as parties would face substantial risk of inconsistent obligations because nonmutual preclusion does not apply to the federal defendants, who would continue to consider their Three-Part Test a Title IX requirement.

**Exhaustion of Administrative Remedies**

36.     The federal defendants have resolved and made up their individual and collective minds that they will not voluntarily repeal the Three-Part Test. Consequently, filing an administrative complaint to enforce the Title IX regulations against recipient schools would prove futile. Under the circumstances, no provision of law requires EIA or its members to exhaust administrative remedies with the federal defendants or any state agency before bringing suit against the JMU defendants.

**Timeliness of Action**

37.     EIA's action against the JMU defendants is timely because JMU announced the cuts on September 29, 2006, refused to rescind the cuts upon becoming aware of its legal error on April 4, 2007, and will not effect the cuts until July 1, 2007.

38.     This action is timely against the federal defendants because (a) the federal defendants have continued to apply their unlawful regulation, thereby constituting a continuing violation; (b) the federal defendants fraudulently concealed the nature of their administrative actions; (c) the federal defendants' 2003 and 2005 "clarifications" re-opened the Three-Part Test to judicial review, (d) EIA Members between the ages of eighteen and twenty-one years have a

timely action against the Three-Part Test pursuant to 28 U.S.C. §2401(a) ("The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases"); (e) EIA Members include those who have not had "actual and timely notice of the terms" of the 1996 Clarification as the quoted phrase is used in 5 U.S.C. §552(a)(1)(E); (f) the officer defendants (and their predecessors) have continuously and are currently engaged in ongoing *ultra vires* acts, in violation of Title IX, the Constitution, and the APA, to which the statute of limitation either does not apply or has not run and to which the equitable defense of laches does not apply; and (g) EIA's timely action against the JMU defendants renders statutes of limitation irrelevant as to the federal defendants.

39.     An agency re-opens a prior action to challenge when it changes its interpretation of that prior action. An agency "constructively re-opens" an administrative action previously closed to judicial review when a subsequent action "changes the stakes" of the earlier action. Further, agencies have an ongoing duty to ensure that their actions are lawful, which requires that agencies revisit prior decisions to reflect new evidence and new circumstances.

40.     In the 1979 Policy Interpretation, by its terms, the Three-Part Test was a tentative, nonbinding application of a tentative, nonbinding policy to consider intercollegiate participation opportunities as an "other factor" in future HEW adjudications of administrative complaints pending approximately thirty years ago. The 1996 Clarification elevated (and the 2003 Further Clarification reaffirmed and extended) the Three-Part Test as a legal obligation for all prospective Title IX compliance, thereby reopening the Three-Part Test for judicial review.

41.     The federal defendants' 1996 and 2003 clarifications purport to elevate the Three-Part Test to a "safe harbor" under which schools lawfully may cut or cap men's teams to achieve gender proportionality with enrollment rates. By authorizing schools to violate the anti-

discrimination and equal-opportunity provisions of the Overall Determination of Compliance, the Equal Protection Clause of the Fourteenth Amendment, Title IX, and the implementing Title IX regulations, these clarifications reopened the 1979 Policy Interpretation to judicial review by revealing an aspect of the Three-Part Test that was unforeseeable (or simply not present) in 1979.

42.     Although the Three-Part Test in the 1979 Policy Interpretation refers to "participation opportunities," the 1996 Clarification declares that schools must compare the gender ratio of "participants" when seeking to demonstrate gender proportionality under the Three-Part Test. Accordingly, the 1996 Clarification revealed (and the 2003 Further Clarification reaffirmed) an aspect of the Three-Part Test that was unforeseeable (or simply not present) in 1979, thereby reopening the 1979 Policy Interpretation to judicial review.

43.     Although the Three-Part Test in the 1979 Policy Interpretation did not apply by its terms to interscholastic athletic programs and neither the 1995 draft clarification nor the final 1996 Clarification published any data or made any findings that discrimination even exists at the interscholastic level, the 1996 Clarification extends the scope of the Three-Part Test to interscholastic athletics. Accordingly, the 1996 Clarification revealed (and the 2003 Further Clarification reaffirmed) an aspect of the Three-Part Test that was unforeseeable (or simply not present) in 1979, thereby reopening the 1979 Policy Interpretation to judicial review.

44.     Although the federal defendants and their predecessors previously memorialized and followed an interpretation of the Three-Part Test's third prong (fully accommodating the interests of the underrepresented gender) that required accommodating the underrepresented gender's interest to the same extent as the school accommodated the other gender's interest, the 1996, 2003, and 2005 clarifications changed the analysis to one based solely on the

accommodation of the interests of the underrepresented gender, without regard for the degree of accommodation of the other gender. Accordingly, the federal defendants' 1996, 2003, and 2005 clarifications changed the interpretation of an aspect of the Three-Part Test, thereby reopening the 1979 Policy Interpretation to judicial review.

45.    In 2002-03, beginning with DOE's chartering a federal advisory commission (the Secretary's Commission on Opportunity in Athletics) and culminating with the federal defendants' "2003 Further Clarification," the federal defendants reopened the Three-Part Test to reconsideration and issued a new final rule or order setting forth the rights and obligations of schools, students, and coaches under Title IX.

46.    Since 1995 or earlier, the federal defendants have misrepresented the legal status of the Three-Part Test in testimony to Congress, public statements, and currently on DOE's internet site. Even if the federal defendants were unaware of the 1979 procedural history described in Paragraphs 74-78, that history was served on them or their predecessors in 2004, and the federal defendants nonetheless have continued to hold out the Three-Part Test as a Title IX obligation.

47.    EIA Members who have attained the age of majority in the last three years (*i.e.,* those aged between eighteen and twenty-one) have a timely cause of action against any action that accrued while such EIA Members were under the legal disability of minority.

48.    The federal defendants' unlawful Three-Part Test continues to be applied to EIA Members within the statutory limitations period for actions against the United States. No statute of limitations applies to the ongoing illegal and *ultra vires* actions taken by federal officers under the color of implementing Title IX, and such officers cannot assert the affirmative defense of laches because they have suffered no judicially cognizable prejudice and their fraudulent

concealment of the Three-Part Test's procedural invalidity constitutes unclean hands that prevents their resort to equitable defenses such as laches.

## IRREPARABLE HARM REQUIRES INJUNCTIVE RELIEF

49.     The injunctive and declaratory relief requested in paragraph 177 will redress the injuries alleged herein against the federal defendants by eliminating the Three-Part Test and the safe-harbor provisions of the 1996 Clarification and 2003 Further Clarification, thereby restoring the statute's and regulations' protections against intentional gender-based discrimination, 20 U.S.C. §1681; 45 C.F.R. §86.41(a), and the regulations' requirement that schools provide equal opportunity (not equal participation) based on interest and abilities (not enrollment). 45 C.F.R. §86.41(c)(1).

50.     The injunctive and declaratory relief requested in paragraph 177 will avert irreparable harm to EIA Members who are JMU student athletes on the unlawfully demoted teams by ensuring that they can participate in their sports during their time-limited window of opportunity to compete in intercollegiate athletics.

51.     Injunctive and declaratory relief are necessary to restore the rights of men and women to an equal footing in the allocation of athletic opportunities, to prevent schools from continuing to rely on the Three-Part Test after the Court declares the Test unenforceable by the federal defendants, and to prevent the loss of further athletic opportunities. EIA Members' intangible and aesthetic injuries cannot be redressed by or reduced to money damages.

52.     Whether or not EIA or the Court joins schools as defendants and even if EIA prevails against such schools in declaring the Three-Part Test unlawful, injunctive relief against the federal defendants remains necessary to ensure that the federal defendants do not seek to discontinue such schools' federal funding. Because nonmutual estoppel does not apply against

the federal defendants, the schools could not rely on this Court's orders against the schools to shield the schools from federal regulatory enforcement.

## STATUTORY BACKGROUND

**Administrative Procedure Act**

53.     Before an agency lawfully can issue a substantive rule, the APA requires the agency to publish a notice of proposed rulemaking in the *Federal Register,* to provide an opportunity to comment, to respond to comments, and to publish the final rule in the *Federal Register.* 5 U.S.C. §553(b)-(c). The APA exempts "interpretative rules, general statements of policy, or rules of agency... practice" from the foregoing notice-and-comment rulemaking requirements. 5 U.S.C. §553(b)(A).

54.     The APA requires a new notice-and-comment rulemaking to add specific new regulatory factors to an existing substantive rule's enumeration of regulatory factors, and that requirement applies notwithstanding that the existing substantive rule allows the agency to consider "other factors" on a case-by-case basis.

55.     Administrative actions constitute substantive regulations (and thus require notice-and-comment rulemaking) when they create the basis either for enforcement action or for agency action to confer benefits; create safe harbors; and/or amend or effectively amend a prior substantive rule or interpretation.

**Title IX**

56.     Congress modeled Title IX on Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§2000d-2000d-7 ("Title VI"). Like Title VI's prohibition on racial discrimination, 42 U.S.C. §2000d, Section 901(a) of Title IX broadly prohibits intentional (*i.e.,* purposeful) gender-based discrimination in federally funded educational programs and activities. 20 U.S.C. §1681(a). For

purposes of Title IX, "intentional discrimination" means discriminatory actions taken because of a person's gender, not merely in spite of that person's gender.

57.     Unlike Title VI, Title IX incorporates the anti-quota provision from Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(j), into Section 901(b), which states inter alia that "Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area." 20 U.S.C. §1681(b).

58.     Like Title VI's rulemaking provision, 42 U.S.C. §2000d-1, Section 902 of Title IX authorizes and directs "each Federal department and agency... empowered to extend Federal financial assistance... to effectuate the provisions of section 1681... by issuing rules, regulations, or orders of general applicability." 20 U.S.C. §1682. Section 902 further states that "No such rule, regulation, or order shall become effective unless and until approved by the President." *Id.*

59.     Congress patterned Section 902 on Section 602 of Title VI, 42 U.S.C. §2000d-1, under which the President must publish his or her approval in the *Federal Register* before the rule, regulation, or order takes effect.

60.     On November 2, 1980, President Carter issued Executive Order 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980), which delegated to the Attorney General the presidential authority to approve rules, regulations, and orders and to coordinate the implementation and enforcement of Title IX and other civil rights legislation.

61.     On June 3, 1981, the Attorney General delegated to the Assistant Attorney

General in charge of the Department of Justice's Civil Rights Division the implementation and enforcement authority (but not the authority to approve rules, regulations, and orders) that Executive Order 12,250 had delegated to the Attorney General.

**Javits Amendment**

62.     In Pub. L. No. 93-380, §844, 88 Stat. 484, 612 (1974), Congress directed HEW's Secretary to publish within 30 days proposed Title IX regulations, which were to "include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Although modified in Conference, the legislative history of this so-called "Javits Amendment" in the Senate makes clear that its requirement to publish proposed (not final) regulations was "not intended to confer on HEW any authority it does not already have under the act." 120 Cong. Rec. 15,323 (1974). In any event, the sports-related components of the Javits Amendment do not apply by its terms to interscholastic athletics.

**Civil Rights Restoration Act**

63.     On February 11, 1984, the Supreme Court's decision in *Grove City College v. Bell,* 465 U.S. 555 (1984) (*Grove City*), held that Title IX extended only to the educational programs and activities that directly received federal funds.

64.     In the Civil Rights Restoration Act, Pub. L. No. 100-259, 102 Stat. 28 (1988) ("CRRA"), Congress prospectively extended the reach of Title IX to all of a school's educational programs and activities if any of the school's educational programs and activities received federal funds.

## REGULATORY BACKGROUND

**1975 HEW Regulations**

65.     On June 20, 1974, HEW issued proposed regulations implementing Title IX. 39 Fed. Reg. 22,228 (June 20, 1974). Regarding athletics, the proposal required schools to assess student interest in athletics. The proposed rule did not, however, require equal expenditure for each gender or for each team.

66.     On June 4, 1975, HEW issued final regulations implementing Title IX. 40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. §§86.1-.71). HEW's regulations regarding athletics, 45 C.F.R. §86.41, include a three-year phase-in period, 45 C.F.R. §86.41(d), which expired on July 21, 1978.

67.     In the preamble to its final rule, HEW indicated that it eliminated the proposal's requirement to assess student interest because commenters misinterpreted it as a requirement to conduct an annual student poll and to offer teams based on the result of that poll. 40 Fed. Reg. at 24,134. In eliminating that proposed requirement, however, HEW expressed its intent that schools consider the interests of both genders when determining what sports to offer. *Id.* Further, HEW disavowed an element of the proposed rule that would have required schools to make affirmative efforts to publicize opportunities available to a gender for which athletic opportunity had been limited without discrimination because that proposed requirement would have been "affirmative action," inconsistent with 45 C.F.R. §86.3. *Id.*

68.     The regulation requires schools to provide "equal athletic opportunity for members of both sexes." 45 C.F.R. §86.41(c). The rule lists ten factors that HEW will consider "among other factors" to determine whether equal opportunities are available. *Id.* The first factor is "[w]hether the selection of sports and levels of competition effectively accommodate the

interests and abilities of both sexes." 45 C.F.R. §86.41(c)(1). The other nine factors include equality of facilities, equipment, and housing, scheduling of games and practice, dining services, travel, and per diems, publicity, tutors, and access to coaching. *See* 45 C.F.R. §86.41(c)(2)-(10).

69.    Under the regulations as promulgated, "level of competition" refers qualitatively to the type of team offered (*i.e.,* intramural v. club v. intercollegiate/interscholastic varsity; local v. regional v. national) and "selection of sports" refers to the sport offered (*e.g.,* track and field, gymnastics, swimming).

70.    HEW intended the regulations' equal-opportunity and equal-accommodation provisions to require schools to assess the interests of both genders. HEW's Secretary contemporaneously testified to Congress that "the interest and abilities of both sexes… obviously involves learning about those interests in one way or another."

71.    President Ford signed and approved the HEW regulation on May 27, 1975, which was published in the *Federal Register.* 40 Fed. Reg. at 24,137.

**1979 HEW Policy Interpretation**

72.    In the months after HEW's phase-in period expired, HEW received approximately 93 complaints against approximately 62 colleges and universities and, on December 11, 1978, HEW's Office for Civil Rights issued a proposed "policy interpretation" as a framework for resolving the complaints. 43 Fed. Reg. 58,070, 58,071 (Dec. 11, 1978).

73.    HEW proposed a precursor to the current Three-Part Test as a non-exclusive means of demonstrating compliance with 45 C.F.R. §86.41(c)(1)'s interest-and-abilities provision. 43 Fed. Reg. at 58,074. HEW recognized that differences in athletic interests between genders could cause participation rates to differ, even at schools that provide equal opportunity. *See, e.g.,* 43 Fed. Reg. at 58,072 ("Intercollegiate athletic programs that provide equal

opportunities for both sexes may offer different sports, and have different participation rates and varying competition opportunities for men and for women, because their interests and abilities may be different").

74.     Initially, HEW took the position – as expressed by its General Counsel – that the forthcoming policy interpretation must meet the procedural requirements of the General Education Provisions Act ("GEPA") and Title IX. *See, e.g.,* Ex. 9 ("Libassi Opinion"); Ex. 10, at 1 ("If we go too far in the other direction and claim this policy statement is a 'rule' of general applicability[,] it would have to be approved by the President") ("Libassi Memorandum"). Because of congressional and public interest in the issue, the HEW Secretary shared its position (including the Libassi Opinion) with Congress and the public.

75.     Notwithstanding HEW's position on the legal necessity for procedural compliance, HEW's civil-rights staff wished to avoid the political and legal impediments and potential delay of HEW's complying with the applicable procedural requirements. Accordingly, internal HEW stakeholders lobbied for releasing the Policy Interpretation without complying with the procedures required for HEW's Title IX rules or orders. To further this effort, an Associate General Counsel prepared an opinion that justified not complying with those procedures. Ex. 11 ("Hamlin Memorandum").

76.     Under the Hamlin Memorandum, the Policy Interpretation is nonbinding and "failure to meet the [Policy Interpretation] compliance factors does not constitute proof that an educational institution violated Title IX," but the then-current draft needed revisions to eliminate the "potentially misleading and… incorrect language" that "may make it appear that this document imposes new legal requirements." Moreover, to avoid classification as a binding rule, HEW expressly disavowed the argument that the notice and comment it provided the public on

the policy interpretation satisfied the APA's notice-and-comment rulemaking requirements.

77.     Like the proposed policy interpretation, the pre-Hamlin draft of the policy interpretation included the Three-Part Test as a means of satisfying 45 C.F.R. §86.41(c)(1)'s interest-and-abilities provision.. One key post-Hamlin revision moves the Three-Part Test from an interpretation of "interests and abilities" under 45 C.F.R. §86.41(c)(1) to an application of a new policy adopted as an "other factor" under 45 C.F.R. §86.41(c) to consider levels of competition, including the opportunity for team competition. In addition, the post-Hamlin revision adds preamble language that the Policy Interpretation "does not contain a separate section on institutions' future responsibilities[,]… institutions remain obligated by the Title IX regulation to accommodate effectively the interests and abilities of male and female students with regard to the selection of sports and levels of competition available." The federal defendants and their predecessors intended this preamble language to make clear that the 1979 Three-Part Test did not alter or amend the 1975 regulations.

78.     Consistent with the Hamlin Memorandum, the federal defendants and their predecessors neither intended nor considered the 1979 Policy Interpretation (including the Three-Part Test) to constitute a "generally applicable rule, regulation, guideline, interpretation, or other requirement" that would bind either the agency or the public, and expressly so indicated in justifying the agency's failure to seek President Carter's signature and to submit the policy interpretation to Congress. The federal defendants and their predecessors adopted the Hamlin Memorandum as their official interpretation of the action that HEW took in its Title IX policy interpretation. Like her predecessor with the Libassi Opinion, the new HEW Secretary shared the Hamlin Memorandum with the Congress and the public. *See, e.g.,* Ex. 12 (letters to Congress); Ex. 13 (newspaper account). On December 11, 1979, HEW issued that policy interpretation. 44

Fed. Reg. 71,413, 71,414 (Dec. 11, 1979) ("1979 Policy Interpretation").

79.     The 1979 Policy Interpretation's guidance on "equal athletic opportunity" consists of an "Overall Determination of Compliance" and three specific sections captioned: (1) determination of interests and abilities; (2) selection of sports; and (3) selection of the level of competition.

80.     The "Overall Determination of Compliance" contains the following three criteria:

(a)     Whether a school's policies are discriminatory in language or effect;

(b)     Whether the school's program as a whole includes substantial and unjustified disparities in the opportunities or treatment afforded to male and female athletes; and

(c)     Whether segments of the school's program include disparities in the treatment and opportunities that are substantial enough to deny equality of athletic opportunity.

81.     With regard to assessing interests and abilities, the 1979 Policy Interpretation allows schools to assess students' athletic interests and abilities by any non-discriminatory method, provided that:

(a)     The process takes into account the nationally increasing levels of women's interests and abilities;

(b)     The methods do not disadvantage the members of the underrepresented gender;

(c)     The methods of determining ability consider team performance records; and

(d)     The methods are responsive to the expressed interests of students of the

underrepresented gender capable of intercollegiate competition.

82.     With regard to selecting sports, the 1979 Policy Interpretation does not require schools to integrate teams or to field male and female teams in all sports. Under the 1979 Policy Interpretation, however, if a school excludes a gender from a contact sport, it must also field a team for the excluded gender if opportunities have been limited and there is sufficient interest to support a viable team with a reasonable expectation of intercollegiate competition. For a non-contact sport, the school must field a team for the excluded gender if that gender has insufficient skill to compete on an integrated team, opportunities have been limited for that gender, and there is sufficient interest to support a viable team with a reasonable expectation of intercollegiate competition.

83.     The 1979 Policy Interpretation does not require schools to upgrade teams to intercollegiate status absent a "reasonable expectation" that intercollegiate competition will be available in the school's normal competitive region. When opportunities for a gender have been limited, however, the 1979 Policy Interpretation may require the school to encourage development of competition in the region.

84.     HEW used its "other factor" authority to create a new (quantitative) factor that it describes as "equal competitive opportunity" in its internal memoranda, and as "levels of competition including the opportunity for team competition" in the 1979 Policy Interpretation. As an application of HEW's new policy to consider this new factor, the 1979 Policy Interpretation sets forth a three-part test to assess compliance with this level-of-competition component of "equal athletic opportunity":

(a)     Whether the school provides intercollegiate "participation opportunities" in numbers substantially proportionate to enrollment;

29

(b)      If not, whether the school can show a continuing history of expansion that is demonstrably responsive to the developing interest of the underrepresented gender; and

(c)      If not, whether the school can show that the interests and abilities of the underrepresented gender are "fully and effectively accommodated."

85.      The 1979 Policy Interpretation was "designed specifically for intercollegiate athletics" but states that "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by regulation." 44 Fed. Reg. 71,413. HEW did not consider the Three-Part Test a "general principle" of the 1979 Policy Interpretation, and HEW did not consider the Three-Part Test to apply outside intercollegiate athletics. Indeed, by its terms, the Three-Part Test applies only to select whether a college or university should sponsor a particular sport at the intercollegiate, club, or intramural level of competition, and the federal defendants expressly relied on Javits Amendment authority that applies only to intercollegiate athletics. In the 1979 Policy Interpretation, HEW expressly did not find universal evidence of discrimination in intercollegiate athletics and did not consider any evidence at all on interscholastic athletics.

86.      No President (before November 2, 1980) or Attorney General (after November 2, 1980) has approved the 1979 Policy Interpretation pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

**Formation of DOE and Promulgation of DOE's 1980 Regulations**

87.      The Department of Education Organization Act of 1979, Pub. L. No. 96-88, 93 Stat. 668 (Oct. 17, 1979), created defendant DOE from certain educational components of HEW, with the remaining components of HEW renamed the Department of Health & Human Services ("HHS"). 20 U.S.C. §3508(b).

88.     HEW never enforced the Three-Part Test or any of the 1979 Policy Interpretation against any school, either at the collegiate or scholastic level. Instead, after issuing the Policy Interpretation, HEW began work on what became the 1980 investigator's manual, which HEW determined it must complete before beginning enforcement. HEW passed that task uncompleted to the new Department of Education in May 1980. DOE completed the task in the summer of 1980.

89.     After the creation of defendant DOE as a separate agency, the federal defendants promulgated the education-related regulations previously issued by HEW and other agencies as the Education title of the Code of Federal Regulations. 45 Fed. Reg. 30,802 (May 9, 1980). HHS, the non-DOE portion of former HEW, retained its own Title IX regulations. *See* 45 C.F.R. §86.1-.71. Defendants' Title IX regulations mirror the HEW/HHS regulations, with the names of the relevant offices and departments changed (*e.g.,* replacing HEW with DOE).

90.     No President (before November 2, 1980) or Attorney General (after November 2, 1980) has approved the 1980 DOE regulations pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

91.     Defendants prepared enforcement manuals in 1980 and 1990, but neither published them in the *Federal Register* nor sought or received approval from the Office of the *Federal Register* to incorporate them by reference in the *Federal Register.*

92.     No President (before November 2, 1980) or Attorney General (after November 2, 1980) has approved the 1980 or 1990 enforcement manuals pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

**1996 Clarification**

93.     On May 9, 1995, the House Subcommittee on Postsecondary Education, Training

and Life-long Learning of the Economic and Educational Opportunities Committee held a hearing on Title IX and the Three-Part Test.

94.     On June 7, 1995, 142 Members of Congress wrote the Assistant Secretary of Civil Rights expressing wide agreement in Congress that DOE's Office for Civil Rights needed to issue a revised policy interpretation because, contrary to the legislative intent behind Title IX, the Three-Part Test was causing schools to eliminate men's athletic opportunities to achieve proportionality, without corresponding increases in women's athletic opportunities.

95.     On September 20, 1995, the federal defendants issued a memorandum proposing to clarify the 1979 Policy Interpretation. "Clarification of Intercollegiate Athletics Policy Guidance: the Three-Part Test" (Sept. 20, 1995) (transmitted by Letter from Norma V. Cantú, Assistant Secretary, Office for Civil Rights, Department of Education (Sept. 20, 1995)). Throughout her DOE service, Assistant Secretary Cantú was a member of the State Bar of Texas.

96.     On October 2, 1995, the federal defendants published a notice in the *Federal Register* announcing the availability of the draft clarification (without publishing that draft) and soliciting "public comment on whether the draft Clarification provides adequate clarity in areas that have generated questions." 60 Fed. Reg. 51,460 (Oct. 2, 1995).

97.     Commenters questioned whether the Three-Part Test substantively complied with Title IX and the Fourteenth Amendment and whether – even if the Three-Part Test was lawful in 1979 – whether changed circumstances between the 1970s and the 1990s required DOE to revisit the Three-Part Test.

98.     On January 16, 1996, the federal defendants issued its "Clarification of Intercollegiate Athletics Policy Guidance: the Three-Part Test" (Jan. 16, 1996) (transmitted by Letter from Norma V. Cantú, Assistant Secretary, Office for Civil Rights, Department of

Education (Jan. 16, 1996)) ("1996 Clarification"). DOE's press release announcing the 1996 Clarification characterized the 1996 Clarification as identifying "legal obligations."

99.     The 1996 Clarification acknowledges receipt of comments suggesting that the 1979 Policy Interpretation "provided more protection for women's sports than intended by Title IX" but dismissed those comments because "it would not be appropriate to revise the 1979 Policy Interpretation."

100.    Throughout Assistant Secretary Cantú's DOE service, Assistant Secretary Cantú, the then-Secretary, DOE, and the United States knew of HEW's positions as reflected in the Libassi Opinion and the Hamlin Memorandum. In the alternative, during that time and until those documents were served on the Assistant Secretary, Secretary, DOE, and United States in 2004, those parties were not aware of those HEW positions.

101.    The 1996 Clarification asserts that the proportionality prong of the Three-Part Test is a "safe harbor" for complying with the equal opportunity provisions of the regulations, but that schools are free to choose to comply with the other two tests.

102.    In the 1996 Clarification, the federal defendants stated that they will count athletes – as opposed to unfilled opportunities on teams – when they assess the proportionality of participation opportunities: "OCR [*i.e.,* the Office for Civil Rights] must, however, count actual athletes because participation opportunities must be real, not illusory."

103.    The 1996 Clarification announces the federal defendants' position on capping: "The rules here are straightforward. An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test." ("Capping" means disparately placing an artificially low limit on the number of one gender's participants on a team to achieve gender proportionality across teams.)

104.    The 1996 Clarification was federal defendants' first public announcement that the federal defendants had extended the Three-Part Test to interscholastic athletic programs. In a contemporaneous sworn statement, their HEW predecessors advised the U.S. District Court for the District of Columbia that HEW would not apply the 1979 Policy Interpretation's "interest-and-abilities" provisions to interscholastic athletics.

105.    The 1996 Clarification was the federal defendants' first post-*Grove City* public announcement that the Three-Part Test applied generally to athletic departments that do not directly receive federal funds.

106.    The third prong of the Three-Part Test described in the 1996 Clarification differs from that described in the federal defendants' 1980 Title IX Intercollegiate Athletics Investigator's Manual. Specifically, in 1980, the federal defendants interpreted prong three to mean that a school must accommodate the underrepresented gender's interest "to the same degree that it accommodates the interests... of the other gender." Although the 1980 manual differs from the 1975 regulations in some respects, this relative-interest interpretation of the third prong conforms to the relative-interest regulatory standard that HEW promulgated in 1975.

107.    During the 1980s, the federal defendants interpreted and enforced prong three consistently with its 1980 manual, under a comparative analysis that included whether a college offered intercollegiate sports for men and women in the same proportion to the interscholastic sports in which boys and girls participated. The 1996 Clarification changed the inquiry of prong three to whether the underrepresented gender has "(a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team," without considering the relative accommodation of the other gender's interest.

108.    The federal defendants neither considered nor found any evidence of intentional

discrimination – much less systemic or universal intentional discrimination – against female athletes in issuing the 1996 Clarification. Instead, the federal defendants relied on the difference between enrollment and athletic participation to determine disparate impacts.

109.    Defendants neither published the 1996 Clarification in the *Federal Register* nor sought or received approval from the Office of the *Federal Register* to incorporate the 1996 Clarification (or the September 20, 1995 draft clarification) by reference in the *Federal Register.*

110.    Defendants did not issue the 1996 Clarification pursuant to any procedure that the federal defendants previously had published in the *Federal Register* pursuant to 5 U.S.C. §552(a)(1)(C).

111.    No President or Attorney General has approved the 1996 Clarification pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

**2003 Further Clarification**

112.    On July 11, 2003, the federal defendants issued "Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance" ("2003 Further Clarification").

113.    Beginning with DOE's chartering the Secretary's Commission on Opportunity in Athletics and ending with the federal defendants' issuing the 2003 Further Clarification, the federal defendants reopened the Three-Part Test for reconsideration and (in the 2003 Further Clarification) issued a new and final rule or order setting forth the rights and obligations of schools, students, and coaches under Title IX.

114.    In the 2003 Further Clarification, the federal defendants *inter alia* claim that the 1979 Policy Interpretation "established a three-prong test for compliance with Title IX, which [defendants] later amplified and clarified in its 1996 Clarification" and elevates the Three-Part

Test's second and third prongs to safe-harbor status, parallel with the 1996 Clarification's elevation of the Three-Part Test's first prong.

115.   The 2003 Further Clarification "advises schools that it will aggressively enforce Title IX standards, including implementing sanctions for institutions that do not comply."

116.   The federal defendants neither considered nor found any evidence of intentional discrimination – much less systemic or universal intentional discrimination – against female athletes in issuing the 2003 Further Clarification. Instead, the federal defendants relied on the difference between enrollment and athletic participation to determine disparate impacts.

117.   Defendants did not issue the 2003 Further Clarification pursuant to any procedure that the federal defendants previously had published in the *Federal Register* pursuant to 5 U.S.C. §552(a)(1)(C).

118.   No President or Attorney General has approved the 2003 Further Clarification pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

**2005 Additional Clarification**

119.   On March 17, 2005, defendants issued "Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test – Part Three" ("2005 Additional Clarification").

120.   Regardless of whether the federal defendants had knowledge of the procedural history of the 1979 Policy Interpretation prior to issuing the 1996 Clarification and the 2003 Further Clarification, they had actual knowledge of that history before they issued the 2005 Further Clarification. Notwithstanding that knowledge, the 2005 Additional Clarification holds the Three-Part Test out as creating "obligations" and allows limiting the assessment of student interest to "all… students of the underrepresented sex," notwithstanding that the Title IX regulations required assessing the interests of both genders.

121.    The 2005 Additional Clarification acknowledges that DOE and the officer defendants "do[] not enforce the Fourteenth Amendment to the U.S. Constitution" and that "because the scope of the Equal Protection Clause of the Fourteenth Amendment may differ from the scope of the Title IX statute, this Additional Clarification does not regulate or implement constitutional requirements or constitute advice about the Constitution."

122.    Defendants did not issue the 2005 Further Clarification pursuant to any procedure that the federal defendants previously had published in the *Federal Register* pursuant to 5 U.S.C. §552(a)(1)(C).

123.    No President or Attorney General has approved the 2005 Further Clarification pursuant to 20 U.S.C. §1682 and Executive Order 12,250. *See* paragraphs 59-61.

## DISCRIMINATION IN JMU'S ATHLETIC PROGRAMS

124.    On March 23, 2001, the JMU defendants and their predecessors approved a plan to move into compliance with the Three-Part Test under which JMU would cap men's participation and encourage greater women's participation to move toward enrollment proportionality. Under this plan as implemented, the JMU defendants imposed gender-specific roster caps on men's teams, including the gymnastics, swimming and diving, and wrestling teams, to limit the participation rates on those teams because of the participants' gender. In doing so, the JMU defendants did not impose similar roster caps or treatment on similarly situated females.

125.    From the 2001-02 to the 2006-07 school years, JMU intentionally and discriminatorily imposed this disparate treatment on male athletes. Historically, JMU was an all-women's institution until 1966, and JMU has no history of intentional discrimination against women. JMU has not been adjudged to have committed intentional discrimination against

women generally or against female athletes in its athletic programs.

126.   On information and belief, for two years prior to September 29, 2006, the JMU officer defendants worked with a consultant named Lamar Daniels to develop a plan to attain enrollment proportionality. In doing so, the JMU defendants and an athletics subcommittee of the Board of Visitors engaged in non-public discussions in violation of the open-meeting requirements of the Virginia Freedom of Information Act. Va. Code §§2.2-3700 to -3714. Mr. Daniels counseled the JMU defendants and the athletics subcommittee of the Board of Visitors that the Title IX regulations require schools to comply with the Three-Part Test and that those regulations allow gender-conscious cutting and capping to attain enrollment proportionality.

127.   Consistent with Mr. Daniels' advice, the JMU defendants did not assess the interests and abilities of both genders as required by the Title IX regulations, but instead focused on attaining enrollment proportionality. The JMU defendants rejected compliance with the Three-Part Test's second and third prongs because JMU had not recently added an intercollegiate  women's team (prong two) and the JMU defendants believed that the women's equestrian and water polo clubs might demonstrate sufficient interest to justify elevating them to intercollegiate status (prong three). Virginia interscholastic programs do not sponsor equestrian or water polo. Equestrian is a coeducational sport, and JMU fields both men's and women's water polo clubs. Neither the interests and abilities provisions of the Title IX regulations (45 C.F.R. §86.41(c)(1)) nor even the third prong of the Three-Part Test (as issued in 1979 and as interpreted throughout the 1980s by the federal defendants and their predecessors) required JMU to elevate equestrian or women's water polo to intercollegiate status.

128.   Although the JMU defendants knew in advance of deciding to eliminate the ten athletic teams that the elimination was likely and knew that the decision would be material to

students that JMU coaches actively recruited to come to JMU to participate on the ten teams, as well as women's swimming, cross country, and track, the JMU defendants did not disclose those material facts to prior to September 29, 2006.

129.    The minutes of the JMU Board of Visitors' meeting on September 29, 2006, provide the following summary of the JMU Board of Visitors' action to eliminate the ten teams: "On motion of Mr. Rivers, seconded by Mr. Foster approved the elimination of the following men's sports: archery, cross country, gymnastics, indoor track, outdoor track, swimming and wrestling; and the following women's sports: archery, fencing, and gymnastics to be in compliance with the proportionality test of Title IX." The JMU Board of Visitors approved the foregoing minutes, which accurately reflect the motivation of the JMU defendants. Neither defendants Rivers and Foster nor any other defendant member of the JMU Board of Visitors would have moved or seconded the foregoing motion if they knew that the Three-Part Test was procedurally invalid, that the proposed cuts violated federal and Virginia substantive equal-protection law, and that their actions violated federal and Virginia procedural due process.

130.    On January 12, 2007, the JMU Board of Visitors heard a request from Jennifer Chapman, a senior track and field athlete, on behalf of the ten sports scheduled for elimination on July 1, 2007. After hearing that request, the JMU officer defendants reconvened in private session to weigh the student athletes' request, in violation of the open-meeting requirements of the Virginia Freedom of Information Act. The defendant Board of Visitors did not vote publicly on the student athletes' request.

131.    By facsimile and Federal Express, on March 23, 2007, plaintiff EIA's counsel advised the JMU defendants' counsel of this litigation by letter enclosing the a copy of the initial complaint in this matter (Ex. 7). Notwithstanding that EIA's letter and the enclosed complaint

undermined the basis on which the JMU defendants had planned their cuts, the JMU defendants declined to revisit their decision to eliminate the ten athletic teams (Ex. 8).

132.    Each of the ten athletic teams that the JMU defendants eliminated and demoted to club status on July 1, 2007, had sufficient returning student athletes to field a competitive team during the 2007-08 season. But for JMU's violations of Title IX and the Fourteenth Amendment, each of the ten club teams would be a viable intercollegiate team if reinstated to varsity status. Each of the ten club teams could become a viable intercollegiate team if reinstated to varsity status. Interest within Virginia and within JMU's geographic market for students would suffice to re-populate the teams if reinstated.

133.    Schools (including JMU) can schedule a season for these sports with no leadtime. For cross country, track and field, and swimming and diving, JMU could simply include the reinstated men's teams in the existing schedules for the corresponding women's teams. For the remaining sports, assuming *arguendo* that JMU could not schedule dual competitions against other schools, JMU could schedule competition to coincide with previously scheduled dual competitions between other teams. Any reinstated team that could not schedule such dual- or tri-school competitions could participate in invitational tournaments (as distinct from dual competitions) until a full season could be scheduled.

134.    As indicated in Exhibit 1 for the 2007-08 academic year, men were the statistically underrepresented gender in JMU's athletic department by 2.2% or 17 athletes, which would have been more than enough to retain men's cross country.

135.    By eliminating a disproportionately large number of non-scholarship male athletes, JMU went from meeting scholarship proportionality in 2006-07 to violating it in 2007-08. As indicated in Exhibit 1 for the 2007-08 academic year, JMU shortchanged its female

athletes by 11.94 percent or approximately $1,313,000 under the federal defendants' scholarship rules. Fielding 17 non-scholarship male cross-country runners or other athletes would have reduced JMU's scholarship-proportionality gap by $288,000 in 2007-08.

## COUNT I

## THREE-PART TEST UNLAWFULLY ESTABLISHES A DISPARATE-IMPACT STANDARD AND UNLAWFULLY AUTHORIZES INTENTIONAL DISCRIMINATION

136.    Plaintiff EIA incorporates Paragraphs 1-132 and Paragraphs 148-176, as if fully set forth herein.

137.    The Equal Protection Clause of the Fourteenth Amendment, the Equal Protection Component of the Due Process Clause of the Fifth Amendment, Title IX, and §86.41(a) of the Title IX regulations prohibit intentional gender-based discrimination and *only* intentional gender-based discrimination. As federal agencies and officers empowered to extend federal financial assistance to educational programs and activities, defendants DOE, Secretary, and Assistant Secretary have a nondiscretionary duty to promulgate rules, regulations, and orders to effectuate Title IX's prohibition of intentional gender-based discrimination and *only* intentional gender-based discrimination. No provision of law authorizes federal agencies or officers to create (by rule or otherwise) a generally applicable disparate-impact standard or affirmative-action requirement.

138.    When otherwise allowed by law, a disparate-impact or equal-opportunity standard requires comparison with the qualified applicant pool, not the general population. Assuming *arguendo* and in the alternative to Paragraph 137 that Title IX authorizes the federal defendants to adopt such regulatory standards, the federal defendants must compare (and must require recipients of federal funds to compare) athletic opportunities to the students actually interested in

participating in athletics, not to all enrolled students. When otherwise allowed by law, agencies must base affirmative-action mandates and disparate-impact standards on credible findings that systemic or universal intentional discrimination exists in the targeted field, and the mandate or standard must include a reasonable sunset provision. The federal defendants never have found that systemic or universal intentional discrimination exists in athletics, and the Three-Part Test does not include a sunset provision.

139.   Title IX does not authorize the federal defendants to authorize schools to engage in intentional gender discrimination – such as gender-based cutting or capping – to achieve compliance with a generally applicable disparate-impact standard or affirmative-action requirement. The federal defendants constitutionally can authorize such gender-conscious remedies at a school only where necessary to remedy the effects of past gender-based intentional discrimination by that school after the school has been adjudged to have committed intentional gender-based discrimination in the provision of athletic opportunities.

140.   The Three-Part Test violates the Equal Protection Clause of the Fourteenth Amendment, the Equal Protection Component of the Due Process Clause of the Fifth Amendment, Title IX, and §86.41(a) and §86.41(c)(1) of the Title IX regulations by requiring and purporting to authorize those schools where men are more interested than women in athletics (including the schools listed in Paragraphs 9-14) to discriminate against male student-athletes in one or more of the following ways:

   (a)   Allocate athletic participation (or limit men's participation) based on enrollment, which provides men with fewer athletic opportunities than it provides to women, vis-à-vis the genders' respective athletic interest;

   (b)   Continually expand athletic opportunities for women far beyond the level

42

of opportunities provided to men, vis-à-vis the genders' respective athletic interest; and/or

(c)     Fully accommodate the athletic interests of women notwithstanding that the school does not also fully accommodate the athletic interests of men.

141.    In addition to the foregoing violations of constitutional, statutory, and regulatory equal-protection rights, the defendants' Three-Part Test also unlawfully interferes with the rights of both male and female athletes to be free of *ultra vires* and arbitrary government interference with their interactions with schools and particularly the rights of female athletes on traditional small-roster sports (*e.g.,* tennis, archery, fencing, and gymnastics), whose sports schools disfavor under the Three-Part Test's unlawful pressure to prefer and to field large-roster women's teams (*e.g.,* rugby, crew, and equestrian).

142.    The federal defendants and their predecessors took the challenged administrative actions with the knowing intent to disadvantage male athletes vis-à-vis female athletes and to increase female athletic participation vis-à-vis male athletic participation. Defendants and their predecessors failed to identify (and do not have) any "important government objective" served by gender-based cutting and capping to bring athletic participation into proportion with enrollment rates.

143.    Capping a male athlete off a team or cutting an entire men's team to meet an enrollment-based quota or because not enough female students elect to participate in the available opportunities violates the Equal Protection Clause of the Fourteenth Amendment (for public schools), Title IX, §86.41(a) and §86.41(c)(1) of the Title IX regulations, and the Overall Determination of Compliance. Defendants' authorizing such capping and cutting violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment, Title IX,

§86.41(a) and §86.41(c)(1) of the Title IX regulations, and the Overall Determination of Compliance.

144.    In the case of reciprocal sports such as men's and women's swimming or track that practice and compete together on the same schedules, the reciprocal teams represent two halves of one unified team, with the team members associating together and participating in the educational aspects of athletics by helping to train each other. Using the Three-Part Test to justify severing such teams by gender violates the educational and associational protections of the First Amendment.

145.    If the Court interprets Title IX or the Title IX regulations to allow the Three-Part Test or to authorize such gender-based cutting or capping, then Title IX and the Title IX regulations are unconstitutional. In the event that the Court so interprets Title IX and/or the Title IX regulations, the "other relief" requested by Paragraph 177.F includes a declaration that Title IX and/or the Title IX regulations violate the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Equal Protection Component of the Due Process Clause of the Fifth Amendment and an injunction against the federal defendants' enforcing them in athletics.

146.    Schools nationwide – including JMU – depend on federal funding, such that the threat of its elimination is coercive. The Spending Clause does not authorize the federal defendants to impose coercive conditions generally, and a fortiorari does not authorize the federal defendants to impose conditions on programs (such as athletics) that do not directly receive federal funds.

147.    For the foregoing reasons, the Three-Part Test, 1979 Policy Interpretation, 1996 Clarification, 2003 Further Clarification, and 2005 Additional Clarification are arbitrary,

capricious, an abuse of discretion, not otherwise in accordance with the law, in excess of authority granted by law, *ultra vires,* and without observance of procedure required by law

## COUNT II
## THREE-PART TEST AND ITS VARIOUS "CLARIFICATIONS" UNLAWFULLY AMENDED TITLE IX REGULATIONS WITHOUT THE REQUIRED RULEMAKING

148.    Plaintiff EIA incorporates Paragraphs 1-147 and Paragraphs 163-176, as if fully set forth herein.

149.    Under 5 U.S.C. §553(b)-(c), agency action that amends prior substantive or interpretive rules requires notice-and-comment rulemaking, which requires publication in the *Federal Register* and the agency's responding to comments as part of its final rule. Agency actions that purport to make such amendments without complying with the relevant procedural requirements are of no force or effect and are void *ab initio.*

150.    Neither HEW nor DOE underwent APA notice-and-comment rulemaking for the 1979 Policy Interpretation, the 1996 Clarification, the 2003 Further Clarification, or the 2005 Additional Clarification. Neither HEW nor DOE responded to the contemporaneous comments presented to the agencies during the agencies' 1978-79, 1995-96, 2002-03, and 2004-05 deliberations that the Three-Part Test violates Title IX and the Constitution, exceeds the agencies' authority, and (with respect to 1995-96 and 2002-03) failed to respond to changed circumstances since the 1970s.

151.    By its original terms, the 1979 Three-Part Test did not apply prospectively to schools' future compliance, but instead served only as HEW's nonbinding proposed framework for future administrative resolution (*i.e.,* in the absence of HEW's negotiating voluntary compliance) in the nearly 100 administrative complaints pending in 1979. By purporting to

elevate the Three-Part Test to a "legal obligation" for Title IX compliance in 1996 (and prospectively thereafter), the federal defendants purport to amend the 1979 Policy Interpretation itself by making it prospective and binding and purport to amend the Title IX regulations by requiring or authorizing the discrimination identified in Paragraph 140 and by changing the 1975 regulations' interest-based equal-opportunity standard to an enrollment-based equal-participation standard.

152.    Assuming *arguendo* and in the alternative to Paragraph 151 that the original 1979 Three-Part Test initially was (or otherwise ever became) binding on the agency or the public, the original 1979 Three-Part Test purported to amend the Title IX regulations as outlined in Paragraph 151.

153.    The 1979 Policy Interpretation's Three-Part Test asks, in part, whether a school provides intercollegiate "participation opportunities" in numbers substantially proportionate to enrollment. The 1996 Clarification purports to amend the 1979 Policy Interpretation from counting "participation opportunities" (*i.e.,* spots on a team) to counting "participants" (*i.e.,* athletes on a team) when determining whether a school complies with the gender-proportionality prong of the Three-Part Test and further purports to amend the Title IX regulations by changing the equal-opportunity standard to an equal-participation standard.

154.    By its terms and HEW's contemporaneous sworn testimony, the 1979 Three-Part Test did not apply at all to interscholastic athletic programs. The 1996 Clarification purports to apply some or all of the Three-Part Test to interscholastic athletics, thereby purporting to amend the 1979 Three-Part Test.

155.    Contemporaneously from the 1979 Policy interpretation through the 1996 Clarification, the third prong of the Three-Part Test directed schools to assess whether they

accommodated the underrepresented gender's interest *to the same extent* as they accommodated the other gender's interest (*i.e.,* to fully accommodate the underrepresented gender meant to accommodate their interests to the same extent as the other gender, consistent with the Title IX regulations). The 1996 Clarification purports to amend the third prong of the Three-Part Test to refer only to whether the schools fully accommodate the interests of the underrepresented gender, with no regard for the extent to which they accommodated the interests of the other gender (*i.e.,* the term "fully" purportedly changed from a term relative to both genders to an absolute term relevant only to one gender).

156.   The Overall Determination of Compliance and §86.41(a) prohibit discrimination and §86.41(c)(1) requires accommodating both genders' interests equally. By authorizing gender-based discrimination and creating a safe harbor for the Three-Part Test's first prong in violation of the foregoing Title IX regulations and the Overall Determination of Compliance, the 1996 Clarification purports to amend the Title IX regulations and the Overall Determination of Compliance.

157.   The Overall Determination of Compliance and §86.41(a) prohibit discrimination and §86.41(c)(1) requires accommodating both genders' interests equally. By authorizing gender-based discrimination and creating a safe harbor for the Three-Part Test's second and third prongs in violation of the foregoing Title IX regulations and the Overall Determination of Compliance, the 2003 Further Clarification purports to amend the Title IX regulations and the Overall Determination of Compliance.

158.   Sections 1 and 7 of Article I of the Constitution vest legislative authority in the Congress and require bicameralism and presentment for the enactment of laws. The APA requires notice-and-comment rulemaking for substantive regulations, 5 U.S.C. §553, and such

47

regulations may only implement the authority that Congress has delegated to an agency. Such congressional delegations must provide an intelligible principle by which the agency can implement the authority delegated by Congress. If Title IX authorizes the federal defendants (without following the APA or Title IX's procedural requirements) to adopt a disparate-impact affirmative-action requirement to "effectuate" a statutory prohibition against intentional gender-based discrimination, then Title IX violates constitutional separation-of-powers and non-delegation doctrines. If Title IX authorizes the federal defendants to take such actions without those required procedures, the "other relief" requested by Paragraph 177.F includes a declaration that Title IX violates the constitutional separation-of-powers and non-delegation doctrines and an injunction against the enforcement of the Three-Part Test.

159.    With regard to athletic scholarships, the 1979 Policy Interpretation indicates that, when schools provide athletic scholarships, the total amount of scholarship aid by gender must be substantially proportional to the genders' participation rates in intercollegiate athletics. The federal defendants' July 23, 1998 "Dear Colleague" letter (which the federal defendants hold out as a binding, current federal position) indicates that a one-percent gap creates a "strong presumption" of noncompliance.

160.    With regard to athletic recruiting and support services, the 1979 Policy Interpretation acknowledges adding these factors to the regulatory list under the agency's regulatory authority to consider "other factors" beyond the regulatory list. 44 Fed. Reg. at 71,415.

161.    Although not the subject of this pleading, the foregoing two paragraphs establish and evidence for additional provisions of the federal defendants' Title IX regime the same conclusion that this pleading establishes for the Three-Part Test: the federal defendants have

changed the Title IX regime erratically and at will, without following procedural requirements of Title IX or the APA.

162.     For the foregoing reasons, the Three-Part Test, 1979 Policy Interpretation, 1996 Clarification, 2003 Further Clarification, and 2005 Additional Clarification are arbitrary, capricious, an abuse of discretion, not otherwise in accordance with the law, in excess of authority granted by law, *ultra vires,* and without observance of procedure required by law.

## COUNT III
## THREE-PART TEST, ITS VARIOUS "CLARIFICATIONS," AND DOE'S TITLE IX REGULATIONS ARE NOT IN EFFECT

163.     Plaintiff EIA incorporates paragraphs 1 through 162 and Paragraphs 168-176, as if fully set forth herein.

164.     Under 20 U.S.C. §1682 and Executive Order 12,250, no rule, regulation, or order of general applicability issued by a federal agency under Title IX takes effect until approved by either the President (before November 2, 1980) or the Attorney General (after November 2, 1980) and such approval is published in the *Federal Register.*

165.     Under 20 U.S.C. §3505(a), all HEW rules, regulations, and orders in effect on May 4, 1980, continue in effect at DOE until amended in accordance with applicable law. Under this provision, HEW's Title IX regulations (45 C.F.R. §86.1-.71) continued in effect for DOE.

166.     No President or Attorney General has approved the 1979 Policy Interpretation, DOE's implementing regulations (34 C.F.R. §106.1-.71), the 1996 Clarification, the 2003 Further Clarification, or the 2005 Additional Clarification pursuant to 20 U.S.C. §1682 and Executive Order 12,250.

167.     For the foregoing reasons, HEW's 1975 regulations remain in effect for DOE, and

the Three-Part Test, 1979 Policy Interpretation, 1996 Clarification, 2003 Further Clarification, and 2005 Additional Clarification have no force or effect and are arbitrary, capricious, an abuse of discretion, not otherwise in accordance with the law, in excess of authority granted by law, *ultra vires*, and without observance of procedure required by law.

## COUNT IV
## JMU ATHLETIC PROGRAM VIOLATES TITLE IX AND THE FOURTEENTH AMENDMENT AND IS SUBSTANTIVELY AND PROCEDURALLY UNLAWFUL

168.    Plaintiff EIA incorporates Paragraphs 1-167, as if fully set forth herein.

169.    By working in secret to eliminate ten athletic teams, the JMU defendants violated the open-meeting requirements of the Virginia Freedom of Information Act and violated the trust of the academic community that the JMU defendants serve.

170.    By formulating the plan to eliminate ten athletic teams without assessing and equally accommodating the interests and abilities of both genders as required by the Title IX regulations, the Virginia Human Rights Act, and the procedural due-process provisions of both the U.S. and Virginia Constitutions, the JMU defendants operated inconsistently with the laws of the Commonwealth and thus *ultra vires* their charter.

171.    By eliminating ten athletic teams for the express purpose of attaining enrollment proportionality in violation of Title IX's statutory and regulatory requirements, the Virginia Human Rights Act, and the substantive due-process and equal-protection provisions of both the U.S. and Virginia Constitutions, the JMU defendants operated inconsistently with the laws of the Commonwealth and thus *ultra vires* their charter.

172.    As to men's swimming and diving, track and field, cross country, and wrestling, the JMU defendants' cuts constitute unlawful gender discrimination under the foregoing

authorities. As to men's and women's archery and gymnastics, and women's fencing, the JMU defendants' cuts constitute arbitrary discrimination in violation of the substantive due-process protections of both the U.S. and Virginia Constitutions.

173.   From 2001 through the 2006-07 academic year, the JMU defendants engaged in intentional gender-based discrimination to limit the squad sizes of the men's gymnastics, swimming and diving, and wrestling teams, depriving male student athletes of opportunities because of their gender, without imposing like treatment on female athletes.

174.   In 2007-08 and subsequent years, after the unlawful demotion of the ten athletic teams, men became the underrepresented gender under the Three-Part Test by a margin large enough to have fielded men's cross country, thereby violating the Three-Part Test to the extent that it has any lawful effect (*i.e.,* JMU was not substantially proportional, did not have a history of expending programs for male athletes, and did not fully accommodate men's athletic interests). With no prong of the Three-Part Test to rely on, JMU has no regulatory safe-harbor defense against charges of intentional gender-based discrimination for the elimination of the ten teams on July 1, 2007.

175.   In 2007-08 and subsequent years, after the unlawful demotion of the ten athletic teams to save approximately $500,000 and achieve "participation proportionality" by eliminating primarily non-scholarship male athletes, JMU created a "scholarship proportionality" gap of over $1.3 million, thereby violating the federal defendants' scholarship-equity rules, to the extent that they have any lawful effect. By failing to comply with those scholarship equity rules, JMU has no regulatory safe harbor to defend its claim that its 2007-08 array of teams would comply with the federal defendants' Title IX guidelines or to defend against charges of intentional gender-based discrimination for the elimination of the ten teams on July 1, 2007

176.    For the foregoing reasons, the JMU defendants' elimination of ten athletic teams to attain enrollment proportionality have no force or effect and are in excess of authority granted by law, *ultra vires,* without observance of procedure required by law, and substantively in violation of Title IX's statutory and regulatory requirements, the Virginia Human Rights Act, and the substantive and procedural due-process and equal-protection provisions of both the U.S. and Virginia Constitutions.

### **PRAYER FOR RELIEF**

177.    Wherefore, EIA respectfully requests that this Court enter the following relief:

A.    Pursuant to 5 U.S.C. §706(2), 28 U.S.C. §§1331, 1343(a)(3)-(4), 1361, 1651(a), 2201-2202, to 42 U.S.C. §1988(a), to Fed. R. Civ. Proc. 57, and to the court's equitable powers, a Declaratory Judgment against the federal defendants providing that:

(i)    The Equal Protection Component of the Due Process Clause of the Fifth Amendment and Title IX authorize only rules that effectuate Title IX's prohibition of intentional discrimination and do not authorize rules that create a disparate-impact standard, affirmative-action mandate, or enrollment-based participation quota;

(ii)    The Equal Protection Component of the Due Process Clause of the Fifth Amendment and Title IX prohibit the federal defendants from requiring or authorizing schools to engage in gender-based cutting or capping solely to meet a disparate-impact standard, affirmative-action mandate, or enrollment-based participation quota;

(iii)    To the extent that schools may make gender-based decisions regarding athletic opportunities, Equal Protection Clause of the Fourteenth Amendment, the Equal

Protection Component of the Due Process Clause of the Fifth Amendment, Title IX, and §86.41(a) and §86.41(c)(1) of the Title IX regulations (and the parallel provisions of other agencies' regulations) require schools to use athletic interest and ability – not enrollment – as the relevant population;

(iv)   Under Equal Protection Clause of the Fourteenth Amendment, the Equal Protection Component of the Due Process Clause of the Fifth Amendment, Title IX, §86.41(a) and §86.41(c)(1) of the Title IX regulations, and the 1979 Policy Interpretation, the relevant unit of "athletic opportunity" is a spot on a team, not an athlete on a team;

(v)   Pursuant to 20 U.S.C. §1682, the 1979 Policy Interpretation, the 1996 Clarification, the 2003 Further Clarification, the 2005 Additional Clarification, and DOE's Title IX regulations (34 C.F.R. §106.1-.71) have no force or effect;

(vi)   The 1996, 2003, and 2005 clarifications' elevation of the Three-Part Test to a legal obligation and safe harbor purports to amend the substantive Title IX regulations in violation of the APA's rulemaking requirements, thus rendering those actions void *ab initio;*

(vii)   Defendants have a statutory obligation to terminate the federal funding of any institution that violates Title IX's prohibition against intentional, gender-based discrimination and the federal defendants' rules, regulations, and orders in effect pursuant to 20 U.S.C. §1682, if such schools do not agree voluntarily to cease the discriminatory conduct;

(viii)   Any school that has cut or capped a team to make athletic participation proportional to enrollment or to work toward achieving such proportionality

constitutes a school for which opportunity for that gender have been limited, within the meaning of 45 C.F.R. §86.41(b) and any other similar regulatory or statutory provision;

(ix)     That the federal defendants lack the authority under the Spending Clause to impose requirements over educational programs that do not directly receive federal funds;

(x)     That the JMU defendants violated Title IX and the Title IX regulations between the years 2001-06 by enforcing a discriminatory, gender-based quota against male gymnasts, swimmers and divers, and wrestlers;

(xi)     That the JMU defendants' elimination of ten athletic teams and demotion of those teams to club status violated the substantive anti-discrimination and equal-opportunity requirements of Title IX and the Title IX regulations; and.

(xii)     That the JMU defendants' elimination of ten athletic teams and demotion of those teams to club status violated the procedural requirements of the Title IX regulations by failing to assess and equally accommodate the interests and abilities of both genders.

B.     Pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4), 1651(a), 2201-2202, to 42 U.S.C. §§1983, 1988(a), to Va. Code §§8.01-194, to VA. CONST. art. 1, §11, to Fed. R. Civ. Proc. 57, and to the court's equitable powers, a Declaratory Judgment against the JMU defendants that:

(i)     The JMU defendants are bound by the same declaratory relief entered in Paragraph 177.A;

(ii)     That the Virginia Freedom of Information Act requires the JMU defendants to conduct their future discussions of athletics policies and plans in public session

unless an applicable exemption expressly applies; and

(iii)    That males are a gender for whom athletic opportunities have been limited within the meaning of 45 C.F.R. §86.41(b) at JMU.

C.    Pursuant to 5 U.S.C. §706(2), 28 U.S.C. §§1331, 1343(a)(3)-(4), 1361, 1651(a), 2202, to 42 U.S.C. §1988(a), to Fed. R. Civ. Proc. 65, and to the court's equitable powers, an Order against the federal defendants providing that

(i)    The Three-Part Test (as defined in Paragraphs 2 and 84) is vacated; and

(ii)    The 1996 Clarification, 2003 Further Clarification, and 2005 Additional Clarification are vacated;

(iii)    The federal defendants shall remove all guidance and other documents related to the Three-Part Test from their internet sites, current publications, and other forms or documents related to compliance with Title IX; and

(iv)    The federal defendants are permanently enjoined from amending the Title IX regulations except in accordance with this Court's declaratory relief in this action.

D.    Pursuant to 28 U.S.C. §§1331, 1343(a)(3)-(4), 1651(a), 2202, to 42 U.S.C. §§1983, 1988(a), to Va. Code §2.2-3901, to Va. Const. art. 1, §11, to Fed. R. Civ. Proc. 65, and to the court's equitable powers, an Order against the JMU defendants providing that

(i)    The JMU defendants' decision to eliminate ten athletic teams and its demotion of those teams to club status is vacated as *ultra vires* their authority, both substantively and procedurally;

(ii)    Until the Court enters the relief requested in Paragraph 177.D(i) and/or a final judgment that determines the standards applicable to Title IX compliance, the JMU defendants are preliminary enjoined from continuing the demoted status of

the ten athletic teams and ordered to maintain those teams at least at the levels of support (including funding, staffing, and any other benefits) provided prior to the announcement of those cuts on September 29, 2006;

(iii)   The JMU defendants' are enjoined from imposing gender-based limits on athletic participation rates on any athletic team and instead must allow coaches the discretion to rely on budgeted funds (supplemented by any monies that that coach or team raises) to determine the optimal size of each team;

(iv)   The JMU defendants are enjoined from conducting any discussions of athletics policies except in compliance with the open-meeting requirements of the Virginia Freedom of Information Act; and

(v)   The JMU defendants are enjoined from eliminating or limiting any athletic team until the JMU defendants first convene a campus-wide task force that includes faculty, coaches, students, trustees, and alumni, in addition to members of the JMU administration and then hear and publicly debate the task force's report and findings.

(vi)   The JMU defendants are ordered to pay to EIA both nominal damages and damages for out-of-pocket expenses suffered by EIA Members as the result of JMU's violations of Title IX and the Fourteenth Amendment that the affected EIA Members have assigned to EIA.

(vii)   In the alternative to reinstatement of the demoted teams, the JMU defendants are ordered to comply with the federal defendants' scholarship proportionality requirements (namely, scholarships by gender must be within one percent of athletic participation by gender), both prospectively and (with respect to past

years back to 2007-08) by making equalizing payments as damages to affected

student-athletes (which include EIA Members) sufficient to bring JMU's past

scholarship ratios within the required one-percent margin.

E.     Pursuant to 42 U.S.C. §1988(b) and any other applicable provision of federal and

Virginia law, award EIA its costs and reasonable attorneys fees from all defendants.

F.     Such other relief as may be just and proper.


Dated: April 20, 2009                          Respectfully submitted,

  /s/ Lawrence J. Joseph                          /s/ Douglas G. Schneebeck
_____                _____
Lawrence J. Joseph[*]                          Douglas G. Schneebeck (VSB No.: 25001)

Law Office of Lawrence J. Joseph               Modrall Sperling
1250 Connecticut Ave, NW, Suite 200            500 Fourth Street, NW Suite 700
Washington, DC 20036                           P.O. Box 2168 (87103-2168)
Tel: 202-669-5135                              Albuquerque, New Mexico 87102
Fax: 202-318-2254                              Tel: (505) 848-1869
                                               Fax: (505) 848-1882

                                               Thomas H. Miller (VSB No.: 25464)

                                               Frankl Miller & Webb, LLP
                                               1711 Grandin Road SW
                                               Roanoke, VA 24015
                                               Tel: (540) 527-3500
                                               Fax: (540) 527-3520

                                               *Counsel for Plaintiff Equity in Athletics, Inc.*
                                               (* admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of April 2009, I electronically filed the foregoing "Second Amended Complaint," and the exhibits thereto, with the Clerk of the Court using the CM/ECF system, which I understand to have caused service of Susan K. Ullman on behalf of the federal defendants and service of John F. Knight and William E. Thro on behalf of the University defendants. In addition, I understand that Messrs. Knight and Thro will provide notice to their co-counsel within Virginia's Office of the Attorney General.

/s/ Lawrence J. Joseph
_____
Lawrence J. Joseph