CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 3 0 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

EQUITY IN ATHLETICS, INC.,           )
                                     )
        Plaintiff,                   )       Civil Action No. 5:07CV00028
                                     )
v.                                   )       **MEMORANDUM OPINION**
                                     )
DEPARTMENT OF EDUCATION, et al.,     )       By: Hon. Glen E. Conrad
                                     )       United States District Judge
        Defendants.                  )

The plaintiff, Equity in Athletics, Inc. (EIA), is a not-for-profit nonstock corporation,

whose members include student-athletes, coaches, fans, booster clubs, parents, and alumni

affiliated with several Virginia colleges and universities, including James Madison University

(JMU). In this action for declaratory and injunctive relief, EIA challenges interpretive guidelines

implementing Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681-

1688, on the grounds that they violate Title IX, the Constitution of the United States, and the

Administrative Procedure Act. EIA further claims that JMU violated Title IX, the Constitution

of the United States, and Virginia law by eliminating ten of its varsity athletic teams in 2007.

The case is presently before the court on motions to dismiss filed by the defendants, as well as a

motion for summary judgment filed by EIA. For the reasons that follow, the defendants' motions

will be granted and EIA's motion will be dismissed as moot.

**Statutory and Regulatory Background**

**I.      Title IX**

"Title IX was Congress's response to significant concerns about discrimination against

women in education." Neal v. Bd. of Tr. of the Cal. State Univ., 198 F.3d 763, 766 (9th Cir.

1999). Enacted in 1972, Title IX provides that "[n]o person in the United States shall, on the

basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Section 1682 of Title 20 authorizes and directs each federal agency empowered to extend federal financial assistance to an educational program to promulgate "rules, regulations, or orders of general applicability," for approval by the President, which ensure the program's compliance with Title IX's anti-discrimination mandate. 20 U.S.C. § 1682. If an educational program that receives federal financial assistance fails to comply with a requirement adopted pursuant to § 1682, the remedy for such non-compliance can include termination of or refusal to grant or continue federal financial assistance to that program. Id.

"After Title IX was passed, there were efforts to limit the effect of the statute on athletic[] programs." McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 287 (2d Cir. 2004). In 1974, Senator John Tower proposed an amendment that would have exempted revenue-producing intercollegiate sports from Title IX's coverage. Id. (citing 120 Cong. Rec. 15,322-15,323 (1974)). That amendment, however, was not enacted. Id. Instead, "[l]ater that year, Congress enacted a provision known as the Javits Amendment, which specifically instructed the Secretary of Health, Education, and Welfare ("HEW") to 'prepare and publish . . . proposed regulations implementing the provisions of Title IX . . . which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.'" Id. (quoting Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974)).

## II.    HEW's 1975 Regulations

On June 20, 1974, in accordance with Congress's directive, HEW published proposed

regulations implementing Title IX, which contained provisions addressing Title IX's application

to athletic programs.  39 Fed. Reg. 22,227, 22,236 (June 20, 1974).  After considering over 9,700

comments, suggestions, and objections, HEW published final regulations implementing Title IX

on June 4, 1975.  The final regulations were approved by President Gerald Ford, as required by

20 U.S.C. § 1682, and they became effective on July 21, 1975, "after Congress declined to

disapprove them."  McCormick, 370 F.3d at 287 (citing 40 Fed. Reg. 24,128, 24,137) (June 4,

1975)).

The regulations prohibit sex-based discrimination in any interscholastic, intercollegiate,

club, or intramural athletic program offered by a recipient of federal funds.  45 C.F.R. § 86.41(a).

While the regulations explicitly authorize recipients to "operate or sponsor separate teams for

members of each sex where selection for such teams is based upon competitive skill or the

activity involved is a contact sport," 45 C.F.R. § 86.41(b), the regulations require recipients to

"provide equal athletic opportunity for members of both sexes," 45 C.F.R. § 86.41(c).  The equal

opportunity determination includes, among other factors, consideration of "whether the selection

of sports and levels of competition effectively accommodate the interests and abilities of both

sexes."  Id.

## III.    The 1979 Policy Interpretation

On December 11, 1978, HEW published a Proposed Policy Interpretation for public

comment.  43 Fed. Reg. 58,070, 58,071 (Dec. 11, 1978).  At that time, HEW had received nearly

100 complaints against more than 50 colleges.  Id.  HEW intended for the Policy Interpretation to

"provide a framework within which those complaints [could] be resolved, and to provide institutions of higher education with additional guidance on the requirements of the law relating to intercollegiate athletic programs." Id.

Following the publication of the Proposed Policy Interpretation, HEW received over 700 comments and visited eight universities "to see how the proposed policy and other suggested alternatives would apply in actual practice at individual campuses." 44 Fed. Reg. 71,413 (Dec. 11, 1979). HEW subsequently published a Final Policy Interpretation on December 11, 1979. Id. The general purposes of the Policy Interpretation included "clarify[ing] the meaning of 'equal opportunity' in intercollegiate athletics . . . [and] provid[ing] guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory." Id. at 71,414. Of particular importance in this case, the Policy Interpretation contains the following guidance with respect to the regulatory requirement that educational institutions "effectively accommodate the interests and abilities of members of both sexes":

> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.
>
> a.    Compliance will be assessed in any one of the following ways:
>
> (1)    Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2)    Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is

4

demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3)     Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

Id. at 71,418. This portion of the 1979 Policy Interpretation, which is at issue in the instant case, has come to be known as the "Three-Part Test."

## IV.    The Department of Education Organization Act

In 1979, Congress divided HEW into the Department of Health and Human Services and the Department of Education (DOE). See Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 669 (1979) (codified at 20 U.S.C. §§ 3401-3510). "HEW's functions under Title IX were transferred . . . to the Department of Education," N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 517 n.4 (1982) (citing 20 U.S.C. § 3441(a)(3)), and the regulations implementing Title IX were recodified without substantive change at 34 C.F.R. Part 106. See McCormick, 370 F.3d at 287 ("All education functions were transferred to [the DOE], and thus we treat [the DOE] as the administrative agency charged with administering Title IX.").

## V.    The Civil Rights Restoration Act of 1987

In 1984, Title IX was construed by the United States Supreme Court in Grove City College v. Bell, 465 U.S. 555 (1984), as being "program-specific," meaning that only the particular program that received federal financial assistance could be regulated under Title IX, as opposed to the entire institution. Grove City College, 465 U.S. at 573-575. In response to the Supreme Court's decision, Congress passed the Civil Rights Restoration Act of 1987, Pub. L.

No. 100-259, 102 Stat. 28 (1988) (codified as amended at 20 U.S.C. § 1687), which reestablished institution-wide coverage under Title IX. The Act expressly provides that an educational institution as a whole must comply with Title IX's requirements if any part of the institution receives federal funds. 20 U.S.C. § 1687. Thus, the Act "mak[es] it crystal clear that Title IX applies to athletic programs operated by any school receiving federal funding for any of its educational programs and activities, and not just to those athletic programs which directly receive[] federal dollars." Nat'l Wrestling Coaches Ass'n v. United States Dep't of Educ., 263 F. Supp. 2d 82, 94 (D. D.C. 2003).

**VI.   Policy Clarifications**

On September 20, 1995, in response to questions regarding the regulations implementing Title IX and the 1979 Policy Interpretation, the DOE released a letter from Norma V. Cantu, the DOE's Assistant Secretary for Civil Rights. The "Dear Colleague" letter enclosed a Draft Clarification of portions of HEW's 1979 Policy Interpretation and asked for comments as to whether the clarification "provides the appropriate clarity in areas that have generated questions." (Fed. Defendants' Ex. 1). The letter was circulated to over 4,500 interested parties. In addition, the DOE published a Notice in the Federal Register announcing the availability of the Draft Clarification. 60 Fed. Reg. 51,460 (Oct. 2, 1995). After reviewing over 200 public comments, the DOE issued a final version of the Clarification on January 16, 1996. (Fed. Defendants' Ex. 2).

The letters transmitting both the draft and final versions of the Clarification emphasized that the DOE was not revisiting the Three-Part Test, but was instead providing additional clarification on it. The Clarification provides specific factors that guide an analysis of each part

6

of the Three-Part Test, as well as examples to demonstrate how these factors will be considered. The Clarification confirms that institutions need only comply with one part of the Three-Part Test in order to provide non-discriminatory participation opportunities for individuals of both sexes, and the letters accompanying both the draft and final versions of the Clarification emphasized that institutions are not required to cap or eliminate participation opportunities for men.

The DOE issued a Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance on July 11, 2003. (Fed. Defendants' Ex. 3). In the Further Clarification, the DOE emphasizes the flexibility of the Three-Part Test, and clarifies that nothing in Title IX or the Three-Part Test requires the cutting or reducing of men's teams or the use of quotas.

On March 17, 2005 the DOE issued an Additional Clarification to explain some of the factors it considers when investigating a recipient's program in order to make a determination under the third prong of the Three-Part Test. (Fed. Defendants' Ex. 4). In the Additional Clarification, the DOE reiterates that each part of the test provides an equally sufficient and separate method of complying with Title IX.

### Factual Background and Procedural History

JMU is a state-sponsored university that receives federal funding. In an effort to bring its varsity athletic program into compliance with Title IX, JMU's Board of Visitors voted on September 29, 2006 to eliminate seven men's sports (archery, cross country, gymnastics, indoor and outdoor track, swimming, and wrestling), and three women's sports (archery, fencing, and

gymnastics). The proposed cuts were based on the first prong of the Three-Part Test; they were designed to achieve proportionality between the gender makeup of JMU's athletic program and that of its undergraduate enrollment. In explaining its decision to eliminate the designated teams, JMU stated that "[t]he primary reason for the decision was to bring JMU into compliance with [Title IX]." (2d Am. Compl. Ex. 4). JMU emphasized that "[a]lternatives were proposed, considered, and analyzed to deal with the need to come into compliance with Title IX," and that "[a]ny solution that would require the addition of sports beyond the current 28 teams was deemed unacceptable." (2d Am. Compl. Ex. 4). Summing up its rationale, JMU stated that "[g]iven its commitment to not add sports and its desire to be in compliance with Title IX, the university was left with the need to comply with the proportionality prong." (2d Am. Compl. Ex. 4).

In a press release issued following the decision, JMU noted that, as of the 2006 fall semester, JMU's athletic program was 50.7% female and 49.3% male, while its undergraduate enrollment was 61% female and 39% male. The Board emphasized that once the Title IX compliance plan was fully implemented "total participation in athletics will move to 61 percent female and 39 percent male, in alignment with current student enrollment." (2d Am. Compl. Ex. 3). The press release further emphasized that the decision affected 144 student-athletes participating in the sports selected for elimination; that the school was "taking great care to preserve the financial guarantees already made to [its] student-athletes"; and that students on eliminated teams who were receiving scholarships would continue to receive the scholarships until they graduate. (2d Am. Compl. Ex. 3).

Athletes, coaches, and fans formed EIA to fight the proposed cuts. The organization filed the instant action against the DOE, the Secretary of Education, the Assistant Secretary for Civil Rights, and the United States (collectively "the federal defendants") on March 19, 2007. In its original complaint, EIA challenged the Title IX interpretive guidelines, specifically the Three-Part Test and the subsequent Clarifications, as violating the Constitution and the Administrative Procedure Act, and as permitting colleges to engage in the kind of gender-conscious decision making that Title IX was intended to prohibit. EIA sought declaratory and injunctive relief that would vacate the allegedly unlawful guidelines and require the DOE to issue new rules consistent with Title IX and the Constitution.

EIA subsequently requested JMU to defer implementing the proposed eliminations until EIA's challenge to the federal guidelines was complete. JMU declined, and EIA amended its complaint to include JMU and several JMU officials as defendants on June 1, 2007. EIA then filed a motion for preliminary injunction on June 15, 2007, seeking to prevent JMU from taking any additional steps to eliminate the targeted programs. The motion was ultimately denied by this court on August 21, 2007, see 504 F. Supp. 2d 88 (W.D. Va. 2007), and the court's decision was affirmed by the United States Court of Appeals for the Fourth Circuit on August 20, 2008, see 291 F. App'x 517 (4th Cir. Aug. 20, 2008). EIA's subsequent petition for writ of certiorari to the United States Supreme Court was unsuccessful. See 129 S. Ct. 1613 (2009).

On April 20, 2009, following remand to this court, EIA filed a second amended complaint. In the complaint, EIA emphasizes that it "brings this action to protect athletic opportunities and teams at Virginia educational institutions that receive federal financial assistance . . . from on-going gender-based discrimination and ultra vires interference by the

federal defendants under the color of implementing Title IX . . . and to preserve and/or to reinstate the ten athletic teams that [JMU] . . . scheduled for elimination in violation of . . . both federal and Virginia law." (2d Amend. Compl. at para. 1-2). EIA alleges that its members have "educational, professional, economic, participatory, aesthetic, and spectator interests" in athletics at the specified colleges and universities, and that the members' interests "have been harmed, continue to be harmed, and are threatened with further harm by the elimination of athletic opportunities and teams that result from schools' efforts to comply with the Three-Part Test." (2d Am. Compl. at para. 4). EIA further alleges that its members "include JMU student athletes from each of the ten teams that the JMU defendants demoted to club status on July 1, 2007." (2d Am. Compl. at para. 9).

Counts I through III of the second amended complaint challenge the legality of the Three-Part Test. Count I alleges that the Three-Part Test violates Title IX; the Equal Protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution; the associational protections of the First Amendment; and the Constitution's Spending Clause, U.S. Const. art. I § 8, cl.1. Count II claims that the Three-Part Test and the subsequent Clarifications unlawfully amended the Title IX regulations without the rulemaking required by the Administrative Procedure Act. Count III claims that the President or the Attorney General was required to approve the Three-Part Test and the subsequent clarifications, and that no such approval was obtained. Count IV claims that JMU's athletic cuts exceeded JMU's authority and were substantively and procedurally unlawful. EIA seeks a declaratory judgment against the federal defendants invalidating the Three-Part Test and the Clarifications, and an order vacating JMU's September 29, 2006 decision to eliminate the ten designated athletic teams.

The federal defendants and the JMU defendants moved to dismiss the second amended complaint. In response to the defendants' motions, EIA filed a motion for summary judgment. Both sides have advised the court that they do not wish to be heard on the motions. The motions are now fully briefed and ripe for review.

## Discussion

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court may dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557).

## I.     Count I

In Count I, EIA challenges the substantive validity of the Three-Part Test contained in the 1979 Policy Interpretation. Specifically, EIA alleges that the test violates Title IX, the Equal Protection Clause of the Fourteenth Amendment, the equal protection component of the Due

Process Clause of the Fifth Amendment, the First Amendment, and the Spending Clause, and

that the test is arbitrary and capricious and, thus, not entitled to deference. The court will address

each of these arguments in turn.

## A.     Title IX

As set forth above, under the Three-Part Test, the first benchmark used to assess whether

an educational institution is "effectively accommodat[ing] the interests and abilities of members

of both sexes," as required by 45 C.F.R. § 86.41(c) and 34 C.F.R. § 106.41(a), is "[w]hether

intercollegiate level participation opportunities for male and female students are provided in

numbers substantially proportionate to their respective enrollments." 44 Fed. Reg. 71,413,

71,418. EIA claims that the use of this criterion violates Title IX by effectively imposing an

"affirmative action requirement" that mandates preferential treatment for women. (2d Am.

Compl. at para. 137). EIA further contends that the Three-Part Test "require[s] and purport[s] to

authorize" universities "to engage in intentional gender discrimination [against men] – such as

gender-based cutting or capping – to achieve compliance with [its] affirmative-action

requirement." (2d Am. Compl. at para. 139-140). For the following reasons, however, the court

concludes that each of these arguments is without merit.

At the outset, the court notes that, contrary to EIA's assertions, neither the Three-Part

Test nor any other portion of the 1979 Policy Interpretation "requires" gender-based quotas or

statistical balancing. The DOE has repeatedly emphasized that the Three-Part Test "furnishes an

institution with three individual avenues to choose from when determining how it will provide

individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate

athletics," (1996 Clarification, Fed. Defendants' Ex. 2), and that "[i]f a school does not satisfy

the substantial proportionality prong, it would still satisfy the three-prong test if it maintains a history and continuing practice of program expansion for the underrepresented sex, or if the interests and abilities of the members of the underrepresented sex have been fully and effectively accommodated by the present program" (2003 Clarification, Fed. Defendants' Ex. 3); see also Kelley v. Bd. of Tr., Univ. of Ill., 35 F.3d 265, 271 (7th Cir. 1994) ("[T]he policy interpretation does not, as plaintiffs suggest, mandate statistical balancing. Rather the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance."). Along the same lines, the Three-Part Test does not require universities to eliminate or cap men's athletic programs. As the DOE emphasized when issuing its 1996 Clarification:

> An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test. However, nothing in the Clarification requires that an institution cap or eliminate participation opportunities for men. In fact, cutting or capping men's teams will not help an institution comply with part two or part three of the test because these tests measure an institution's positive, ongoing response to the interests and abilities of the underrepresented sex. Ultimately, Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

(1996 Clarification, Fed. Defendants' Ex. 2).

To the extent that the first prong of the Three-Part Test authorizes (rather than requires) universities to engage in gender balancing, the test is nonetheless consistent with Title IX. Although Title IX states that it should not be interpreted to "require" proportionality between the total number or percentage of persons of a particular gender who participate in an activity or program and the total number or percentage of persons of such gender in the community as a whole, see 20 U.S.C. § 1681(b), "the statute does not forbid [proportionality] either," Chalenor

v. Univ. of N.D., 291 F.3d 1042, 1047 (8th Cir. 2003). Indeed, the statute expressly permits consideration of the existence of a gender imbalance in the course of enforcement proceedings. As the statute goes on to state:

> [T]his subsection shall not be construed to prevent the consideration in any hearing or proceeding under this title of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b).

Based on the plain language of the statute, courts have uniformly held that Title IX "does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies." Neal, 198 F.3d at 771; see also Cohen v. Brown Univ., 101 F.3d 155, 171 n.11 (1st Cir. 1996) (noting that while Title IX does not mandate gender-based preferential treatment, it does not ban "gender-conscious remedies"). In addition, "[e]very court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) or by decreasing athletic opportunities for the overrepresented gender." Neal, 198 F.3d at 770 (emphasis in original). As the United States Court of Appeals for the First Circuit emphasized in its first opinion in Cohen v. Brown University:

> Title IX does not require that a school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent.

Cohen, 991 F.2d 888, 898 n.15 (1st Cir. 1993); see also Roberts v. Colo. State Bd. of Agric., 998

F.2d 824, 830 (10th Cir. 1993) ("Financially strapped institutions may still comply with Title IX

by cutting athletic programs such that men's and women's athletic participation rates become

substantially proportionate to their representation in the undergraduate population."); Kelley, 35

F.3d at 272 ("[D]espite plaintiffs' assertions to the contrary, neither the regulation nor the policy

interpretation run afoul of the dictates of Title IX.").

While none of the foregoing decisions bind this court, their reasoning is sound, and the

court has been unable to find, and EIA has failed to point to, any case that has held to the

contrary. Accordingly, the court agrees with the federal defendants that the Three-Part Test does

not violate Title IX, and that the proportionality prong is a permissible means of complying with

the statute's ban on gender discrimination.

### B.     Equal Protection

Consistent with decisions from appellate courts across the country, the court also

concludes that EIA's equal protection challenge is without merit. Indeed, every appellate court

that has considered the constitutionality of the proportionality prong of the Three-Part Test has

held that it does not offend constitutional principles of equal protection. As the Seventh Circuit

explained in Kelley, supra:

> To the extent that plaintiffs' argument is that Title IX and the applicable
> regulation . . . are unconstitutional, it is without merit. While the effect of
> Title IX and the relevant regulation and policy interpretation is that
> institutions will sometimes consider gender when decreasing their athletic
> offerings, this limited consideration of sex does not violate the
> Constitution. Congress has broad powers under the Due Process Clause of
> the Fifth Amendment to remedy past discrimination. Metro Broadcasting,
> Inc. v. Federal Communications Comm'n, 497 U.S. 547, 565-566 (1990).
> Even absent a specific finding that discrimination has occurred, remedial
> measures mandated by Congress are "constitutionally permissible to the

extent that they serve important governmental objectives . . . and are substantially related to achievement of those ends." Id. at 565; see also Mississippi University for Women v. Hogan, 458 U.S. 718 (1982). There is no doubt but that removing the legacy of sexual discrimination – including discrimination in the provision of extra-curricular offerings such as athletics – from our nation's educational institutions is an important governmental objective. We do not understand plaintiffs to argue otherwise.

Plaintiffs' complaint appears, instead, to be that the remedial measures required by Title IX and the applicable regulation and policy interpretation are not substantially related to their purported goal. Plaintiffs contend that the applicable rules allow "the University to . . . improve[] its statistics without adding any opportunities for women . . ." (Br. 23), an outcome they suggest is unconstitutional. But to survive constitutional scrutiny, Title IX need not require -- as plaintiffs would have us believe -- that the opportunities for the underrepresented group be continually expanded. Title IX's stated objective is not to ensure that the athletic opportunities available to women increase. Rather its avowed purpose is to prohibit educational institutions from discriminating on the basis of sex. And the remedial scheme established by Title IX and the applicable regulation and policy interpretation are clearly substantially related to this end. Allowing a school to consider gender when determining which athletic programs to terminate ensures that in instances where overall athletic opportunities decrease, the actual opportunities available to the underrepresented gender do not. And since the remedial scheme here at issue directly protects the interests of the disproportionately burdened gender, it passes constitutional muster. Mississippi University for Women, 458 U.S. at 728 ("[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

Kelley, 35 F.3d at 271-273; see also Cohen, 991 F.2d at 900-901 (rejecting Brown University's

equal protection challenge to the Three-Part Test); Neal, 198 F.3d at 772 (adopting the reasoning

of Cohen and Kelley, and "hold[ing] that the constitutional analysis contained therein

persuasively disposes of any serious constitutional concerns" that might be raised with respect to

the Policy Interpretation); Boulahanis v. Bd. of Regents, 198 F.3d 633, 639 (7th Cir. 1999)

("[W]e repeat our holding in Kelley that while the effect of Title IX and the relevant regulation

16

and policy interpretation is that institutions will sometimes consider gender when decreasing their athletic offerings, this limited consideration of sex does not violate the Constitution.") (internal citation and quotation marks omitted).

In an attempt to persuade the court to decline to follow the foregoing cases, EIA continues to maintain, as it did when it was previously before the court, that the Supreme Court's decision in Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701 (June 28, 2007) is controlling intervening authority that compels the conclusion that gender balancing, such as that provided by the first prong of the Three-Part Test, violates the Constitution's guarantee of equal protection. However, the court remains convinced that EIA's reliance on Parents Involved is misplaced. As the court emphasized in its previous opinion on EIA's motion for preliminary injunction, Parents Involved centered on racial classifications and the higher degree of scrutiny to which such classifications are subject. None of the justices' opinions discussed gender classifications. Such classifications are not only subject to a somewhat lesser standard of scrutiny,[1] but are simply different from racial classifications, particularly in the realm of athletics. As courts have recognized, "Title IX as it applies to athletics is distinct from other anti-discrimination regimes in that it is impossible to determine compliance or to devise a remedy without counting and comparing opportunities with gender explicitly in mind." Cohen, 101 F.3d at 184. Moreover, unlike most educational settings, "athletic teams are gender segregated, and universities must decide beforehand how many athletic opportunities they will

---

[1] Whereas racial classifications are subject to a strict scrutiny analysis, gender classifications are subject to a less demanding intermediate scrutiny analysis. See Adkins v. Rumsfeld, 464 F.3d 456, 468 (4th Cir. 2006) ("A statute that explicitly classifies people based on sex is subject to intermediate scrutiny, which means 'it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'") (quoting Nguyen v. INS, 533 U.S. 53, 60 (2001)).

allocate to each sex." Neal, 198 F.3d at 773 n.8. Consequently, "athletics require a gender conscious allocation of opportunities in the first instance," and "[t]he paradigm that has motivated the Supreme Court's more recent [racial] reverse-discrimination jurisprudence simply does not fit the case at bar." Id.

In sum, the court agrees with the First, Seventh, and Ninth Circuits that while the effect of Title IX, the regulation, and the Policy Interpretation is that educational institutions will sometimes consider gender when decreasing their athletic programs, such "limited consideration of sex does not violate the Constitution." Kelley, 35 F.3d at 272. Accordingly, EIA's equal protection claim must be dismissed.

### C.   First Amendment

In its second amended complaint, EIA asserts a new claim under the First Amendment to the United States Constitution. Specifically, EIA alleges that using the Three-Part Test to justfy severing "reciprocal sports" teams, such as men's and women's swimming and track, violates the associational protections of the First Amendment. (2d Am. Compl. at para. 144). In its response to the defendants' motions to dismiss, however, EIA provides no authority to support the proposition that members of "reciprocal" sports teams are entitled to First Amendment protection, and the court is convinced, from its own review of existing case law, that such claim is without merit.

To start, the court notes that there is no "generalized right of 'social association.'" City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989). Instead, the First Amendment only protects two distinct forms of association: (1) "intimate" association and (2) "expressive" association. Roberts v. United States Jaycees, 468 U.S. 609, 616-620 (1984). As the Supreme Court

explained in Roberts, intimate association refers to "certain kinds of highly personal relationships," Id. at 618, such as "those that attend the creation and sustenance of a family – marriage; childbirth; the raising and education of children; and cohabitation with one's relatives," Id. at 619 (internal citations omitted). Expressive association, on the other hand, pertains to the "right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for redress of grievances, and the exercise of religion." Id. at 618.

In the instant case, EIA's second amended complaint includes no allegations which would suggest that the relationships between members of the men's and women's swimming, track, and cross country teams implicate the right to intimate association. The second amended complaint merely alleges that the members of reciprocal teams compete together and "help to train each other." (2d Am. Compl. at para. 144). In any event, the court concludes that "[t]he relationship enjoyed by [athletic] team members is [simply] not the type of intimate relationship protected by the freedom of private association." Burrows v. Ohio High Sch. Athletic Ass'n, 712 F. Supp. 620, 626 (S.D. Ohio 1988); see also Schul v. Sherard, 102 F. Supp. 2d 877, 888 (S.D. Ohio 2000) (holding that a high school track coach's relationship with the members of his track team did not implicate a right to intimate association); Gruenke v. Seip, 225 F.3d 290, 308 (3d Cir. 2000) (holding that a defendant's alleged interference with a high school student's interaction with other swimmers "clearly [did] not amount to a violation of a protected right").

EIA's second amended complaint also fails to allege any facts which would indicate that the members of reciprocal teams engage in the type of expressive activity that gives rise to the second form of associational rights. As indicated above, "a constitutionally protected right to

19

associate for expressive purposes exists if the activity for which persons are associating is itself protected by the First Amendment," <u>Willis v. Town of Marshall</u>, 426 F.3d 251, 259 (4th Cir. 2005), and courts "have generally been unwilling to extend First Amendment protection to sports or athletics," <u>Maloney v. Cuomo</u>, 470 F. Supp. 2d 205, 213 (E.D. N.Y. 2007) (citing cases); <u>see also</u> <u>Burrows</u>, 712 F. Supp. at 626 ("Members of youth soccer teams have not associated for expressive purposes, but to improve athletic skills. They are playing a game, not promoting an ideal. As this type of association is not related to an individual's freedom to speak, to worship, . . . or to petition the government for the redress of grievances, this is not the type of expressive association protected by the First Amendment."); <u>Graham v. Tenn. Secondary Sch. Ath. Ass'n</u>, 1995 U.S. Dist. LEXIS 3211, at *20 (E.D. Tenn. Feb. 20, 1995) ("Participation by students in school athletic activities is recreational in nature and qualifies neither as a form of 'intimate association' nor as a form of 'expressive association.'"). For these reasons, the court concludes that EIA has failed to state a claim under the First Amendment.

**D.     Spending Clause**

EIA's second amended complaint also includes a new claim under the Spending Clause of the United States Constitution. Specifically, EIA alleges that the Spending Clause "does not authorize the federal defendants to impose coercive conditions generally, and a fortiorari does not authorize the federal defendants to impose conditions on programs (such as athletics) that do not directly receive federal funds." (2d Am. Compl. at para. 146). For the following reasons, both allegations are without merit.

Title IX was enacted under Congress's spending power, which permits Congress to "provide for the . . . general Welfare of the United States," U.S. Const. art. 1, § 8, cl. 1, and to

attach conditions on the funds it provides. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274,

286-287 (1998). "Such Spending Clause legislation is 'much in the nature of a contract: in return

for federal funds, the [recipients] agree to comply with federally imposed conditions.'"

Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 490 (4th Cir. 2005)

(quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002)). While the Supreme Court has

"recognized that in some circumstances the financial inducement offered by Congress might be

so coercive as to pass the point at which pressure turns into compulsion," South Dakota v. Dole,

483 U.S. 203, 211 (1987), EIA has not set forth any persuasive basis upon which the court could

conclude that the instant statutory or regulatory provisions are unduly coercive. Indeed, as the

federal defendants emphasize in their memoranda, Title IX permits the termination of federal

funding for a recipient that has violated Title IX only after an opportunity for a hearing and a

determination that compliance with Title IX cannot be secured by voluntary means. See 20

U.S.C. § 1682. Moreover, the statute authorizes agencies to impose upon a non-compliant

institution a penalty less drastic than the withholding of federal funding, provided that the

requisite procedural protections are afforded. Id. In light of such provisions, the court concludes

that EIA's coercion claim is without merit. See, e.g., West Virginia v. United States Dep't of

Health & Human Serv., 289 F.3d 281, 292-294 (4th Cir. 2002) (rejecting West Virginia's claim

that it was unduly coerced by the mere possibility that it could lose all of its federal funding if it

did not comply with certain amendments to the federal Medicaid program, and emphasizing that

the Secretary of Health and Human Services was authorized to impose less drastic penalties).

The court is also unpersuaded by EIA's claim that the federal defendants are not

authorized "to impose conditions on programs (such as athletics) that do not directly receive

federal funds." (2d Am. Compl. at para. 146). As previously stated, the Civil Rights Restoration Act of 1987 reestablished institution-wide coverage of Title IX, and was enacted specifically to ensure that even those programs that do not directly receive federal funding are subject to the statute's anti-discrimination provisions. See 20 U.S.C. § 1687. In this regard, § 1687 is virtually identical to sections of the Rehabilitation Act, 29 U.S.C. § 794, and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000d-4a(1)(A), both of which have been upheld by the Fourth Circuit as valid Spending Clause legislation. See Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005) (Rehabilitation Act); Madison v. Virginia, 474 F.3d 118 (4th Cir. 2006) (RLUIPA). In light of the Fourth Circuit's decisions in Constantine and Madison, and in the absence of any basis upon which to believe that the same reasoning would not extend to § 1687, the court concludes that EIA has failed to state a cognizable claim under the Spending Clause.

### E. Deference

In its final claim under Count One, EIA asserts two related arguments: (1) that the 1979 Policy Interpretation is an unreasonable interpretation of 45 C.F.R. § 86.41(c); and (2) that equal opportunity under the regulation should instead be measured solely on the basis of whether each gender's athletic participation matches the gender's expressed interest. Stated differently, EIA contends that "the federal defendants must compare (and must require recipients of federal funds to compare) athletic opportunities to the students actually interested in participating in athletics, not to all enrolled students." (2d Am. Compl. at para. 138). For the following reasons, the court concludes that EIA's arguments in this regard are without merit, and that the Policy Interpretation is entitled to deference.

As previously explained, Congress explicitly delegated to HEW, the DOE's predecessor, the task of prescribing standards for athletic programs under Title IX. Neal, 198 F.3d at 770 (citing Pub. L. No. 93-380). In accordance with Congress' directive, HEW promulgated the applicable regulations in 1975 and, in turn, issued the 1979 Policy Interpretation. "It is well-settled that where, as here, Congress has expressly delegated to an agency the power to 'elucidate a specific provision of a statute by regulation,' the resulting regulations should be accorded 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" Cohen, 101 F.3d at 173 (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)). It is likewise well-established that "an agency's interpretation of its own regulation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" Shipbuilders Council of Am., Inc. v. United States Coast Guard, 578 F.3d 234, 242 (4th Cir. 2009) (quoting Auer v. Robbins, 519 U.S. 452, 461 (1997)).

As the federal defendants emphasize in their initial memorandum, every court that has confronted the issue has held that the 1979 Policy Interpretation constitutes a reasonable and considered interpretation of § 86.41, and thus, that it is entitled to deference. See, e.g., Cohen, 991 F.2d at 896-897 ("Because this document is a considered interpretation of the regulation, we cede it substantial deference."); Kelley, 35 F.3d at 271 ("Since the policy interpretation maps out a reasonable approach to measuring compliance with Title IX, this Court does not have the authority to condemn it."); Neal, 198 F.3d at 770 ("[I]t is clear that OCR's interpretation of Title IX's athletic provisions merits deference . . . ."); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002) ("Consistent with the precedent of this court and various other courts, we conclude that the Policy Interpretation is entitled to deference."); Chalenor, 291 F.3d

at 1046 ("We conclude, as did the Cohen court, that the policy interpretation constitutes a reasonable and considered interpretation of the regulation. Therefore controlling deference is due it.").

In addition, "[c]ourts have consistently rejected EIA's underlying claim that equal opportunity under § 86.41 should be tied to expressed interest rather than actual participation." Equity in Athletics, Inc., 291 F. App'x at 523. As the First Circuit explained in Cohen, supra, 101 F.3d 155 (1st Cir. 1996),

> To assert that Title IX permits institutions to provide fewer athletic participation opportunities for women than men, based upon the premise that women are less interested in sports than are men, is (among other things) to ignore the fact that Title IX was enacted in order to remedy discrimination that results from stereotyped notions of women's interests and abilities. Interest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience . . . . To allow a numbers-based lack of interest defense to become the instrument of further discrimination against the underrepresented gender would pervert the remedial purpose of Title IX.

Cohen, 101 F.3d at 178-180; see also Neal, 198 F.3d at 767 (emphasizing that the appellees' recommended interest-based test for Title IX compliance "would hinder, and quite possibly reverse, the steady increases in women's participation and interest in sports that have followed Title IX's enactment"); McCormick, 370 F.3d at 295-296 (rejecting the school districts' argument that "girls were simply not interested in winning," and emphasizing that "[i]nterest is often a function of experience and opportunity").

In response to the federal defendants' motion to dismiss, EIA asserts that the Policy Interpretation is not entitled to deference due to a variety of alleged procedural irregularities. For instance, EIA contends that the Policy Interpretation, which was issued by HEW, is not entitled

to deference, since "Congress did not transfer HEW's interpretive authority to DOE" upon DOE's creation. (Pl.'s Initial Br. at 35). This argument, however, is without merit. As the Supreme Court recognized in N. Haven Bd. of Education v. Bell, 456 U.S. 512, 516 n. 4 (1982), when Congress divided HEW into the Department of Health and Human Services and the DOE in 1979, "HEW's functions under Title IX were transferred . . . to the [DOE]." Bell, 456 U.S. at 516 n.4 (citing 20 U.S.C. § 3441(a)(3)). Thus, the DOE is "the administrative agency charged with administering Title IX." Cohen I, 991 F.2d at 896. Upon its creation, the DOE recodified the regulations implementing Title IX without substantive change, and has "as a practical matter . . . treated the relevant policy interpretation as its own." Cohen, 991 F.2d at 896; see also McCormick, 370 F.3d at 287 ("All education functions were transferred to [the DOE], and thus we treat [the DOE] as the administrative agency charged with administering Title IX.").

The court also rejects EIA's argument that HEW did not have the authority to promulgate the underlying regulations in the first place. Citing to the Javits Amendment, EIA argues that the amendment only authorized HEW to issue a "proposed" rule, rather than a final rule, and even then only a proposed rule with respect to "intercollegiate athletics." (Pl.'s Initial Br. at 36-37). EIA's argument in this regard, however, ignores the fundamental fact that Congress granted HEW the authority to publish regulations governing recipients' programs and activities, when it enacted 20 U.S.C. § 1682. The Javits Amendment did nothing to alter § 1682, and the court is convinced that the authority delegated to HEW under that statute was inherited by the Department of Education.

In sum, the court concludes that the 1979 Policy Interpretation constitutes a reasonable and considered interpretation of the applicable Title IX regulations, and that it is entitled to deference. Accordingly, for all of the foregoing reasons, Count I will be dismissed.

## II.     **Count II**

In Count II, EIA claims that the Three-Part Test is procedurally invalid because neither the 1979 Policy Interpretation nor the DOE's subsequent Clarifications underwent the notice and comment procedures prescribed by the Administrative Procedure Act (APA), 5 U.S.C. § 553. For the following reasons, the court concludes that this claim is also without merit.

The APA requires federal agencies to publish proposed rules in the Federal Register in order to afford the public notice and an opportunity to comment. 5 U.S.C. § 553. The only rules that are subject to the notice and comment requirement, however, are "legislative rules," which create new rights, impose new obligations, or effect a change in existing law. L.A. Closeout, Inc. v. Dep't of Homeland Security, 513 F.3d 940, 941 (9th Cir. 2008). "The notice and comment requirement of the APA does not apply to 'interpretive rules,'" Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1340 (4th Cir. 1995) (citing 5 U.S.C. § 553(b)), which "simply state what the administrative agency thinks a statute means." Id.; see also L.A. Closeout, Inc., 513 F.3d at 941 ("Interpretive rules are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.") (internal citation and quotation marks omitted).

In this case, the court agrees with the federal defendants that neither the 1979 Policy Interpretation nor the DOE's Clarifications were subject to the APA's notice and comment requirement. They did not create new rights, impose new obligations, or change the existing law. Instead, the 1979 Policy Interpretation "represent[ed] [HEW's] interpretation of the

26

intercollegiate athletic provisions of Title IX . . . and its implementing regulation," Fed. Reg. 71,413, and both the Policy Interpretation and the Clarifications were intended to provide "additional guidance on the requirements for compliance with Title IX . . . ," Id.; see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 940 (D.C. Cir. 2004) (emphasizing that the challenged policies "are interpretive guidelines that the Department was not obligated to issue in the first place"). Although EIA argues that the 1979 Policy Interpretation and the Clarifications amended the regulations that they interpret, the court disagrees. An interpretive guideline does not "become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. Cir. 1993). For these reasons, the court concludes that Count II must be dismissed.

### III.    Count III

In Count III, EIA claims that the Three-Part Test is not in effect because "[n]o President or Attorney General has approved the 1979 Policy Interpretation." (2d Am. Compl. at para. 166-167). The court agrees with the federal defendants that this claim is also without merit.

As previously explained, 20 U.S.C. § 1682 provides that any "rule, regulation, or order" issued by a federal agency to effectuate Title IX must be approved by the President in order to become effective, 20 U.S.C. § 1682, and consistent with this requirement, President Ford signed the Title IX regulations that were promulgated by HEW in 1975. Contrary to EIA's assertions, however, the statute does not require Presidential approval each and every time an agency issues interpretive guidelines. Equity's argument to this effect has been expressly rejected by other courts, and this court similarly concludes that the claim is without merit. See, e.g., Cohen v.

Brown Univ., 879 F. Supp. 185, 199 (D. R.I. 1995), rev'd in part on other grounds, 101 F.3d 155

(1st Cir. 1996) (holding that the 1979 Policy Interpretation "need not be approved by the

President in order to become effective," since the Policy Interpretation "is not a rule, regulation,

or order, but is a guideline designed to interpret a rule, regulation, or order, namely the agency's

own regulations . . . ."); Cmtys. For Equity v. Mich. High Sch. Athletic Ass'n, 2001 U.S. Dist.

LEXIS 5834, at *6 (W.D. Mich. May 2, 2001) ("[T]he Court finds no reason why the Policy

Interpretation must be signed by the President as it is only a guideline to interpret Title IX, and

not a rule, regulation, or order."). Accordingly, Count III is also subject to dismissal.

**IV.    Count IV**

In Count IV, EIA asserts claims against the JMU defendants. Specifically, EIA alleges:

(1)    that the JMU defendants violated the Virginia Freedom of Information Act by "working in secret to eliminate ten athletic teams";

(2)    that the JMU defendants "operated inconsistently with the laws of the Commonwealth" by "formulating [a] plan to eliminate ten athletic teams without assessing and equally accommodating the interests and abilities of both genders" and by "eliminating ten athletic teams for the express purpose of attaining enrollment proportionality";

(3)    that the JMU defendants engaged in unlawful gender discrimination in violation of the Equal Protection Clause by eliminating ten athletic teams to attain enrollment proportionality;

(4)    that the JMU defendants violated the substantive and procedural due process protections of the United States Constitution by eliminating the ten teams in order to comply with the Three-Part Test;

(5)    that the JMU defendants' elimination of the ten athletic teams resulted in men being the "underrepresented gender," and thus "violat[ed] the Three-Part Test to the extent that it has any lawful effect"; and

(6)     that the JMU defendants violated the federal defendants' "scholarship-equity" rules by creating a "scholarship proportionality gap" as a result of their efforts to achieve participation proportionality.

(2d Am. Compl. at para. 168-176). For the following reasons, the court concludes that each of these claims is without merit.

## A.     State Law

First, to the extent that EIA claims that the JMU defendants violated Virginia law when it undertook to eliminate the athletic teams, such claims are clearly barred by the Eleventh Amendment. The Eleventh Amendment provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[A]lthough the literal text of the Eleventh Amendment appears to restrict only Article III diversity jurisdiction, we have come to understand that the Amendment confirms principles of State sovereign immunity that are embedded in the constitutional structure and thus that it bars 'citizens from bringing suits in federal court against their own states.'" Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 291 (4th Cir. 2001) (quoting Litman v. George Mason Univ., 186 F.3d 544, 549 (4th Cir. 1999)). The protection afforded by the Eleventh Amendment also extends to "state agents and state instrumentalities." Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997).

A state's immunity to suit in federal court pursuant to the Eleventh Amendment is subject to several well-established exceptions:

Sovereign immunity does not, for example, prevent the United States itself from bringing suit against an unconsenting State to ensure compliance with federal law. See United States v. Texas, 143 U.S. 621, 644-45 (1892). Moreover, Congress may abrogate a State's immunity pursuant to its enforcement power under § 5 of the Fourteenth Amendment. See Seminole Tribe [v. Florida, 517 U.S. 44, 59 (1996)]. A State, of course, may waive its immunity by "consenting to be sued in federal court."[2] Litman, 186 F.3d at 550 (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 627 at 666, 675 (1999)); see also Idaho v. Coeur d' Alene Tribe, 521 U.S. 261, 267 (1997); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985). And, . . . the Eleventh Amendment does not preclude private individuals from bringing suit against State officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law. See Ex parte Young, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908); DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999) (citing Green v. Mansour, 474 U.S. 64, 68 (1985)).

Bragg, 248 F.3d at 291-292.

None of the established exceptions, however, permit private citizens to bring suit against state officials for injunctive or declaratory relief designed to remedy violations of state law. As the Supreme Court explained in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984),

> It is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Pennhurst, 465 U.S. at 106 (holding that the Ex parte Young exception to Eleventh Amendment immunity is "inapplicable in a suit against state officials on the basis of state law"); see also Antrican v. Odom, 290 F.3d 178, 187 (4th Cir. 2002) (noting that the Ex parte Young exception

---

[2] For instance, in Litman, supra, the Fourth Circuit held that Congress, in enacting 42 U.S.C. § 2000d-7, had "permissibly conditioned [George Mason University's] receipt of Title IX funds on an unambiguous waiver of GMU's Eleventh Amendment immunity; and "that, in accepting such funding, GMU [had] consented to litigate Litman's [Title IX] suit in federal court." Litman, 186 F.3d at 555.

"does not apply to actions against State officials seeking to compel their compliance with State law"). Based on the foregoing, the court concludes that EIA's state law claims against JMU are barred by the Eleventh Amendment.

**B.    Equal Protection**

EIA next alleges that JMU's gender-conscious decision to eliminate the men's swimming and diving, track and field, cross country, and wrestling teams violated the team members' right to equal protection under the Fourteenth Amendment. For the following reasons, the court remains convinced that this claim is without merit.

To state an equal protection claim, a plaintiff must plead sufficient facts to "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Williams v. Hansen, 326 F.3d 569, 576 (4th Cir. 2003) (emphasis added). In this case, while JMU used gender to select which athletic programs to eliminate, it is undisputed that the eliminations were made in an attempt to comply with the requirements of Title IX. For this reason, both the Seventh Circuit and the Eighth Circuit have rejected identical equal protection claims. As the Seventh Circuit explained in Kelley, supra:

> [T]he record makes clear that the University considered gender solely to ensure that its actions did not violate federal law. And insofar as the University actions were taken in an attempt to comply with the requirements of Title IX, plaintiff's attack on those actions is merely a collateral attack on the statute and regulations and is therefore impermissible.

Kelley, 35 F.3d at 272; see also Miami Univ. Wrestling Club, 302 F.3d at 614 ("In the case before us today, it is evident that Miami took the challenged actions in an attempt to comply with

the requirements of Title IX . . . . Only if Title IX, its regulations or the Policy Interpretation are unconstitutional . . . could we hold that Miami's compliance with the law and the regulations is unconstitutional."). For the reasons set forth in the foregoing cases, the court likewise concludes that EIA's equal protection claim against JMU is subject to dismissal.

### C. Due Process

EIA also claims that the JMU defendants violated the substantive and procedural due process rights of the student-athletes on the teams chosen for elimination. In order to state a due process claim, either substantive or procedural, a plaintiff must first allege sufficient facts to establish that the student-athletes "were deprived of life, liberty, or property, by governmental action." Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). Here, EIA's second amended complaint fails to identify any specific liberty or property interest of which the student-athletes were deprived by the university. Moreover, even assuming that the complaint could be construed to allege that the student-athletes had a protected property interest in participating on the teams for which they were recruited, the court concludes that such claim is without merit.

"It is well-settled that the Fourteenth Amendment itself does not create property interests." Tri-County Paving, Inc. v. Ashe County, 281 F.3d 430, 436 (4th Cir. 2002). Instead, such interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). Moreover, to have a property interest in a benefit, a person must have a "legitimate claim of entitlement to it." Id. A mere "unilateral expectation of it" or "abstract need or desire for it" is insufficient. Id.

Applying the foregoing principles, the court concludes that EIA has failed to state a claim upon which relief can be granted. EIA does not cite, and the court is unable to locate, any authority which would support the notion that a property interest in continued participation in intercollegiate athletics exists in Virginia,[3] and courts in other jurisdictions have repeatedly held that "participation in intercollegiate athletics is not a property right, but [instead] a privilege not protected by Constitutional due process safeguards," Brennan v. Bd. of Trustees for Univ. of La. Sys., 691 So.2d 324, 330 (La. Ct. App. 1997). See also Rutledge v. Ariz. Bd. of Regents, 660 F.2d 1345, 1352 (9th Cir. 1981) (holding that the appellant "enjoyed no right under the Constitution nor under the laws of Arizona to maintain his position" on the college football team); Colo. Seminary v. Nat'l Collegiate Athletic Ass'n, 570 F.2d 320, 321 (10th Cir. 1978) (affirming the district court's decision that "the interest of the student athletes in participating in intercollegiate sports was not constitutionally protected"); Gardner v. Wansart, 2006 U.S. Dist. LEXIS 69491, at *17 (S.D. N.Y. Sept. 26, 2006) (holding that the plaintiff's due process claim was without merit, since he was "not . . . entitled under state or other law to participate as a matter of right in college athletics"); Lesser v. Neosho Cmty. Coll., 741 F. Supp. 854, 861 (D. Kan. 1990) (emphasizing that "participation in intercollegiate athletics is a privilege and not a right"); Hysaw v. Washburn Univ., 690 F. Supp. 940, 944 (D. Kansas 1987) (rejecting the plaintiffs' claim that the defendants deprived them of their contractual rights under their scholarship agreements to play football at Washburn University, since "no deprivation of those funds took place" and "[p]laintiffs had no other protectable property interest"); Nat'l Collegiate

---

[3] The court notes that EIA's complaint focuses on the students' right to participate on the teams that were chosen for elimination. There is no claim that any students lost scholarship funding as a result of the teams' elimination. Indeed, the exhibits submitted with the second amended complaint indicate that student-athletes on eliminated teams would continue to receive scholarship funding.

<u>Athletic Assoc. v. Yeo</u>, 171 S.W.3d 863, 870 (Tex. 2005) (holding that the plaintiff's claimed interest in intercollegiate athletics was not entitled to due process protection).

Based on the foregoing case law, and in the absence of any Virginia authority to support the existence of a protected property interest, the court concludes that EIA's due process claims against the JMU defendants are without merit.

### D.    <u>Title IX</u>

#### 1.    <u>Participation Opportunities</u>

Relying on data that was submitted to the DOE for the 2007-2008 academic year, EIA alleges that men became the "underrepresented gender" by 2% as a result of the elimination of the men's athletic teams, and thus, that JMU ultimately "violat[ed] the Three-Part Test to the extent that it has any lawful effect." (2d Am. Compl. at para. 174). According to the data cited by EIA, which was submitted with its second amended complaint, men made up 39.1% of the undergraduate population during the 2007-2008 school year, but only 37.1% of the university's athletes.[4]

In moving to dismiss this claim, the JMU defendants initially take the position that the regulation on which the Three-Part Test is based "go[es] beyond the substantive requirements of the Title IX statute," and thus, that EIA has no private right of action to enforce the regulation. (JMU Defendants' Initial Br. at 9) (citing <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001)). However, for the reasons explained with respect to Counts II and III, <u>supra</u>, the court concludes that the regulation and the Policy Interpretation "implement but do not expand the scope of Title

---

[4] The record indicates that, as of the 2006 fall semester, prior to the elimination of the athletic teams, men made up 49.3% of the university's athletes, but only 39% of the university's student body. (2d Am. Compl. Ex. 3).

IX," and thus, that "there is no Sandoval issue here." Choike v. Slippery Rock Univ., 2006 U.S.

Dist. LEXIS 49886, at *33 (Jul. 21, 2006); see also Barrett v. W. Chester Univ., 2003 U.S. Dist.

LEXIS 21095, at *41 (E.D. Pa. Nov. 12, 2003) (holding that the members of the university's

former women's gymnastics team had a private cause of action under Title IX against the

university). Nonetheless, the court concludes, for the following reasons, that EIA has failed to

state a claim under Title IX.

An institution's compliance with Title IX under the first prong of the Three-Part Test

does not hinge on exact proportionality. Instead, an institution will be found to "effectively

accommodate the interests and abilities of members of both sexes," as required by the applicable

Title IX regulation, if "intercollegiate level participation opportunities for male and female

students are provided in numbers substantially proportionate" to the institution's undergraduate

enrollment. Rather than suggesting any particular ratio that constitutes "substantially

proportionate" for purposes of the first prong, the DOE has suggested that such determinations

should be made on a case-by-case basis.[5]

While the court has located several cases in which courts have found that certain

disparities were sufficiently large enough to establish non-compliance with the first prong of the

---

[5] Citing to the 1996 Clarification, EIA asserts in its initial memorandum that the sole "question," for purposes of determining substantial proportionality, is "whether the 'proportionality gap' is large enough to fit a viable team." EIA's assertion is without merit. The 1996 Clarification repeatedly emphasizes that the determination of compliance should be made on a "case-by-case" basis and that there are a variety of circumstances in which it would be unreasonable to expect a university to achieve exact proportionality. While it cites, as one such example, a situation in which the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, the document in no way mandates a finding of non-compliance if the number of opportunities that would be required would be sufficient. To the contrary, the Clarification identifies a number of variables that affect the determination of substantial proportionality, including natural fluctuations in enrollment and participation rates, the size of the student body, and the average size of the athletic teams offered for the underrepresented sex.

Three-Part Test,[6] EIA has not cited, and the court has been unable to locate, any authority to support the proposition that a disparity as low as 2% is substantially disproportionate as a matter of law. To the contrary, at least three courts have considered institutions to be in compliance with Title IX, where the gender disparity that existed during the time period following the elimination of particular athletic teams was similar to that alleged by EIA. See, e.g., Boulahanis, 198 F.3d at 639 (noting that it was undisputed that the university achieved substantial proportionality between men's enrollment and men's participation in athletics, where the number of male athletes was within three percentage points of enrollment following the elimination of men's soccer and wrestling); Miami Univ. Wrestling Club, 302 F.3d at 614 (emphasizing that the university took the challenged actions in an attempt to comply with Title IX and that the university "was successful in that attempt," since the number of female athletes was within two percentage points of the number of female students); Miller v. Univ. of Cincinnati, 2008 U.S. Dist. LEXIS 4339, at *20 (S.D. Ohio Jan. 22, 2008) (holding that the university was in compliance with Title IX during the 2005-2006 reporting period, where the student body was 52.5% male and 47.5% female, and the number of student athletes was 51.1% male and 48.9% female).

---

[6] See, e.g., Roberts, 998 F.2d at 829 (holding that a 10.5% disparity between female athletic participation and female undergraduate enrollment was not substantially proportionate); Ollier v. Sweetwater Union High School District, 604 F. Supp. 2d 1264 (S.D. Cal. 2009) (holding that the plaintiffs demonstrated, as a matter of law, that the defendants failed to provide female students with opportunities to participate in athletics in substantially proportionate numbers, where "for the relevant class-period years, the percentage difference between female enrollment and female participation in sports were 6.7%, 10.3% and 6.7%); Brust v. Regents, 2007 U.S. Dist. LEXIS 91303 (E.D. Cal. Dec. 12, 2007) (holding that the plaintiff stated a claim under Title IX, where the plaintiff alleged that the university had a continuing practice of providing its male students with greater athletic opportunities, and that during the 2005-2006 year, a 6% disparity existed between participation and enrollment); Choike, 2006 U.S. Dist. LEXIS 49886 (holding that the plaintiffs met their burden of proving that the university had "failed the substantial proportionality test" where the participation disparities ranged from 8.7% to 15% over a multi-year period).

Like the institutions in <u>Boulahanis</u> and <u>Miami Univ. Wrestling Club</u>, <u>supra</u>, it is undisputed that JMU eliminated the designated athletic programs in an attempt to comply with the Three-Part Test. To the extent that EIA's second amended complaint suggests that an institution that seeks to comply with the proportionality prong should be required to achieve exact proportionality immediately, the court disagrees. Such a requirement would not only be plainly unreasonable, but also contrary to the 1979 Policy Interpretation and its subsequent clarifications, which reflect the need for flexibility and recognize that natural fluctuations in enrollment and/or participation rates can impede an institution's attempts to attain substantial proportionality.

For these reasons, the court concludes that EIA has failed to state a claim upon which relief can be granted. Simply stated, the mere fact that men became the "underrepresented gender" by 2% as a result of JMU's initial efforts to comply with the Three Part Test is insufficient to state a plausible claim for relief under Title IX.

## 2. Female Athletic Scholarships

In its final claim, EIA asserts, for the first time during this protracted litigation, that the JMU defendants violated Title IX by "shortchang[ing] its female athletes by 11.94 percent or approximately $1,313,000 under the federal defendants' scholarship rules." (2d Am. Compl. at para. 135). For reasons that follow, the court agrees with the JMU defendants that EIA lacks standing to assert such claim.

EIA is an association that has pursued this action on behalf of its alleged members. The principles that govern associational standing are well-established. An association possesses standing to sue on behalf of its members when: "(1) its members would otherwise have standing

to sue in their own rights; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). Moreover, "standing is not dispensed in gross." Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996). Instead, "a plaintiff must demonstrate standing for each claim [it] seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

Applying these principles, it is clear from the second amended complaint that EIA lacks standing to challenge the amount of scholarship money that has been allotted to female students on athletic teams that continue to exist at JMU. EIA's sole purpose for bringing this action was to preserve and/or reinstate the athletic teams that were selected for elimination by the university. The second amended complaint alleges that its members include student-athletes from each of the ten teams that JMU demoted to club status on July 1, 2007, as well as other individuals associated with teams that have been, or may be, eliminated as a result of an institution's reliance on the Three-Part Test. There is absolutely no indication, however, that EIA's members include female athletes on JMU's existing teams or individuals who would otherwise have standing to challenge the current allotment of scholarships to female athletes.[7] Because the right to complain of one alleged administrative deficiency does not automatically confer the right to complain of all administrative deficiencies, EIA's final claim pertaining to scholarship proportionality must be dismissed. See Lewis, supra at n. 6; see also Blum v. Yaretsky, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that

---

[7] As previously noted, the record indicates that athletes on teams that were chosen for elimination would continue to receive any scholarships that had been awarded prior to the university's September 29, 2006 decision.

injury the necessary stake in litigating conduct of one kind, although similar, to which he has not been subject."); DaimlerChrysler Corp., 547 U.S. at 353 n.5 (noting that a litigant cannot "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him").

## Conclusion

For the reasons stated, the court concludes that EIA has failed to state a claim upon which relief can be granted.[8]  Accordingly, the defendants' motions to dismiss will be granted and the plaintiff's motion for summary judgment will be dismissed as moot.  The Clerk is directed to send certified copies of the memorandum opinion to all counsel of record.

ENTER: This 30th day of December, 2009.

_____
United States District Judge

_____

[8] Having reached this decision, the court need not address the additional arguments that the defendants have advanced in their motions to dismiss.